Robert W. Sadowski, Esq.
SADOWSKI FISCHER PLLC
39 Broadway, Suite 1540
New York, New York 10006
Tel. No.: (212) 913-9678
*Attorneys for Relator Orlando Lee*

Noah Kinigstein, Esq.
315 Broadway, Suite 200
New York, New York 10007
Tel. No.: (212) 285-9300
*Attorney for Relator Melville Luckie*

-and-

Petro Zinkovetsky, Esq.
432 Park Avenue South
10th Floor
New York, New York 10016
Tel. No.: (212) 729-4090
*Attorney for Relator Luz Gonzalez*
*Of counsel for the brief*

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA and
NEW YORK STATE *ex rel.* ORLANDO LEE,
MELVILLE LUCKIE and LUZ GONZALEZ,

          Plaintiffs/Relators,

- against -

NORTHERN ADULT DAILY HEALTH CARE
CENTER and GALENA DEVERMAN,

          Defendants.

Civ. No. CV 13-4933 (MKB)

**RELATORS' MEMORANDUM OF LAW IN SUPPORT OF RELATORS' MOTION FOR ALTERNATE REMEDY**

Orlando Lee ("Lee"), Melville Luckie ("Luckie"), and Luz Gonzalez ("Gonzalez")

(collectively "Relators"), by and through their counsel, Sadowski Fischer PLLC, Petro

Zinkovetsky, and Noah Kinigstein, pursuant to 31 U.S.C. § 3730(d), the Federal False Claims Act ("FCA"), and New York State Finance Law § 190(5)(c), the New York False Claims Act, (the "State FCA"), hereby moves this Court to award Relators a percentage of the $6.5 million restitution fee paid by Metropolitan Foundation for Health Care, Inc. and its subsidiary Northern Manor Multicare Center, Inc. in connection with its operation of Defendant Northern Manor Adult Day Health Care Program ("Northern" or "Defendant").[1]

Relators seek from New York State a relator's share of the civil settlement that the New York State Attorney General entered into with Defendant resolving a State FCA prosecution in which the State recovered over $6.5 million in damages based at least in part on information obtained from Relators' Complaint, disclosure statement, and the extensive interviews of the Relators. Although Relators have approached the State to resolve this dispute, the State has declined to pay Relators any relators' share of the State's recovery from Defendant.

### Preliminary Statement

Generally, if the government intervenes in a *qui tam* action, the relator is entitled to "at least 15% but not more than 25% of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d)(1). While the Government did not intervene in the Relators' action, the State settled the State FCA prosecution of the Defendant, received damages, and forced the Defendant to close down its operation. Here, rather than intervening in the Relators' action, the State, after collecting Relators' insider information (all three Relators were former employees of Defendant), pursued a separate action and negotiated a settlement with Defendant, and then denied the Relators their share. This is precisely what happened in *United States ex rel.*

---

[1] Relators' first brought this to the Court's attention during a pretrial conference on or around February 11, 2015.

*Bledsoe v. Community Health System,* 342 F.3d 634 (6th Cir. 2003). In *Bledsoe*, the Sixth Circuit held that the relator was entitled to his share of the proceeds because the settlement was an "alternate remedy" with respect to the claims in his valid *qui tam* case. *Id.* at 647. The Sixth Circuit held that "the government may not settle a relator's claims and seek to avoid paying a relator his or her statutory share to the settlement proceeds by excluding the relator's claims from the terms of the settlement agreement." *Id.* at 650.

## Factual Background

Here, the Relators' Complaint obviously overlaps with the State's investigation, resulting in a forced closing and recovery of damages from Northern. On or around September 3, 2013, Lee, Luckie, and Gonzalez filed under seal their Complaint against the captioned Defendants. Declaration of Robert W. Sadowski dated July 27, 2015 ("Sadowski Dec."), Ex. A (Complaint). In their Complaint, Relators' alleged Defendant had billed Medicaid for services that were not reimbursable. The State chose not to intervene.

On August 12, 2014, almost a full calendar year after Relators filed their *qui tam* against Defendant, the New York Attorney General's Medicaid Fraud Control Unit ("MFCU") announced a settlement agreement between the State and Defendant, whereby Defendant would pay $6.5 million for their engagement in Medicaid Fraud. Sadowski Dec., Ex. B (Press Release). Also in the announcement, four employees of Northern, one of whom is a captioned defendant in this action, were indicted for their role in the fraud. *Id.* In the Attorney General's press release, he reported that "[t]he arrests and civil settlement came after an investigation conducted by the Attorney General's Medicaid Fraud Control Unit ("MFCU") into the adequacy of adult day health (ADHC) services provided at the Brooklyn facility." *Id.*

3

In Relators' Complaint, Relators alleged multiple allegations of fraud and abuse that occurred at Northern including:

- Untrained and unqualified staff;
- No provision of physical or occupational therapy;
- Admitting ineligible healthy individuals into the program;
- Fraudulently accepting unqualified residents;
- Harassment, abuse, mistreatment, segregation and discrimination against minorities;
- Unhealthy meals with no provision for low sodium or diabetic meals;
- Allowing the consumption of alcohol;
- Allowing residents to wander the neighborhood and nearby park unescorted; and
- A host of indignities suffered by elderly minority residents.

*See generally* Sadowski Dec., Ex. A.

In its essence, Relators disclosed a scheme whereby Northern misappropriated Medicaid funds and inappropriately used those funds to run a Russian social club for individuals ineligible for Medicaid benefits. Sadowski Dec., Ex. D (Amended Complaint).

On June 26, 2014, unbeknown to Relators, MFCU and Northern entered into a Settlement Agreement involving Northern. According to the Settlement Agreement, MFCU conducted an investigation of Medicaid claims submitted by Northern during the time period of on or about July 1, 2010 through on or about June 30, 2011. Sadowski Dec., Ex. C (Non-Prosecution Agreement). As a result of the investigation, MFCU discovered that Northern knowingly submitted and caused to be submitted to Medicaid false and fraudulent claims for services rendered to registrants at Northern that did not comply with all applicable Medicaid rules and regulations. *Id.*

MFCU contended that: (1) Northern operated its program without a qualified social worker on staff to provide required socials services; (2) and on sixty-three days during the relevant time period, Northern admitted more registrants than it was certified to treat by the New York State Department of Health. *Id.* MFCU withheld $3.5 million in reimbursement claims

and Northern paid another $3.0 million in cash, whereby the State recovered $6.5 million in total from Northern. *Id.* The Settlement Agreement barred Northern from owning, operating, or having any financial interest in any adult day health care program in New York State, with the exception of its facility in Monsey, New York. *Id.* In addition, Northern was required to close its adult day health care program. *Id.*

On or around June 25, 2015, Relators filed their Amended Complaint. While this Complaint is factually the same, the Complaint was amended to satisfy the heightened requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Sadowski Dec., Ex. D (Amended Complaint).

<u>**Argument**</u>

<u>**POINT 1**</u>

**THE FALSE CLAIMS ACT'S ALTERNATE REMEDIES PROVISION PROTECTS RELATORS WHEN THE GOVERNMENT ELECTS AN ALTERNATIVE REMEDY.**

Relators are entitled to a relator's share of any proceeds of any government funds recovered under an "alternative remedy" to their *qui tam* actions under New York State Finance Law § 190(5)(c). *See also* 31 U.S.C. § 3730(c)(5) (federal provision for relator's share of an alternate remedy). In interpreting State False Claims Acts, courts routinely look to case law and history of the Federal False Claims Act.

The State FCA (NY FIN. LAW § 190(5)(c)) alternate remedy provision provides as follows:

> Notwithstanding any other provision of law, whether or not the attorney general or local government elects to supersede or intervene in a qui tam civil action, the attorney general and such local government may elect to pursue any remedy available with respect to the criminal or civil prosecution of the presentation of false claims, including any administrative proceeding to determine a civil money penalty or to refer the matter to the office of the medicaid inspector general for medicaid related matters. If any such alternative civil remedy is pursued in another proceeding, the person initiating the action

5

shall have the same rights in such proceeding as such person would have had if the action had continued under this section.

There appears to be no New York State Court authority interpreting Section 190(5)(c). However, when interpreting State False Claims Acts, courts look to precedent interpreting the analogous FCA, which itself contains a similar alternate remedy provision, which provides as follows:

> Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section. For purposes of the preceding sentence, a finding or conclusion is final if it has been finally determined on appeal to the appropriate court of the United States, if all time for filing such an appeal with respect to the finding or conclusion has expired, or if the finding or conclusion is not subject to judicial review.

31 U.S.C. §§ 3730(c)(5).

In the 1986 amendments to the FCA, Congress enacted the alternative remedies provision, which was designed to protect relators in the event the government chose to redress the fraud exposed by the relator in a remedy other than the *qui tam* action, such as a criminal prosecution, thus giving relators the same rights in alternative proceedings as they would have had if the action had continued under the FCA. *See United States ex rel. Dunleavy v. County of Del.*, 123 F.3d 734, 738-39 (3d Cir. 1997). This right of participation afforded to relators is especially important because any findings of fact or conclusions of law made in alternative proceedings are "conclusive on all parties" to the pending *qui tam* action. 31 U.S.C. § 3730(c)(5). Thus, relators have a right to a percentage of the recovery even when the government chooses to pursue its claim in any alternative proceedings.

6

The 1986 amendment alternate remedy provision was designed to "delineate[] the *qui tam* relator's right to a portion of recovery resulting from a successful false claims suit initiated by the relator." S. Rep. 99-345, at 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5292. The Senate Committee characterized this "definite amount" as "a 'finder's fee' which the person bringing the case should receive as of right." *Id.* at 5293. The 1986 amendments protect *qui tam* relators in other ways: It ensures that a relator will receive the same 15-25% share if "the Government . . . elect[s] to pursue its claim through any alternate remedy available . . ." 31 U.S.C. § 3730(c)(5).

Rep. Howard Berman, the House sponsor of the 1986 Amendments, made the 15% "guarantee" crystal clear:

> If the Government comes into the case, the person is guaranteed a minimum of 15% of the total recovery even if that person does nothing more than file the action in federal court. This is in the nature of a "finder's fee" and is provided to develop incentives for people to bring the information forward. The person need do no more than this to secure an entitlement to a minimum 15%.

132 Cong. Rec. H9382-03.

Courts have found that the statutory language allowing the United States to "pursue its claim through any alternate remedy," means that the statute "unambiguously places no restriction on the alternate remedies available to the United States." *United States v. Bisig,* 2005 U.S. Dist. LEXIS 38316, at *7,*9 (S.D. Ind. 2005)(internal citations omitted). The court in *Bisig* noted that Congress' purpose in amending the FCA "was to encourage more private enforcement suits" and that "only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds." *Id.* at *10 (internal citations omitted). As the *Bisig* court explained, the government can

> [s]tay a *qui tam* suit, prosecute the Defendant, and recover the Defendant's assets through criminal forfeiture without having to share that recovery with the relator, who was first to

7

> uncover the fraudulent activities and report them to the United States. The advantage that this interpretation would grant the United States is clear: it would not be forced to share its recovery with relators. As a result, the United States would carry the incentive in most cases to stay the *qui tam* action and seek recovery through the criminal prosecution and forfeiture proceedings.

*Id.* at *11. The court decided that the problem with this result was that it would:

> contradict the [FCA's] purpose. First, when dealing with a defendant who violates the [FCA], the United States will likely recover most, if not all, of the defendant's available assets through the criminal forfeiture proceeding. This results in the defendant becoming judgment-proof. And while the United States' interpretation would allow the relator to continue with the *qui tam* action against the defendant, there would be nothing left for the relator to recover from a judgment proof defendant. Consequently, this interpretation would have the effect of destroying Congress' unambiguous purpose that the Government and private citizens collaborate in battling fraudulent claims, and it would impede Congress' legislative intent to encourage more private citizens to file *qui tam* suits.

*Id.*

Further, Congress specifically states in the House Report of the 1986 Amendments to the FCA that a criminal prosecution is an alternate remedy contemplated by Section 3730(c)(5):

> The section further provides that, notwithstanding the filing of a *qui tam* action, the *Government may pursue its claim through alternate remedies available to it, such as a criminal prosecution* or an adjudication under the administrative remedy section of this Act. If the Government elects to pursue an alternate remedy, however, the rights of the relator shall be protected, and he shall have the same rights as in the civil action.

H.R. Rep. No. 99-660, at 24 (emphasis added).

The statement in the House Report that a criminal prosecution may be an alternative remedy is particularly important because the House Report refers to the language of Section 3730(c)(5) as ultimately enacted by Congress.

Accordingly, when the relator uncovers the fraud and brings it to the government's attention but the government decides to pursue or must pursue an alternate remedy, the relator should not lose his or her share of the recovery. Congress intended that, "[i]f the Government

8

elects to pursue an alternate remedy . . . the rights of the relator shall be protected, and he shall have the same rights as in the civil action." H.R. Rep. No. 99-660, at 24.

Here and as shown in detail in Point 2, Relators brought the frauds to the attention of the Government. While the *qui tam* Complaint was under seal, the Government brought civil and criminal prosecutions for Medicaid fraud against Northern, its Director, and three other employees based on the same acts alleged in the relator's civil complaint. The Defendant agreed to a settlement paying $6.5 million in restitution. Shockingly, the State refuses to acknowledge three insiders, who risked their jobs and livelihood, to come forward publically and expose the fraud. The State's treatment of these brave individuals is a shame and a travesty. This type of situation is the very reason the alternative remedy provision was enacted.

## POINT 2

**RELATORS EFFECTIVELY COMMUNICATED THEIR INSIDER INFORMATION TO TWO ASSISTANT ATTORNEY GENERALS AND SEVERAL STATE AGENTS WHO TOOK COPIOUS NOTES OVER INTERVIEWS LASTING SEVERAL HOURS.**

Relators filed their Complaint on or around September 3, 2013, and with their depth of insider information, provided multiple examples of the fraud witnessed at Northern. *See generally* Sadowski Dec., Ex. A. Relators' also acknowledged that Northern was under an obligation under 10 NYCRR § 425 to provide specific care to the registrants, but was currently failing to do so. *See id.* at 5-8.

As patient/registrant safety was the largest concern of the Relators, the Complaint focused on two main areas, untrained and unqualified staff and their handling of food and discriminatory practices. In regards to unqualified staff, Relators' provided examples of workers not wearing gloves, nets, or mouth covers, picking food up and eating it while dishing it out, and not providing diabetic or low sodium diets to registrants with diabetes. *See id.* at 12-13.

9

Examples of discriminatory practices are also described in detail, as Relators provided experiences of non-Russian individual former registrants and their horrendous ordeals. *Id.* at 13-24. Some of these stories included how African Americans, Latinos, and Chinese registrants were taunted, bullied, discriminated against, and put into life threatening situations while attending Northern. *Id.* Further, Relators' provided examples of how both issues were intertwined, such as when a Latino registrant was provided food with stool in it. *Id.* at 12. Relators also filed a disclosure statement, which provided physical evidence of the fraudulent activity.

After filing their Complaint, the New York State Office of the Attorney General met individually with Relators Lee, Gonzalez, and Luckie. Mr. Lee and Mr. Luckie were interviewed on November 1, 2013, while Ms. Gonzalez was interviewed on December 12, 2013. In their individual meetings, each Relator informed the Government of all allegations of abuse that they had witnessed, including those not mentioned in the Complaint. The agents copious notes will bare out the areas of the State's interest and Relator's detailed responses.

As evidenced by the Settlement Agreement between MCFU and Northern, patient safety was a priority for MFCU. Relators' share that concern. Although the State chose not to intervene in this action, it is evident that the State used a least a portion of the information complained about in the Complaint or learned through the disclosure statement and interviews. There is no evidence that the State was even aware of any wrongdoing on the part of Northern prior to the filing of this Complaint. In fact, the opposite seems more accurate, as one year after the filing of the Complaint and a few months following the interviews of Relators, the State settled a State FCA case against Northern for Medicaid Fraud.

## POINT 3

### THERE IS NO REQUIREMENT THAT THE GOVERNMENT INTERVENE IN THE *QUI TAM* ACTION IN ORDER FOR RELATOR TO RECEIVE A RELATOR'S SHARE.

There is no requirement that the government intervene in the *qui tam* action before the relator may share in the proceeds of an alternate remedy. *Bledsoe*, 342 F.3d at 649 (citing the Ninth Circuit in *Barajas* and the Fourth Circuit in *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 192 (4th Cir. 1999)). Indeed, there is no authority for the proposition that the relator's share may be "abrogated by an agreement when the relator is not a party." *Bledsoe*, at 649. In the present case, the fact that the Government chose not to intervene does not mean that Relators are barred from a relator's share.

## POINT 4

### RELATORS ARE ENTITLED TO A RELATOR'S SHARE BECAUSE THEY ALLEGED FRAUD IN THEIR COMPLAINT AND THE GOVERNMENT RECEIVED PROCEEDS.

For a proceeding to qualify as an alternate remedy under Section 3730(c)(5), the proceeding must meet one of two initial criteria and one final criterion. Initially, the proceeding must either: (a) redress the fraud alleged in the relator's complaint; or (b) impair the relator's right to proceed with the FCA action. If one of these two initial criteria is met, the proceeding will be considered an alternative remedy if it meets a final criterion: Providing a recovery to the government.

Suspension and debarment proceedings, such as non-prosecution agreements which require closure of the facilities, as here, are considered alternative remedies because they redress the fraud alleged in the relator's complaint. *See United States ex rel. Barajas v. Northrop Corp.*, 258 F.3d 1004, 1012, 1013 (9th Cir. 2001) (suspension and debarment proceedings are

11

alternative remedies because the government achieved "essentially the same result" that it would have achieved by intervening in the relator's FCA action).

As long as relator can prove either redress **_or_** impairment, the relator need only prove recovery of "proceeds" to the Government. "Proceeds" is interpreted broadly. In *Barajas,* the Ninth Circuit explained that proceeds "need not 'always consist of money or some tangible asset'" while holding that the value of the replacement and repair of airline parts constitutes proceeds to the government that the relator was entitled to share. *Id.* at 1013. Similarly, the Fifth Circuit held that "proceeds" include noncash items such as the value of claims released against the government in return for the government's release of the FCA claims. *United States ex rel. Thornton v. Science Applications Int'l Corp.,* 207 F.3d 769, 771 (5th Cir. 2000). In addition, one court has held that the value of a monitoring agreement, although not involving cash, was "proceeds" for the purposes of determining the relator's share of a government settlement. *United States ex rel. Nudelman v. International Rehab. Assocs.,* 2005 U.S. Dist. LEXIS 9605, at *3-4 & n.1 (E.D. Pa. May 12, 2005) (the court and parties valued the monitoring agreement at $1.5 million for purposes of determining the relator's share.).

When the government accepts "restitution payments" to settle the prosecution, the Ninth Circuit held that a relator is entitled to a share of the payments. *Covington v. Sisters of the Third Order of St. Dominic,* 1995 U.S. App. LEXIS 20370, at *9 n.1 (9th Cir. 1995). In that case, the court rejected the government's contention that the "restitution payments" were not proceeds of the relator's claims because such an argument "would allow the Government to eliminate recovery for relators by simply characterizing the nature of the conduct." *Id.* Finally, in *Bisig* the court held that the relator is entitled to share in the proceeds of a criminal forfeiture action where the United States has not intervened in the *qui tam* but recovered substantially all of the

12

defendant's assets through the criminal forfeiture proceedings. *Bisig,* 2005 U.S. Dist. LEXIS 38316, at *4.

As evidenced by the Relator's Complaint and the Settlement Agreement with Northern (*see* Sadowski Dec., Ex. A and Ex. C), Relators clearly alleged in their Complaint the fraud Northern admitted to in the agreement—not providing therapy services. *See* Sadowski Dec., Ex. A, at 3 ("Defendants provided no physical or occupational therapy"); at 14 ("After Deverman's arrival, Northern stopped providing physical therapy and exercise for registrants"); at 31 ("Gonzalez complained to Northern Management when physical therapy was no longer provided"). Further, even though it is unclear whether the Settlement Agreement is considered to impair a False Claim Act action, it may be argued that the $ 6.5 million "restitution" would reduce the recovery in an False Claim Act action. Indeed, based on the Agreement on the payment of restitution, Northern may not be in a financial position to pay further civil penalties. Finally, the final criterion is met because the government has obtained "proceeds" for the relators' share purposes, and thus has obtained funds from which to pay the relators' share.

## Conclusion

Based on the foregoing, Relators are entitled to a minimum of 15% of the $6.5 million Northern payment of restitution under the Settlement Agreement.

WHEREFORE, for the foregoing reasons, the Court should grant Relators' motion and such other and further relief as this Court deems appropriate.

Dated: New York, New York
      July 27, 2015

                            SADOWSKI FISCHER PLLC
                            Attorneys for the United States of America
                            *ex rel.* Orlando Lee

By:

                            /s/Robert W. Sadowski
                            Robert W. Sadowski
                            39 Broadway
                            Suite 1540
                            New York, New York 10006
                            212 913 9678
                            rsadowski@sflawgroup.com


                            NOAH KINIGSTEIN, ESQ.
                            Attorneys for the United States of America
                            *ex rel.* Melville Luckie

                            /s/ Noah Kinigstein
                            315 Broadway, Suite 200
                            New York, New York 10007
                            Tel. No.: (212) 285-9300

                            -and-

                            PETRO ZINKOVETSKY, ESQ.
                            Attorneys for the United States of America
                            *ex rel. Luz Gonzalez*
                            *Of counsel for the brief*

                            /s/Petro Zinkovetsky
                            432 Park Avenue South
                            10th Floor
                            New York, New York 10016
                            Tel. No.: (212) 729-4090

TO:
Kenneth M. Abell, Esq.
Assistant United States Attorney
United States Attorney for the
Eastern District of New York
610 Federal Plaza
Central Islip, New York  11722

Attorney General
Civil Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530-0001

Jill Diane Brenner, Esq.
New York State Attorney General
Medicaid Fraud Control Unit
120 Broadway
New York, New York  10006

Frank Anthony Hess, Esq.
Peckar & Abramson, PC
70 Grand Avenue
River Edge, New Jersey  07661