# EXHIBIT D

Robert W. Sadowski, Esq.
SADOWSKI FISCHER PLLC
39 Broadway, Suite 1540
New York, New York 10006
Tel. No.: (212) 913-9678
*Attorneys for Relator Orlando Lee*

Noah Kinigstein, Esq.
315 Broadway, Suite 200
New York, NY 10007
Tel. No.: (212) 285-9300
*Attorney for Relator Melville Luckie*

 -and-

Petro Zinkovetsky, Esq.
432 Park Avenue South
10th Floor
New York, NY 10016
Tel. No.: (212) 729-4090
*Attorney for Relator Luz Gonzalez*
*Of counsel for the brief*

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA and
NEW YORK STATE *ex rel.* ORLANDO LEE,
MELVILLE LUCKIE and LUZ GONZALEZ,

|  |  |
|---|---|
| Plaintiffs/Relators, | **AMENDED COMPLAINT** |
| - against - | Civ. No. CV 13-4933 (EDNY) (MKB) |
| NORTHERN ADULT DAILY HEALTH CARE CENTER and GALENA DEVERMAN, | |
| Defendants. | |

Plaintiffs the United States of America, ("United States") and New York State ("New

York") *ex rel.* Orlando Lee ("Lee"), Melville Luckie ("Luckie"), and Luz Gonzalez

("Gonzalez") (collectively "Relators"), by and through their counsel, Sadowski Fischer PLLC,

Petro Zinkovetsky, and Noah Kinigstein, allege for their complaint as follows:

## PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1.      This is a civil action brought by Relators on their own behalves and on behalf of

the United States and New York against Northern Adult Daily Health Care Center ("Northern")

and Galena Deverman ("Deverman") (collectively "Defendants") under the False Claims Act, 31

U.S.C. §§ 3729 *et seq*. (the "False Claims Act"), and the New York False Claims Act, New York

State Finance Law §§ 187 *et seq*., (the "New York False Claims Act"), to recover damages

sustained by, and penalties owed to, the United States and the State of New York as the result of

Defendants having knowingly presented or caused to be presented false claims for the payment

of funds to them, including funds disbursed through Medicaid, in excess of the amounts to which

Defendants were lawfully entitled.  In addition, Relators on their own behalf bring claims against

Northern for employment discrimination.

2.      These claims are based on Defendants' submission of false and fraudulent claims

to New York for payment of monies through Medicaid.  The monies were to be used to provide

adult day care health and medical services for elderly and low-income individuals to allow these

individuals, who required daily nursing assistance, to remain at home in their communities

instead of entering skilled nursing or assisted living facilities.  However, Defendants failed to

provide the required services or to provide basic healthcare or nursing services.  Instead,

Defendants provided an unhealthy, abusive, hostile, and racially and ethnically discriminatory

environment for these individuals, using the Medicaid reimbursements paid on behalf of their

minority clients to provide a social club for the local Russian community and for individuals not

entitled to services.  As such, Defendants billed for worthless, discriminatory, harmful, and

unreasonable services provided to its clients, as well as for services not provided, and services violating the Civil Rights Laws and New York laws and regulations as follows:

- Defendants provided unhealthy, high-fat meals with no option of a low-sodium or diabetic meal.

- Defendants allowed registrants to consume alcohol.

- Defendants allowed registrants to wander the neighborhood and nearby park unescorted.

- Defendants provided no physical or occupational therapy. Indeed, Northern's alleged only social worker was unlicensed.

- Defendants failed to provide materials for arts and crafts.

- Defendants operated Northern as if it were a Russian social club for individuals not qualified under Medicaid for adult day care. Many were healthy individuals not qualified economically for Medicaid. Photographic evidence shows healthy and active individuals sporting expensive accessories such as fur coats, and residing in upscale or luxury apartment buildings.

- Defendants engaged in and permitted staff and registrants to harass, abuse, mistreat, and discriminate against minority African American and Hispanic American registrants and even refused to allow Chinese individuals to register or only allowed Chinese individuals in the facility when Russians were not present.

- Defendants funded operating Northern as a Russian social club by using the money from the daily rates of the minority clients, rather than providing them with services.

3.      Through Defendants' false claims and fraudulent actions, the United States and New York State have been damaged by the monies paid to Defendants through Medicaid.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. §§ 1331, 1345, and 1367.

5.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1391(b) and 1391(c), because Defendants are located in this District, Defendants do business in this District, and because many of the acts complained of herein took place in this District.

## THE PARTIES

6.      Plaintiffs are the United States, on behalf of its agencies, the United States Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and New York, on behalf of its agency, the Department of Health ("DOH").

7.      Relators are former employees of Northern.  They have voluntarily disclosed to the Government the information upon which this Complaint is based, and otherwise fulfilled all of their obligations under the False Claims Act and the New York False Claims Act.

8.      Relator Orlando Lee was hired to conduct marketing for Northern.  Specifically, Lee viewed his position as a way of diversifying the registrant population with his contacts in the Chinese and Hispanic American communities of Brooklyn and Queens.  Mr. Lee also regularly monitored registrant's complaints with health care services at Northern.

9.      Relator Luz Gonzalez has worked for Northern since 2003.  Ms. Gonzalez is Hispanic American.  She has worked at Northern most recently as Assistant Director of Recreation.  She is a certified nursing assistant and provided health care services to Hispanic American and African American registrants.

4

10. Relator Melville Luckie is an African American of Guyanese decent. Mr. Luckie is a certified nursing assistant and also is a certified EKG technician and certified phlebotomist. Most recently, Mr. Luckie was the coordinator of all of the certified nursing assistants at Northern, with responsibility over staff schedules. Mr. Luckie worked the evening shift at Northern until Deverman cut his hours. Mr. Luckie provided health care services for Northern registrants. As a result of Mr. Luckie's whistleblowing activities, he was demoted in 2010 from Coordinator and after twelve years at Northern, Deverman informed him that she had no hours for him, but she might call him to substitute, which has never happened. He was replaced immediately by a Russian-speaking person.

11. Defendant Northern is an Adult Day Health Care Center operating under the Medical Model program type. Northern is located at One Prospect Park West, Brooklyn, New York 11215-1613. Defendant Deverman became the full time Assistant Director of Northern on December 18, 2008. Northern's hours of operation are Sunday through Friday 8:00 am to 8:00 pm.

12. The alleged services Northern claims to provide are cognitive stimulation, arts and crafts, personal hygiene (*i.e.,* bathing and toileting), music, exercise, medical monitoring, occupational therapy, and physical therapy. Northern accepts Medicaid, managed Medicaid, private insurance, and private payment at a daily rate of $150. Northern alleges to have language capacity in English, Russian, Spanish, and Chinese. Northern alleges it provides the following meals: snack, lunch, dinner, Kosher, low fat, and NSA and NCS diets. Northern provides round-trip transportation through its fleet of vans, which services are allegedly included in the daily rate. Northern is licensed by DOH to operate a medical model day care facility. The vehicles used do not appear DOH certified and bear non-commercial license plates.

Case 1:13-cv-04933-EK-JO Document 37-4 Filed 08/22/15 Page 7 of 60 PageID #: 435

13.     Northern is an affiliate of Northern Metropolitan headquartered at 225 Maple Avenue, Monsey, New York 10952.  Northern Metropolitan operates independent retirement communities, sub-acute rehabilitation and long term care facilities, assisted living facilities, community outreach, outpatient rehabilitation, home health care, and adult day health centers, such as Northern.

14.     Defendant Deverman is the Assistant Director of Northern.  Since she has become Assistant Director, Northern has become systematically racist, has failed to provide required medical and health related services, registers non-eligible individuals, and submits false and fraudulent claims for payment to Medicaid.  Deverman, along with three other Northern employees, including an unlicensed social worker, have been indicted by New York State for Medicaid fraud.

### Adult Day Health Care

15.     Generally, adult day care programs operating under the State's "Medical Model" offer a broad spectrum of health and social services.  Medical Model day care offers nursing care, including medication administration, occupational and physical therapies, routine dental care, podiatry, social work, nutritional counseling, and a hot noon-time meal.

16.     The adult day care program provides medically supervised services for individuals with physical and mental impairments.  The program is available through Medicaid. All adult day care programs are operated by nursing homes, known as residential care facilities, although they are not necessarily located at the nursing home — Northern is such a facility. While there is a skilled nursing facility within the same building with Northern, the residential nursing facility is unrelated to Northern.  There is no overlap in any services between Northern and the residential facility located in the building.  Northern is located in the basement of the

building.  Adult day care program operators must submit a certificate of need application and

obtain written approval from the DOH, and must comply with the pertinent provision in Title 10

and Title 18, of New York Codes, Rules and Regulations.

17.     Pursuant to 10 NYCRR § 425.1, adult day health care is defined as health care

services and activities provided to a group of registrants with functional impairments to maintain

their health status and enable them to remain in the community.

18.     Additionally, pursuant to 10 NYCRR § 425.1, a registrant is defined as a person:

(1) who is not a resident of a residential health care facility; is functionally impaired and not

homebound; and requires supervision, monitoring, preventative, diagnostic, therapeutic,

rehabilitative or palliative care or services, but does not require continuous 24-hour-a-day

inpatient care and services; (2) whose assessed social and health care needs can satisfactorily be

met in whole or in part by the delivery of appropriate services in the community setting; and (3)

who has been admitted to adult day health care program based on an authorized practitioner's

order and the adult day health care program's interdisciplinary comprehensive assessment.

19.     Pursuant to 10 NYCRR § 425.6, operators can admit and retain only those

persons for whom adequate care and needed services can be provided to and who, according to

the persons' interdisciplinary needs assessments, can benefit from the services as well as require

a minimum of at least one visit per week to the program.

20.     Persons over 18 years of age with social, physical, and/or mental dependencies

and who require the program's services to remain in or return to the community may be served.

Operators are required to give admission priority to persons who:  (1) require supervision in

order to live in the community; (2) need assistance with activities of daily living in order to

remain in the community; (3) are socially isolated or disoriented and need opportunities for

social interaction to prevent deterioration that would lead to placement in congregate facilities; (4) are in transition from a higher level of care; (5) are in danger of being neglected or abused by a caregiver or have needs that the caregiver is unable to meet; or (6) are receiving services as part of a protective services for adults program.

21.     Under 10 NYCRR § 425.4, the general requirements for operation provide:  The rights of a registrant include the freedom to voice grievances about care or treatment without discrimination or reprisal; protection from physical and psychological abuse; participation in developing the care plan; and freedom to decide whether or not to participate in any given activity.

22.     10 NYCRR § 425.5 mandates that the operator of an adult day care facility must provide or arrange for services appropriate to each registrant in accordance with the individual's interdisciplinary needs assessment and comprehensive care plan.  At least the following program components must be available:  (1) case management, including health education; (2) interdisciplinary care planning; (3) nursing services; (4) nutrition; (5) social services; (6) assistance and supervision with the activities of daily living, such as toileting, feeding, ambulation, bathing including routine skin care, care of hair and nails, oral hygiene, and supervision and monitoring of personal safety, restorative rehabilitative and maintenance therapy services; (7) planned therapeutic or recreational activities that reflect the interests, cultural backgrounds and the communities of the registrants and provide the registrants with choices; (8) pharmaceutical services; and (9) referrals for necessary dental services and sub-specialty care.

23.     As to nutrition, 10 NYCRR § 425.11 states that "the operator of an adult day care facility must (a) provide nutritional services for each registrant; (b) provide meals and nutritional supplements, including modified diets when medically prescribed to registrants who are on the

8

premises at scheduled meal times; (c) ensure that the quality and quantity of food and nutrition services provided to registrants are in conformance with section 415.14 of that Subchapter of Title 10, exclusive of the requirements specified in section 415.14(f); (d) ensure that nutrition service are under the direction of a qualified dietitian, as defined in section 415.14 of this Subchapter; and (e) ensure that dietary service records for the adult day health care service are maintained in conformance with section 415.14(c)(1) and (2) of this Subchapter."

24.      Day programs must comply with all applicable New York regulations including those concerning participants' rights.   18 NYCRR § 492.3.

25.      Day programs must admit only those "who, by reason of social, physical and/or mental dependencies require the services provided by a nonresident services program in order to remain in or return to the community."  18 NYCRR § 492.5.

26.      Day programs must formulate an individualized written plan for each patient that provides, among other things, adequate equipment and supplies for participants, provides group activities and at least four hours of planned activities, encourages socializing between the participants, provides adequate personal care and supervision services.   18 NYCRR § 492.6.

### Northern's Self-Described Services

27.      In the directory of Adult Day Care Facilities in the New York City metropolitan area, Northern describes itself as follows:

- Criteria for admission:  Adults 18 or older, non-combative, chronic medical condition;

- Available Counties:  Kings (Brooklyn); New York (Manhattan); Queens; and Richmond (Staten Island);

9

- Other Programs:  Computer, GSL, citizenship, chorus/music program, multi-culture programs;

- Other Information: Multi-lingual program (English, Russian, Spanish, Creole);

- Program Services:

- Health Education:  Professional RN provides individual group and lectures;

- Nursing:  Assessments, health monitoring, individual plan of care;

- Occupational Therapy:  Maintenance/restorative, safety, ADL training equipment;

- Physical Therapy:  Maintenance/restorative, ambulation training, ther-ex (sic), pain management;

- Social Services:  Case management, entitlements, supportive counseling; and

- Therapeutic Activities:  daily walks in the park, tai chi, community excursions, music, and crafts.

### Prohibition against Discrimination

28.    Title VI of the Civil Rights Act prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives Federal funds or other Federal financial assistance.  Programs that receive Federal funds cannot distinguish among individuals on the basis of race, color or national origin, either directly or indirectly, in the types, quantity, quality or timeliness of program services, aids or benefits that they provide or the manner in which they provide them.  This prohibition applies to intentional discrimination as well as to procedures, criteria or methods of administration that appear neutral but have a discriminatory effect on individuals because of their race, color, or national origin.

## THE LAW

### The Medicaid Program

29.     The Medicaid Program was created by Title XIX of the Social Security Act to provide healthcare benefits for poor and disabled individuals.  42 U.S.C. §§ 1396-1396v.  The Medicaid Program is funded by both state and federal funds, with the federal contribution computed separately for each state.  42 U.S.C. §§ 1396b and 1396d(b).  Medicaid is administered at the Federal level by the CMS.  Federal involvement in Medicaid is largely limited to providing matching funds and ensuring that the states comply with minimum standards in the administration of the program.

30.     The Federal Medicaid statute sets forth the minimum requirements for State Medicaid Programs to qualify for Federal funding, which is called Federal Financial Participation ("FFP").  42 U.S.C. §§ 1396 *et seq.*

31.     New York administers Medicaid through DOH and other cooperating agencies.

32.     In order to be reimbursed by Medicaid, a provider of services for individuals with disabilities must enroll in the New York Medicaid Program.

33.     At all times relevant hereto, Northern was required to and did submit an enrollment application to participate in the New York Medicaid Program.

34.     At all times relevant hereto, Northern was required to and did submit along with such applications a certification, including in form EMEDNY-490602, that it would comply with all DOH and Medicaid regulations and provider manuals, and Title VI, as well as impliedly certifying compliance with such regulations by submitting claims for reimbursement.  Northern also specifically certified in a Medicaid Provider Agreement, dated January 14, 2010, that in order to receive payment from the New York Medicaid Program, it was required to comply with

11

Title VI of the Civil Rights Act of 1964, and to comply with all Federal and State law, and regulations of the DOH or the Department of Mental Hygiene, or the Department of Health and Human Services.

35.     Medicaid only reimburses for services that are medically necessary and appropriate, consistent with quality of care and generally accepted professional standards, and in compliance New York Department of Health Regulations, and sound medical practice.  18 NYCRR §§ 500.1 and 500.3.

36.     Medicaid will not reimburse inappropriate, improper, unnecessary, or excessive services, or services which are inaccurately described in the claim, or services which amount to unacceptable practices.  18 NYCRR §§ 518.1 and 518.3.

### The Federal False Claims Act

The False Claims Act, as amended, provides, in pertinent part, that:

any person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000]… plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

37.     Billing the Government for services not provided or for harmful, worthless, inappropriate, or unacceptable services violates the False Claims Act.

38.     Billing the Government for services that are not reasonable and necessary violates the False Claims Act.

39.     Billing the Government while disclosing information that had the Government known it would not have paid the claim violates the False Claims Act, such as falsely certifying compliance with, and/or violating New York's DOH, Department of Mental Hygiene, Department of Health and Human Services, and civil rights, laws, rules, and regulations.

40.     Misappropriating Government money for purposes other than those intended by the Government also violates the False Claims Act.

### The New York False Claims Act

41.     The New York False Claims Act provides, in pertinent part, that:

(1) Any person who (A) knowingly presents, or causes to be presented, to any employee, officer or agent of the State or a local government, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . (G) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State or a local government shall be liable:  (i) to the State for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of damages which the State sustains because of the act of that person; and (ii) to a local government for three times the amount of damages sustained by such local government because of the act of that person.

New York State Finance Law §§ 189 (1)(A), (B), (G), (i), and (ii).

42.     Those acts described above which violate the False Claims Act similarly violate the New York False Claims Act

### <u>NORTHERN'S FRAUDULENT BILLING SCHEME</u>

### Billing for Services Not Provided and/or for Inappropriate, Unnecessary, Substandard, Unacceptable and Worthless Services

43.     Defendant Northern billed for substandard services that were inappropriate, unacceptable, harmful, worthless, and/or unnecessary, and violated the DOH and Medicaid regulations.

13

44.     Among other things, Defendants failed to adequately supervise registrants by allowing them to wander unescorted in Prospect Park and Park Slope, failed to maintain adequate nursing, failed to maintain adequate and/or appropriate care to registrants, including failing to provide food consistent with dietary restrictions, failed to provide food to African American or Hispanic American residents, provided alcoholic beverages and allowed registrants to get drunk, provided a room for developmentally disabled men, where to pacify them, they were allowed to watch pornographic videos, segregated Hispanic Americans and African Americans in a separate room with only a video player and playing cards for entertainment, failed to provide to Hispanic American and African Americans materials for arts and crafts, forced developmentally disabled individuals to dress in embarrassing costumes for the entertainment and amusement of white Russian registrants, collected money from registrants to purchase birthday gifts for staff, required registrants to contribute money for birthday cake as a condition of having the registrant's birthday acknowledged, refused to provide registrants a choice for meals—often serving only Russian cuisine that was catered by the Russian restaurant Euphoria, allowed the Russian registrants and staff to belittle, harass, and ostracize African American and Hispanic American registrants, refused to accept Chinese registrants for days when Russians were in attendance, forced African American and Hispanic American registrants to sit in the back of transportation vans, forced African American and Hispanic American registrants to be the last registrants to be transported to their homes, and refused transportation to African American or Hispanic American neighborhoods.

45.     Thus, Northern was turned into a Russian social club at the expense of its minority registrants. Funds provided by Medicaid intended for the minority registrants was instead misappropriated to fund parties, dances, meals, and outings for Russian registrants, who

14

were in fact ineligible both because they were neither economically nor physically eligible for Medicaid-funded adult day care services.

46.     Northern also failed to provide its registrants with health related services, including failing to provide physical or occupational therapy.  In fact, the purported social worker at Northern was not even licensed to provide therapy.

47.     Northern thus billed Medicaid for the daily rate of registrants despite failing to provide appropriate, acceptable, reasonable and necessary, or otherwise reimbursable services, and in fact failing to provide health related services at all.  This violated the False Claims Act on its face as well as DOH rules and regulations, with which Northern expressly and impliedly certified compliance.

48.     Therefore, Northern violated the False Claims Act for multiple reasons.  First, by billing for worthless services.  Additionally, by violating the minority registrants' Title VI civil rights.  This amounted to the submitting of false claims because Northern certified that it was only entitled to payment if it complied with Title VI.   Additionally, these claims were false because, the monies intended for the minority registrants were instead misappropriated to benefit the Russian population of Northern.  Finally, even the claims for many of those Russian registrants were false because they received excessive services and were well-off healthy individuals, who often sported fur coats and lived in high-end apartments, who were not entitled to Medicaid benefits.

## Inadequate and Discriminatory Food Service and Diets

49.     After Deverman arrived at Northern, Northern stopped using the catering services of the kitchens to the nursing home, run by an unaffiliated entity that was located in the same

building as Northern, which had served hot food on individual trays delivered to Northern. Under Deverman's direction, Northern contracted for catering services with a Russian restaurant named Euphoria, located at 4210 18th Avenue, Brooklyn, NY 11218.

50.     The food from Euphoria arrived in bulk pans, which Northern staff then had to dish out in individual proportions.  This was in violation of health and sanitation law, because Northern did not have a food service certificate and its staff was not trained in food handling. The staff of Northern did not handle food in a sanitary manner.  For example, while dishing out individual portions, staff put food in their own mouths.

51.     Food servers did not wear gloves, hair nets, or mouth covers.  In one instance there was steel wool found in the food served to Hispanic Americans.

52.     Northern's dietician Irena LNU[1] came to Northern to complete paperwork at night and never met or interviewed registrants.

53.     Northern did not provide diabetic or low sodium diets.

54.     In blatant disregard for the feelings and dignity of African American and Hispanic American registrants, when food was served, the staff were required to serve Russians before African Americans and Hispanic Americans, even while sitting next to each other at the same table.  If at separate tables, the African American and Hispanic American registrants were served last.

55.     These acts further rendered claims for registrants false because they are additional examples of substandard care and disparate treatment in violation of civil rights laws.

---

[1] We have used the term "LNU" to denote the term "Last Name Unknown" throughout this Complaint.

## Discriminatory Treatment

56.     African American and Hispanic American registrants were segregated in Room 6, which was uncomfortably hot in the summer.  In that room, Northern maintained a small television with a video player—the only televisions that received broadcast/cable channels, were in rooms where only Russian channels were on.

57.     One Certified Nursing Assistant, Tatiana LNU, refused to provide necessary emergency medical assistance to an African American registrant because of his race.  She then refused to accompany him to the hospital after he had suffered a seizure while at Northern.  In 2007, Tatiana was fired.  Later, when Deverman came on board, she rehired Tatiana, despite Luckie's warning that she had refused necessary emergency medical assistance to an African American registrant.

58.     One African American Hispanic American man, DR, was forced to sit in the last seat of the van, so Russian registrants could sit in the front.  DR brought his own radio to Northern, which the Spanish speaking registrants shared.  DR became irritated with the discrimination and stopped going to Northern.

59.     RB, a Hispanic American registrant with a pacemaker, was dropped off by the transportation van two blocks from her home.

60.     NF was teased, taunted, and humiliated by Russians for the way she dressed.

61.     Genadye LNU, the head nurse at Northern, gave seminars about diabetes and other health topics only in Russian and only to the Russian registrants.

62.     After Deverman arrived, Northern stopped providing physical therapy and exercise for registrants.

63.     African American and Hispanic American registrants were treated rudely and were abused during meals and entertainment.

64.     Russian registrants were allowed to bully, mistreat, and yell at African American and Hispanic American registrants.

65.     After Deverman's arrival, Northern stopped providing in-service training of staff and cut staff overall.

66.     Northern only had print newspapers in Russian.  When Relator Gonzalez called El Diario to subscribe to a Spanish newspaper, Northern refused to pay for the subscription.

67.     The Hispanic American and African American registrants were not given supplies for arts and crafts.  For instance, while Russians were provided yarn for crochet projects, Relator Gonzalez would have to cut black plastic into strips for crochet projects for African American and Hispanic American registrants who sat in Room 6.

68.     While Northern provided a hair dresser for Russian registrants, African Americans and Hispanic Americans were not provided with such service.

69.     The billiards table at Northern was only to be used by Russians.

70.     On several occasions, van drivers and Northern staff members asked Hispanic American and African American registrants for money.  Hispanic American registrant RM was asked for $20.  Simon LNU, who worked in recreation at Northern collected a total of $200 from registrants on one occasion.

71.      Julia LNU, the Director of Recreation, required registrants to pay $60 to have a birthday cake, and if they failed to pay, that registrant's birthday would not be acknowledged.

72.     The Northern staff allowed Russian registrants to drink alcohol and become intoxicated.

73.    Northern allowed demeaning and humiliating treatment of one African American registrant who was developmentally disabled.  On several occasions, Alfred LNU was dressed up in woman's clothing or as Michael Jackson and made to dance for the entertainment and amusement of Russian registrants.  In fact, Julia LNU, one of the recreation directors, orchestrated these humiliating spectacles with Alfred and made jokes and laughed at his expense. These humiliating spectacles were video-taped and published in YouTube.

74.    After Deverman began to manage Northern, she cut staff significantly.  Because of staff shortages and Northern's inability to care for individuals with developmental disabilities, Northern put a computer in what was formerly a library so that Clarence LNU and Alfred LNU could watch pornographic movies to pacify them.  Clarence and Alfred came to Northern from an Individual Residence Alternative ("IRA") run by the New York Office for People With Developmental Disabilities ("OPWDD").

75.    Shortly after Deverman became a director of Northern, she decided to induce Russian registrations by providing a high-calorie, high-fat breakfast consisting of two eggs, butter, and cream cheese.  The dietician consulting at Northern was ignored when complaining that this was an unhealthy diet.  Shortly thereafter, the weight of the Russian registrants started climbing.

76.    Russian registrants who had trouble eating were assisted, but African American and Hispanic Americans who needed assistance feeding themselves were not helped.

77.    In 2009 after Deverman arrived,  Hedda Venables, Northern's director of Irish descent, was fired by Deverman and replaced by a Russian nurse Gadnadye LNU.

78.    These further examples of disparate treatment and substandard services further demonstrate how claims for Medicaid reimbursement for registrants were false.

## Video Evidence

79.     Over her time as the program director of Northern, Ms. Deverman herself documented the maltreatment and dehumanization of Northern's registrants, as well as the fact that Northern was operated as a Russian social club, and that some registrants did not qualify to be in adult day care.  Specifically:

•     On November 10, 2011, Ms. Deverman uploaded a video to her personal YouTube.com account titled "Michael visit's Northern." https://www.youtube.com/watch?v=Yd9pdrhfTZk.  In this video, a man dressed in a red jump suit and a black hat is dancing with a healthy looking adult to a version of the song *To Vuo Fa' L'Americano* by Renato Carosone (1956).  *Id.*  The man is developmentally disabled and was coerced by Ms. Deverman and staff to dress up and dance for their own personal amusement.

•     On December 19, 2012, Ms. Deverman again uploaded a video to her personal YouTube.com account titled "Northern performs Ballet." https://www.youtube.com/watch?v=-DIVq0zOt3o.  In this video, three men and a woman dance to what appears to be a version of *Swan Lake* (Tchaikovsky 1876).  *Id.*  Health looking elderly individuals are seen walking around and are vibrantly enjoying the show, evidencing that Northern is operated as a Russian social club for the benefit of individuals not entitled to services.  *Id.*

•     On December 19, 2012, Ms. Deverman uploaded another video, this time having three men, dressed as women, dance to *I'm Sexy and I Know It* by LMFAO (Interscope Records 2010) and even invited an elderly man to dance on stage with them. https://www.youtube.com/watch?v=htdKVeOk8gE.  This man, clearly uncomfortable

with the situation, is disrespected by these men while Ms. Deverman or another woman cackle while videotaping the scene. *Id.* This shows a lack of respect for the individuals they purportedly assist and that Northern was operated as a Russian social club.

- On December 22, 2012, Ms. Deverman uploaded another video to her personal YouTube.com account, this time depicting young men and women dancing again to *I'm Sexy and I Know It.* https://www.youtube.com/watch?v=pR_S1kRZbZ8. During this seven minute video, men and women, who appear at a company party, are also seen dancing to *Gangnam Style* by Psy (YG Entertainment, Universal Republic Records, and School Boy Records, 2011) while a DJ works in the background and strobe lights light the dance floor and people enjoy themselves, courtesy of the Government. *Id.* Clearly this depicts a Russian social club much more than a professional working environment where services are rendered.

- Finally, on November 1, 2013, Ms. Deverman uploaded her final video, this time depicting costumed men and women of all ages dancing and having a great time. https://www.youtube.com/watch?v=ttHurdKQX3A. This demonstrates evidencing that Northern is operated as a Russian social club for the benefit of individuals not entitled to services**.**

### Individual Examples of False Claims

**<u>CS</u>**

80.     CS attended Northern periodically from January 10, 2010, through May 30, 2010. Because CS is Asian, she was only allowed to attend Northern on weekend days, when no Russians were in attendance at Northern. See Exhibit A (New York DOH Office of Medicaid Management Recipient Profile showing billing for day care services, including the location,

service code, date, amount paid, diagnosis code, claim reference, payment date, and name of provider).  CS received no health related services from Northern.

81.    The Medicaid monies paid to reimburse Northern for purported services provided to CS were instead used to fund parties, dances, meals, and outings for Russian registrants who were in fact ineligible both because they were neither economically nor physically eligible for Medicaid-funded adult day care services.

82.    Thus, the claims submitted on CS's behalf were false for the following reasons: CS was not provided health-related services, meaning Northern billed for services that were not necessary, and such services were inappropriate, substandard, unacceptable, harmful, discriminatory, and worthless.

83.    Further Northern misappropriates Medicaid funds intended to provide CS with services in order to maintain a Russian social club. Ironically, this endeavor meant that Northern failed to provide reasonable and necessary services to its Russian registrants, who themselves were ineligible to receive Medicaid funded services.

84.    Each claim for reimbursement for services not provided to CS was false because it violated Title VI of the Civil Rights laws and DOH conditions of payment, including the provision of harmful, discriminatory, and worthless services.  This rendered each claim false on its face as well as impliedly false.

**LX**

85.    LX a Chinese American attended Northern on two days, January 17, 2010, and January 24, 2010, 82.  LX was only allowed to attend Northern on Sundays, when no Russians were in attendance at Northern.  See Exhibit B  (New York State Department of Health Office of Medicaid Management Recipient Profile showing billing for day care services, including the

location, service code, date, amount paid, diagnosis code, claim reference, payment date, name of provider). LX received no health related services from Northern.

86.     The Medicaid moneys paid to reimburse Northern for LX purported services were instead used to fund parties, dances, meals, and outings for Russian registrants who were in fact ineligible both because they were neither economically nor physically eligible for Medicaid-funded adult day care services.

87.     Thus the claims submitted on LX's behalf were false for the following reasons: LX was not provided health-related services, meaning Northern billed for services that were not reasonable and necessary and in fact such services were inappropriate, substandard, unacceptable, harmful, discriminatory, and worthless.

88.     Northern misappropriated Medicaid funds intended to provide LX with services in order to maintain a Russian social club that itself did not provide reasonable and necessary services to its Russian registrants, who themselves were ineligible to receive Medicaid funded services.

89.     Each claim for reimbursement for services not provided to LX was false because it violated Title VI of the Civil Rights laws and DOH conditions of payment, including the provision of harmful, discriminatory, and worthless services. This rendered each claim false on its face as well as impliedly false.

**LQ**

90.     LQ a Chinese American attended Northern from January 10, 2010, through April, 22, 2010, LQ was only allowed to attend Northern on Sunday, when no Russians were in attendance at Northern. LQ is diabetic. See Exhibit C (New York State Department of Health Office of Medicaid Management Recipient Profile showing billing for day care services,

23

including the location, service code, date, amount paid, diagnosis code, claim reference, payment

date, name of provider). Li received no health related services from Northern and no diabetic

meals.

91.     The Medicaid moneys paid to reimburse Northern for LQ's purported services

were instead used to fund parties, dances, meals, and outings for Russian registrants who were in

fact ineligible both because they were neither economically nor physically eligible for Medicaid-

funded adult day care services.

92.     Thus the claims submitted on LQ's behalf were false for the following reasons:

LQ was not provided health-related services, meaning Northern billed for services that were not

reasonable and necessary and in fact such services were inappropriate, substandard,

unacceptable, harmful, discriminatory, and worthless.

93.     Northern misappropriated Medicaid funds intended to provide LQ with services in

order to maintain a Russian social club that itself did not provide reasonable and necessary

services to its Russian registrants, who themselves were ineligible to receive Medicaid funded

services.

94.     Each claim for reimbursement for services not provided to LQ was false because

it violated Title VI of the Civil Rights laws and DOH conditions of payment, including the

provision of harmful, discriminatory, and worthless services. This rendered each claim false on

its face as well as impliedly false.

**LY**

95.     LY a Chinese American attended Northern from January 10, 2010, through May

30, 2010, LY was only allowed to attend Northern on Sundays, when no Russians were in

attendance at Northern. Lu is diabetic. See Exhibit D (New York State Department of Health

Office of Medicaid Management Recipient Profile showing billing for day care services, including the location, service code, date, amount paid, diagnosis code, claim reference, payment date, name of provider). LY received no health related services from Northern, including no diabetic meals.

96. The Medicaid moneys paid to reimburse Northern for LY's purported services were instead used to fund parties, dances, meals, and outings for Russian registrants who were in fact ineligible both because they were neither economically nor physically eligible for Medicaid-funded adult day care services.

97. Thus the claims submitted on LY's behalf were false for the following reasons: LY was not provided health-related services, meaning Northern billed for services that were not reasonable and necessary and in fact such services were inappropriate, substandard, unacceptable, harmful, discriminatory, and worthless.

98. Northern misappropriated Medicaid funds intended to provide LY with services in order to maintain a Russian social club that itself did not provide reasonable and necessary services to its Russian registrants, who themselves were ineligible to receive Medicaid funded services.

99. Each claim for reimbursement for services not provided to LY was false because it violated Title VI of the Civil Rights laws and DOH conditions of payment, including the provision of harmful, discriminatory, and worthless services. This rendered each claim false on its face as well as impliedly false.

**SK**

100. SK an Asian American attended Northern on April 4, 2010, SK was only allowed to attend Northern on Sundays, when no Russians were in attendance at Northern. See Exhibit E

(New York State Department of Health Office of Medicaid Management Recipient Profile showing billing for day care services, including the location, service code, date, amount paid, diagnosis code, claim reference, payment date, name of provider). SK received no health related services from Northern.

101.    The Medicaid moneys paid to reimburse Northern for SK's purported services were instead used to fund parties, dances, meals, and outings for Russian registrants who were in fact ineligible both because they were neither economically nor physically eligible for Medicaid-funded adult day care services.

102.    Thus the claims submitted on SK's behalf were false for the following reasons: SK was not provided health-related services, meaning Northern billed for services that were not reasonable and necessary and in fact such services were inappropriate, substandard, unacceptable, harmful, discriminatory, and worthless.

103.    Northern misappropriated Medicaid funds intended to provide SK with services in order to maintain a Russian social club that itself did not provide reasonable and necessary services to its Russian registrants, who themselves were ineligible to receive Medicaid funded services.

104.    Each claim for reimbursement for services not provided to SK was false because it violated Title VI of the Civil Rights laws and DOH conditions of payment, including the provision of harmful, discriminatory, and worthless services. This rendered each claim false on its face as well as impliedly false.

**AM**

105.    Medicaid beneficiary AM attended Northern from July 20, 2009, through July 26, 2011. During that time, Northern billed Medicaid for adult day care services for AM under

service code 3800 for day care services, for which Northern was reimbursed $85.85, and service code 3833 for round trip day care transportation, for which it was reimbursed $44.39. See Exhibit F  (New York State Department of Health Office of Medicaid Management Recipient Profile showing billing for day care services, including the location, service code, date, amount paid, diagnosis code, claim reference, payment date, name of provider).

106.    AM is Hispanic American.  At the time, there was a small group of Hispanic American registrants—most of the registrants were Russian.

107.    According to AM, AM and the other Hispanic American registrants were kept in a small room—Room 6.  According to AM, "The Russian registrants were in a big room with a piano and a place to dance and sing."

108.    AM stated further that "AM and the other Hispanic Americans were told to be quiet, because the Russian registrants complained that the Hispanic American spoke too much and loudly."

109.    Ultimately, AM grew tired of people at Northern yelling at the Hispanic Americans and stopped going.  When AM first came to Northern there were about twenty-five Hispanic American and African Americans, when AM stopped going there were only five or six Hispanic Americans and African Americans.

**CC**

110.    Medicaid beneficiary CC attended Northern for a time in 2009 and 2010.  CC is Hispanic American.  While CC attended Northern most of the residents were Russian. According to CC, while CC was at Northern, the African Americans and Hispanic Americans were kept separate from the Russians.

111.    During outings and at meal times, the African Americans and Hispanic Americans were kept separate from the Russians.

112.    CC stated that she arrived home at 7:30 pm because she was the last individual dropped off.  On one occasion, CC was sitting in the back of the van and injured and bruised when the driver pressed the brakes hard, but the driver refused to assist CC.  Following the incident, CC filed a report with Northern staff, and decided CC did not want to return to Northern.

113.    CC learned about Northern from Relator Lee, who had asked her and two other Hispanic American individuals to come to Northern.

**ED**

114.    Medicaid beneficiary ED attended Northern from July 4, 2009, through May 17, 2010.  During that time, Northern billed Medicaid for adult day care services for ED under service code 3800 for day care services, for which Northern was reimbursed $85.85 or $85.96, and service code 3833 for round trip day care transportation, for which it was reimbursed $44.39 or $58.00.

115.    According to ED, ED experienced substantial racism from Northern staff members and the Russian registrants.  ED was treated well by the Hispanic American staff, but the Russian staff treated him poorly.  When any activities were provided to the registrants, the Hispanic Americans were separated from the Russians.  When the Hispanic Americans played Bingo or Dominos, they were segregated in a separate room away from the Russian registrants.

116.    During meals, Hispanic American registrants were seated at a table separate from the Russians.  The Hispanic Americans were angry about the dining table arrangements.

117.    ED, who is blind, received no medical treatment while at Northern.

28

118.    Ultimately, ED decided to leave Northern and not return because ED was tired of the racism.

**DO**

119.    Medicaid beneficiary DO attended Northern in 2009 or 2010.  DO is Hispanic American.

120.    DO found Northern through Relator Lee, who brought DO to Northern for an interview.

121.    DO attended Northern for a few months.

122.    DO stated that when DO started to attend Northern, DO thought people went to Northern to talk and socialize, but instead DO and the other Hispanic Americans and African Americans were put in a little room that was too hot.  According to DO, "The Russian registrants stayed in a big room.  Most of the registrants at Northern were Russian—more than fifty, and only ten Hispanic Americans and African Americans.  There was one table for African Americans and Hispanic Americans."

123.    DO felt uncomfortable with the racism at Northern.  DO recalls one Hispanic American staff member who was nice to him—Relator Gonzalez.

124.    According to DO, while he was sitting at the Hispanic American and African American table, a Russian lady approached him and told him to be quiet and she put her finger on DO's face.

125.    Northern only played Russian music.  When DO asked for English and Spanish music, DO's request was refused.

126.    DO, who is diabetic, was not offered any diabetic meals.  DO did not like the food served at Northern and instead was forced to bring DO's own meals from home.

29

127.    DO's transportation home was more than an hour because DO and other Hispanic American registrants were dropped off last.  The Russians were always dropped off first.

**GH**

128.    GH attended Northern from July 23, 2009, through December 27, 2009. Although GH is Hispanic American, GH was allowed to attend Northern, even though most of the registrants were Russian. See Exhibit G (New York DOH Office of Medicaid Management Recipient Profile showing billing for day care services, including the location, service code, date, amount paid, diagnosis code, claim reference, payment date, and name of provider).  GH is diabetic.  GH received little to no health related services from Northern, including no diabetic meals.

129.    During that time, Northern billed Medicaid for adult day care services for GH under service code 3800 for day care services, for which Northern was reimbursed $85.85, and service code 3833 for round trip day care transportation for which it was reimbursed $44.39.

130.    According to GH, when GH first started attending Northern, there were activities and music.  GH made jewelry, exercised, and played games.  Exercise was very important for GH because it helped her diabetes.

131.    When GH first came to Northern, there were six or seven Hispanic Americans and they informed GH more would be coming.

132.    As time went on, however, the activities and exercise program ended.  They stopped playing Spanish music and played only Russian music.

133.    GH did not like the meals because the meat was not fully cooked and sometimes raw.

134.    GH decided to no longer attend Northern because they isolated the Hispanic Americans in another room and the Russians had activities in a different room.

135.    The Medicaid funds paid to reimburse Northern for GH's purported services were instead used to fund parties, dances, meals, and outings for Russian registrants who were in fact ineligible both because they were neither economically nor physically eligible for Medicaid-funded adult day care services.

136.    Thus the claims submitted on GH's behalf were false for the following reasons: GH was not provided health-related services, meaning Northern billed for services that were not necessary, and in fact such services were inappropriate, substandard, unacceptable, harmful, discriminatory, and worthless.

137.    Northern misappropriated Medicaid funds intended to provide GH with services in order to maintain a Russian social club that itself did not provide reasonable and necessary services to its Russian registrants, who themselves were ineligible to receive Medicaid funded services.

138.    Each claim for reimbursement for services not provided to GH were false because they violated Title VI of the Civil Rights laws and DOH conditions of payment, including the provision of harmful, discriminatory, and worthless services. This rendered each claim false on its face as well as impliedly false.

**IM**

139.    Medicaid beneficiary IM attended Northern for about two years from late 2008 into 2010. Northern billed Medicaid for adult day care services to IM under service code 3800 for day care services, for which Northern was reimbursed $85.85, and service code 3833 for round trip day care transportation, for which it was reimbursed $44.39. See Exhibit H (New

York DOH Office of Medicaid Management Recipient Profile showing billing for day care services, including the location, service code, date, amount paid, diagnosis code, claim reference, payment date, and name of provider).

140.    IM is Hispanic American with diabetes.  IM attended Northern five days per week.

141.    According to IM, IM stopped going to Northern because the van would no longer pick her up in Queens, even though IM lived close by to Russian registrants, who the van continued to transport to Northern.  IM could not understand why the van would not transport her.

142.    On January 21, 2009, the van picked up IM to take IM home at 6:30 pm and IM arrived home from Northern two hours later at 8:30 pm because IM was the last one dropped off.  IM is scheduled to take insulin at 8:00 p.m.

143.    IM used to play pool at Northern.  There was a Hispanic American group of six people who were kept in Room 6.  According to IM, the Russians did not like the Hispanic American registrants.  While IM was at Northern, there were no African American registrants.  There were approximately 100 Russian registrants while IM was at Northern.

**MJ**

144.    On September 24, 2008, Relator Lee brought three non-Russian individuals, MJ, H, and LW, to Northern as prospective registrants.  Medicaid beneficiary MJ attended Northern for two or three days.

145.    MJ was not included in any activities.

146.    MJ enjoyed the music and while the Russians were dancing, no one asked MJ or MJ's friend to dance.  MJ wanted to dance, but a female staff member informed MJ that instead

32

of dancing, "we have a TV in the back room if you and LW [MJ's friend] could go back there and watch TV." MJ became angry and replied "why should I come here and watch TV, I could watch TV at home." MJ asked "why would you put me and my friend in the back room, looking at your TV, and all the best activities, everybody is playing the piano, singing, dancing?" MJ asked for a newspaper to read and the staff handed her a Russian newspaper. MJ does not read Russian. MJ then asked for a deck of playing cards, so MJ and MJ's friend could play cards, but no cards were provided MJ.

147.    MJ went to the back room, where there was an African American woman.

148.    MJ asked for an American newspaper, but none was provided.

149.    MJ was told where to sit, so she sat there and ate. MJ went to Northern for activities. MJ thought Northern was supposed to give registrants something useful, to help her function better in society, more than just sitting, eating, and watching TV.

150.    LW, MJ's friend, was forced to sit in the back of the transportation van.

151.    Northern called Johnson when she didn't come back after two days and asked her if MJ wanted to be picked up and brought back, however, MJ declined because MJ did not feel wanted in a facility that favored Russian people.

152.    According to MJ, MJ felt left out. After filling out all the papers for Northern to get Medicaid reimbursement, there was nothing for MJ to do but sit there and watch TV. MJ was embarrassed, insulted, angry, and felt like crying and decided never to come back. MJ did not feel wanted at Northern. MJ felt like a pawn, as if MJ was only asked to come to Northern because Medicaid pays a lot of money.

**NF**

153.    Medicaid beneficiary NF was a registrant at Northern for two years around 2010.

33

154. According to NF, NF was picked up in a van in the afternoon but often did not get home until 9 pm.

155. Most registrants were Russian and only six or seven were Hispanic American. Northern placed all of the Hispanic American people at a table separate from the Russians.

156. NF once lost NF balance and fell exiting the transportation van. The driver neglected to help NF and instead was disrespectful towards NF. A Hispanic American man helped NF up. One of the Russian people told her it was NF's fault that NF fell.

157. NF stopped going to Northern because NF was not happy there because they separated Hispanic Americans from the Russians.

158. NF was also the last person dropped off and spent two hours on the van ride to and from Northern.

**LP**

159. Medicaid beneficiary LP attended Northern from January 28, 2009 and January 29, 2009. During that time, Northern billed Medicaid for adult day care services for LP under service code 3800 for day care services, for which Northern was reimbursed $86.58, and service code 3833 for round trip day care transportation, for which it was reimbursed $58.00. See Exhibit I (New York DOH Office of Medicaid Management Recipient Profile showing billing for day care services, including the location,

160. As an African American, and unlike the Chinese American registrants, LP was allowed to attend Northern when Russians were also in attendance. However, LP was still treated disparately from the Russians. Everything was culturally Russian, registrants were Russian, the food was Russian, and the music and the television were all Russian. LP was segregated with the other African American registrants and given nothing to do.

161.    LP received little to no health related services from Northern. LP is diabetic but received no diabetic meals, and Northern did not even provide LP with enough food, nor did they give LP opportunities to exercise.

162.    LP was so disturbed by Northern's discriminatory treatment and lack of health care services that LP refused to return to Northern after attending one day of day care.

163.    The Medicaid monies paid to reimburse Northern for LP's purported services were instead used to fund parties, dances, meals, and outings for Russian registrants who were in fact ineligible both because they were neither economically nor physically eligible for Medicaid-funded adult day care services.

164.    Thus the claims submitted on LP's behalf were false for the following reasons: LP was not provided health-related services, meaning Northern billed for services that were not necessary, and in fact such services were inappropriate, substandard, unacceptable, harmful, discriminatory, and worthless.

165.    Northern misappropriated Medicaid funds intended to provide LP with services in order to maintain a Russian social club that itself did not provide reasonable and necessary services to its Russian registrants, who themselves were ineligible to receive Medicaid funded services.

**MT**

166.    Medicaid beneficiary MT attended Northern from April 20, 2009 through June 26, 2009. During that time, Northern billed Medicaid for adult day care services for MT under service code 3800 for day care services, for which Northern was reimbursed $85.96, and service code 3833 for round trip day care transportation, for which it was reimbursed $44.39. See Exhibit J (New York DOH Office of Medicaid Management Recipient Profile showing billing

35

for day care services, including the location, service code, date, amount paid, diagnosis code, claim reference, payment date, and name of provider).

167.   As a Hispanic American, and unlike the Chinese American registrants, MT was allowed to attend Northern when Russians were also in attendance.  However, MT was still treated disparately from the Russians.  MT attended Northern from April 20, 2009, through June 26, 2009.  Everything was culturally Russian, registrants were Russian, the food was Russian, and the music and the television were all Russian.  MT was segregated with the other African American registrants and given only Russian reading materials.  MT, along with other Hispanic American and African Americans, were forced to sit in back of the van.

168.   MT is diabetic.  MT received little to no health related services from Northern including no diabetic meal.

169.   MT complained to Northern about its discriminatory treatment of African-Americans and Hispanic Americans.  Russians were being treated better than African Americans and Hispanic Americans, she complained to the staff.  The staff replied that "They [the Russians] were here before you."  MT was so disturbed by Northern's discriminatory treatment and lack of health care services that MT stopped going to Northern and refused to return to Northern.

170.   The Medicaid moneys paid to reimburse Northern for MT's purported services were instead used to fund parties, dances, meals, and outings for Russian registrants who were in fact ineligible both because they were neither economically nor physically eligible for Medicaid-funded adult day care services.

171.   Thus the claims submitted on MT's behalf were false for the following reasons: MT was not provided health-related services, meaning Northern billed for services that were not

necessary, and in fact such services were inappropriate, substandard, unacceptable, harmful, discriminatory, and worthless.

172.     Northern misappropriated Medicaid funds intended to provide MT with services in order to maintain a Russian social club that itself did not provide reasonable and necessary services to its Russian registrants, who themselves were ineligible to receive Medicaid funded services.

**W**

173.     W came to Northern in the winter of 2013, to inquire whether they would accept his mother.  W is of Chinese decent.  When he asked if his mother could become a registrant the Northern staff member said "no, your mom can't be here."

174.     The staff asked W whether his mother was Chinese and he replied that his mother was Chinese.  The staff member replied that "we don't take Chinese people."

175.     W said that his mother speaks English and that he heard that Northern took Chinese people.  The staff member replied that two years ago Northern took Chinese, but not now.

176.     W asked what people did come to Northern and the staff member replied that Russian and Spanish people come to Northern.

**Retaliation**

**Retaliation Against Relator Lee**

177.     Relator Lee worked for Northern from the fall of 2008 until April 2010.

178.     Northern and Deverman constructively terminated him on or about April 1, 2010. He served as Northern's marketing director at the time of his termination.

37

179.    Northern and Deverman intentionally retaliated against Lee by making it impossible for him to continue working there after he raised questions regarding serious violations of law by Defendants.  Ultimately, Lee was forced to resign by Defendants.

180.    During his tenure at Northern, Lee did community outreach to the Hispanic American and Chinese communities for adult day care.  Lee consistently complained to Northern management that Hispanic American registrants were treated rudely and abused during their transportation in vans to and from Northern.  Van drivers often refused to pick up Hispanic American registrants.  Hispanic American and African American registrants were made to sit in the back of transportation vans, so Russians could sit in the front of the vans.  Hispanic American registrants who fell or were injured while in transit were ignored and neglected.

181.    Specifically, on or about October 8, 2008, NF could no longer come to Northern because van drivers refused to pick up NF.

182.    On or about March 28, 2009, AL became a registrant, but the transportation company used by Northern refused to pick up AL from AL home—2.2 miles from Northern— and bring her to the facility.  On March 28, 2009, Lee reported to Northern that "[t]his is a very serious issue and must be resolved if NADHCC [Northern] wants to improve retention and attendance w/ new registrants.  I have many registrants that disenrolled or refused to come to NADHCC because of transportation issues."  The "many registrants" Lee referred to are all Hispanic American or African American.

183.    On November 5, 2009, Lee reported to Northern management that on October 23, 2009, the van driver ignored and refused to pick up HC a Hispanic American.  He further reported that HC was very upset and disappointed and might not come back to the program.

184.    On September 29, 2009, Lee reported to Northern management that "[RT] was refused for a pick up to bring RT to the facility."

185.    On May 21, 2009, Lee reported that the van driver did not pick up IM as scheduled.  He reported that IM was very upset and crying.  Lee went to pick up IM himself, so IM would not miss a celebration scheduled for that day.  On June 16, 2009, Lee reported that the van driver was rude and condescending to IM.

186.    On May 5, 2009, Lee reported the following to top Northern management:

> On 05/0[9] [MR] went to do sewing crafts w/ group at another room in the center, when [MR] came back [MR] found [MR's] coat trampled and soiled dirty under [MR's] table, [MR] felt it was done spitefully. . . [MR] is very angry and sad about this situation and the transportation problem.
>
> To ad[d] insult to injury,  . . . , [MR] uses [MR's] coat to sit higher at [MR's] table since [MR] is physically size challenged.  [MR] express[ed] [MR's] feelings to me and WILL NOT COME BACK to our program unless NADHCC obtains a special chair that [MR] can seat safely and properly in . . ., this is a medical issue that addresses a registrant who is physically handicap[ped].  [MR's] coat can be dry cleaned, but [MR's] dignity, and respect cannot.
>
> Please help resolve this issue in the best way possible. We do not want to lose new registrants after 1-2 weeks in program, [MR] is part of our last group [a]dmitted in April.

187.    On May 1, 2009, Lee sent Deverman and Northern executive Gedalia Klein the following message:  "Last night I spoke w/ G[A], new registrant from Boro Park, [GA] says that the bus co[.] did not pick [GA] up this past week for [GA] 3 scheduled days 04/28, 04/29, and 04/30. [GA] is very angry and upset no one has called [GA] from NADHCC or bus co[.], please investigate this matter, we can lose [GA] as a registrant as well as some of [GA] other friends newly registered w/ us."

188.    On March 30, 2009, Lee wrote this following message to Deverman:

Here are the following registrants who are disenrolled or on AOL because of

trans[portation] issues:

M[J]-trans refuses to go to [MJ's] area.
L[W]-M[J]'s friend, kept on back of bus, treated unfairly.
R[B]-you know this case
N[F]-got injured on bus due to driver neglect and disrespect, also over 2 hour trip each
way
A[L]-03/27 trans refuses p/u and d/o
[A]'s Mother f/Bushwick—unruly driver, poor services
Also with issues,
R[B]-1 driver refuses to d/o where designated, unruly.
[IM]-over 2 hr trip each way.

189.    Deverman did not respond to Lee's complaints in writing, but asked him to meet

with her.  On January 13, 2010, Deverman asked for a meeting by e-mail.  At that private

meeting, Deverman told Lee "be careful what [you] say since it creates friction with her + PSG."

190.    Defendants retaliated against Lee on April 1, 2010, by constructively terminating

him because he raised serious violations of law by Defendants, because he reported these

violations to the management of Northern, and because Defendants feared he would become a

whistleblower in an action filed against them.

191.    As a result of Defendants' acts, Lee has suffered economic damages, including,

but not limited to, the loss of his job, the monies he has expended since his discharge in pursuing

new employment, lost wages, as well as damages resulting from personal hardship, including,

but not limited to, emotional distress.

### Retaliation Against Relator Luckie

192.    Relator Luckie worked for Northern from 1998 until February 2011.

193.    Northern and its Director Deverman demoted Luckie after twelve years of highly

professional successful service in his position as a Coordinator to CNAs.  In February, 2011,

Deverman fired Luckie saying she was cutting back on hours. Luckie was immediately replaced by a Russian person.

194. Northern and Deverman intentionally retaliated against Luckie by demoting and ultimately discharging him because he raised questions regarding serious violations of law by Defendants, and because Defendants feared he would become a whistleblower in an action filed against them.

195. During his tenure at Northern, Luckie complained to Northern management about several serious violations of law that presented a danger to registrants' health.

196. Luckie complained that African American and Hispanic American registrants were treated rudely and abusively during meals and entertainment.

197. Luckie complained that Russian registrants were bullying African American and Hispanic American registrants.

198. Luckie complained about the food catered from the restaurant Euphoria. The food from Euphoria arrived in bulk pans, which Northern staff then had to dish out in individual proportions. Luckie complained about this because Northern did not have a food service certificate and staff were not trained. Luckie complained about unsanitary handling of food, including staff putting food in their mouth while dishing out portions.

199. Luckie complained about the rehiring of Tatiana LNU. In 2007, Tatiana was fired, when she refused to accompany an African American registrant to the hospital after he suffered a stroke while at Northern. When Deverman came on board, she rehired Tatiana, despite Luckie's warning that Tatiana refused necessary emergency medical assistance to a African American registrant.

200.    Housekeeping staff at Northern showed Luckie empty vodka bottles in the garbage at Northern.  Luckie also smelled alcohol on Russian registrants and brought this to the attention of nursing staff, who tracked which registrants' medications.  Luckie also brought this to Northern management's attention and explained the health and safety risk of allowing alcohol to be consumed at Northern.

201.    Luckie complained of demeaning and humiliating treatment of one African American registrant who was developmentally disabled.  On several occasions, A. LNU was dressed up in woman's clothing or as Michael Jackson and made to dance for the entertainment and amusement of Russian registrants.  In fact, Julia LNU, one of the recreation directors, orchestrated these humiliating spectacles with A. and made jokes and laughed at his expense.

202.    Luckie complained when Northern converted its library into a room with a computer.  Northern then used that room to pacify two developmentally disabled African American registrants, C. LNU and A. LNU, by providing them with pornographic videos.

203.    Luckie complained when African American and Hispanic American registrants were segregated in Room 6, which was uncomfortably hot in the summer.  In that room, Northern maintained a small television with a video player—the only televisions that received broadcast/cable channels were in rooms where only Russian channels were played.

204.    Luckie remarked that the Russian registrants did not dress like Medicaid beneficiaries, noting that the women wore expensive dresses, were well-coiffed, wore mink and other fur coats, and wore a lot of jewelry.  Luckie also remarked that the Russian registrants seemed remarkably healthy, robust and vigorous, requiring very little medical assistance.

205.    As a result of Defendants' acts, Luckie has suffered economic damages, including but not limited to the loss of his job, the monies he has expended since his discharge in pursuing

new employment, and lost wages, as well as damages resulting from personal hardship, including but not limited to emotional distress.

### Retaliation Against Relator Gonzalez

206.    Gonzalez was an Assistant Director for Recreation at Northern and was assigned to operate the Hispanic American and African American recreation programs at Northern.

207.    Gonzalez complained of the shortage of staff at Northern, which shortage presented a danger to registrant's health.

208.    When a room was set up for C. LNU and A. LNU for them to watch pornographic movies to pacify them, Gonzales complained that this was caused by Northern's inability to care for individuals with developmental disabilities and staff shortages.

209.    Gonzalez complained when, after Deverman arrived, Northern stopped providing physical therapy and exercise for registrants.

210.    Gonzalez complained to Northern management that African Americans and Hispanic Americans were the last registrants to be served food—after the Russian registrants had been served.

211.    Gonzalez complained to Northern management that RB, a Hispanic American registrant with a pacemaker was dropped off by the transportation van two blocks from RB home.

212.    Gonzalez complained to Northern when NF was teased, taunted, and humiliated by Russians for the way NF dressed.

213.    Gonzalez complained that the dietician Irena LNU came to Northern to complete her paperwork at night and never interviewed to registrants.

43

214.    Gonzalez complained to Elizabeth LNU, the Assistant Manager of Northern, that the head nurse Gadnadye LNU only talks in Russian to the Russian registrants about diabetes and other health topics.

215.    Gonzalez complained to Northern Management that after Deverman arrived, in-service training stopped.

216.    Gonzalez complained to Northern Management when physical therapy was no longer provided.

217.    Gonzalez complained to Julia LNU, the Director of Recreation, that Northern only had newspapers in Russian.  Gonzalez called El Diario to subscribe to a Spanish newspaper, but Northern refused to pay for the subscription.

218.    Gonzalez complained to Julia LNU about the fact that Northern only did things for the Russian registrants and not for the Hispanic American or African American registrants.

219.    Gonzalez complained when van drivers and other staff members of Northern asked Hispanic American and African American registrants for money for staff birthday celebrations.  Hispanic American registrant RM was asked for $20.  Simon LNU, who worked in recreation collected a total of $200 from registrants on one occasion.

220.    Gonzalez complained to Julia LNU, the Director of Recreation, that registrants had to pay $60 in order to have a birthday cake and have their name mentioned on their Birthday.

221.    Gonzalez has been out of the office since breaking her arm earlier this year, but Deverman has made it quite unclear as to whether she will have a job when she returns.

222.    As a result of Defendants' acts, Gonzalez has suffered economic damages, including, but not limited to, constructive termination, as well as damages resulting from personal hardship, including, but not limited to, emotional distress.

## CONCLUSION

Defendants engaged in a knowing scheme to receive and retain Medicaid funds without using them to benefit beneficiaries' health care as well as to seek reimbursement for improperly provided services and services that were of such poor, negligent and abusive quality that they amounted to services not rendered and resulted in harm to the recipients of those services. Consequently, Northern received New York Medicaid payments that it is not entitled to in violation of the False Claims Act and the New York False Claims Act.

## FIRST CLAIM

Violations of the Federal False Claims Act
(31 U.S.C. § 3729 (a)(1)(A))
Presenting False Claims for Payment

223.     Plaintiffs incorporate by reference the paragraphs above as if fully set forth herein.

224.     The United States seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

225.     As set forth above, Defendants certified their compliance with Medicaid and DOH regulations.  Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in connection with the submission of their requests for reimbursement under the Medicaid Program.

226.     Medicaid paid Northern because of Defendants' fraudulent conduct.

227.     By reason of Defendants' false claims, the United States through its federal financial participation, and New York has been damaged in a substantial amount to be determined at trial.

## SECOND CLAIM

Violations of the Federal False Claims Act
(31 U.S.C. § 3729 (a)(1)(B))
Use of False Statements

228.    Plaintiffs incorporate by reference the paragraphs above as if fully set forth

herein.

229.    The United States seeks relief against Defendants under Section § 3729(a)(1)(B)

of the False Claims Act, 31 U.S.C. 3729(a)(1)(B).

230.    As set forth above, Defendant Northern certified its compliance with Medicaid

and DOH regulations.  Defendants knowingly made, used, or caused to be made or used, false

records or statements material to false and fraudulent claims, in connection with the submission

of its requests for reimbursement under the Medicaid Program.

231.    The United States paid such false or fraudulent claims because of Defendants'

acts and conduct.

232.    By reason of Defendants' false claims, the United States has been damaged in a

substantial amount to be determined at trial.

## THIRD CLAIM

Violations of the Federal False Claims Act
(31 U.S.C. § 3729 (a)(1)(G))
Use of False Statements

233.    Plaintiffs incorporate by reference the paragraphs above as if fully set forth

herein.

234.    The United States seeks relief against Defendants under Section § 3729(a)(1)(G)

of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

235.    As set forth above, Defendants certified their compliance with Medicaid and

DOH regulations.  Defendants knowingly made, used, or caused to be made or used, false

46

records or statements material to an obligation to pay or transmit money or property to the

Government, or knowingly concealed or knowingly and improperly avoided or decreased an

obligation to pay or transmit money or property to the Government in connection with the

submission of their requests for reimbursement under the Medicaid Program.

236.     Defendants failed to pay or transmit money due to the United States because of

Defendants' acts and conduct.

237.     By reason of the Defendants' use of false statements, the United States has been

damaged in a substantial amount to be determined at trial.

### FOURTH CLAIM

Violations of the New York State False Claims Act
(NY State Finance Law § 189 (1)(a))
Presenting False Claims For Payment

238.     Plaintiffs incorporate by reference the paragraphs above as if fully set forth

herein.

239.     New York seeks relief against Defendants under Section 189 (1)(a) of the New

York False Claims Act, NY State Finance Law § 189 (1)(a).

240.     As set forth above, Defendants certified their compliance with Medicaid and

DOH regulations.  Defendants, knowingly or acting with deliberate ignorance or with reckless

disregard for the truth, presented, or caused to be presented, to an officer, employee or agent of

New York, false and fraudulent claims for payment or approval in connection with the

submission of Defendants' requests for reimbursement under the Medicaid Program.

241.     New York paid Northern under the Medicaid Program because of Defendants'

fraudulent conduct.

242.     By reason of Defendants' conduct, New York has been damaged in a substantial

amount to be determined at trial.

47

## FIFTH CLAIM

Violations of the New York State False Claims Act
(NY State Finance Law § 189 (1)(b))
Use of False Statements

243.     Plaintiffs incorporate by reference the paragraphs above as if fully set forth
herein.

244.     New York seeks relief against Defendants under Section 189 (1)(b) of the New
York False Claims Act, NY State Finance Law § 189 (1)(b).

245.     As set forth above, Defendants certified their compliance with Medicaid and
DOH regulations. Defendants, knowingly or acting in deliberate ignorance or in reckless
disregard for the truth, made, used, or caused to be made and used, false records and statements,
in order to get false or fraudulent claims paid or approved by New York in connection with the
submission of Defendants' requests for reimbursement under the Medicaid Program.

246.     New York paid Northern under the Medicaid Program because of Defendants'
fraudulent conduct.

247.     By reason of Defendants' conduct, New York has been damaged in a substantial
amount to be determined at trial.

## SIXTH CLAIM

Violations of the New York State False Claims Act
(NY State Finance Law § 189 (1)(g))
Use of False Statements

248.     Plaintiffs incorporate by reference the paragraphs above as if fully set forth
herein.

249.     New York seeks relief against Defendants under Section 189 (1)(g) of the New
York False Claims Act, NY State Finance Law § 189 (1)(g).

250.     As set forth above, Defendants certified their compliance with Medicaid and DOH regulations.  Defendant, knowingly or acting in deliberate ignorance or in reckless disregard for the truth, made, used, and caused to be made and used, false records and statements, in order to conceal, avoid, or decrease the obligation to pay or transmit money or property to New York in connection with the submission of Defendant's requests for reimbursement under the Medicaid Program.

251.     Defendants failed to pay or transmit money due to New York because of Defendants' acts and conduct.

252.     By reason of Defendants' acts and conduct, New York has been damaged in a substantial amount to be determined at trial.

### SEVENTH CLAIM

Violations of the Federal False Claims Act
(31 U.S.C. § 3730 (h))
Retaliation as Against Relator Lee

253.     Relator Lee incorporates by reference the paragraphs above as if fully set forth herein.

254.     Defendants violated Section § 3730(h) of the False Claims Act, 31 U.S.C. § 3730(h).

255.     Defendants have intentionally retaliated against Lee by constructively discharging him by forcing him to resign and withholding pay.

256.     Such conduct by Defendants was due to their actions taken in furtherance of this action, and Defendants had actual and constructive knowledge of such actions.

257.     Such conduct by Defendants have damaged Lee in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

49

## EIGHTH CLAIM

Violations of the New York State False Claims Act
(NY State Finance Law § 191)
Retaliation as Against Relator Lee

258.    Relator Lee incorporates by reference the paragraphs above as if fully set forth herein.

259.    Defendants violated Section 191 of the New York False Claims Act, NY State Finance Law § 191.

260.    Defendants have intentionally retaliated against Lee by terminating him (by forcing him to resign) and by removing his health benefits.

261.    Such conduct by Defendants was due to Lee's actions taken in furtherance of this action, and Defendants had actual and constructive knowledge of such actions.

262.    Such conduct by Defendants have damaged Lee in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## NINTH CLAIM

Violations of the New York Labor Law
(NY Labor Law § 741)
Retaliation as Against Relator Lee

263.    Relator Lee incorporates by reference the paragraphs above as if fully set forth herein.

264.    Relator Lee complained of violations of law that constituted a substantial and specific danger to residents' health.

265.    Defendants violated Section 741 of the New York False Claims Act, NY Labor Law § 741.

266.    Defendants' acts and omissions set forth above constitute violations of NY Labor Law § 741.

267.    Such conduct by Defendants have damaged Gonzalez in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## TENTH CLAIM

Violations of the Federal False Claims Act
(31 U.S.C. § 3730 (h))
Retaliation as Against Relator Luckie

268.    Relator Luckie incorporates by reference the paragraphs above as if fully set forth herein.

269.    Defendants violated Section § 3730(h) of the False Claims Act, 31 U.S.C. § 3730(h).

270.    Defendants have intentionally retaliated against Luckie by discharging him and withholding pay.

271.    Such conduct by Defendants was due to their actions taken in furtherance of this action, and Defendants had actual and constructive knowledge of such actions.

272.    Such conduct by Defendants have damaged Luckie in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## ELEVENTH CLAIM

Violations of the New York State False Claims Act
(NY State Finance Law § 191)
Retaliation as Against Relator Luckie

273.    Relator Luckie incorporates by reference the paragraphs above as if fully set forth herein.

274.    Defendants violated Section 191 of the New York False Claims Act, NY State Finance Law § 191.

275.    Defendants have intentionally retaliated against Luckie by terminating him, and by removing his health benefits.

276.    Such conduct by Defendants was due to Luckie's actions taken in furtherance of this action, and Defendants had actual and constructive knowledge of such actions.

277.    Such conduct by Defendants have damaged Luckie in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## TWELTH CLAIM

Violations of the New York Labor Law
(NY Labor Law § 741)
Retaliation as Against Relator Luckie

278.    Relator Luckie incorporates by reference the paragraphs above as if fully set forth herein.

279.    Relator Luckie complained of violations of law that constituted a substantial and specific danger to residents' health.

280.    Defendants violated Section 741 of the New York False Claims Act, NY Labor Law § 741.

281.    Defendants' acts and omissions set forth above constitute violations of NY Labor Law § 741.

282.    Such conduct by Defendants have damaged Luckie in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

### THIRTEENTH CLAIM

Violations of the Federal False Claims Act
(31 U.S.C. § 3730 (h))
Retaliation as Against Relator Gonzalez

283.    Relator Gonzalez incorporates by reference the paragraphs above as if fully set forth herein.

284.    Defendants violated Section § 3730(h) of the False Claims Act, 31 U.S.C. § 3730(h).

285.    Defendants have intentionally retaliated against Gonzalez by constructively discharging her and withholding pay.

286.    Such conduct by Defendants was due to their actions taken in furtherance of this action, and Defendants had actual and constructive knowledge of such actions.

287.    Such conduct by Defendants have damaged Gonzalez in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

### FOURTEENTH CLAIM

Violations of the New York State False Claims Act
(NY State Finance Law § 191)
Retaliation as Against Relator Gonzalez

288.    Relator Gonzalez incorporates by reference the paragraphs above as if fully set forth herein.

289.    Defendants violated Section 191 of the New York False Claims Act, NY State Finance Law § 191.

290.    Defendants have intentionally retaliated against Gonzalez by constructively terminating her and withholding her health benefits.

291.    Such conduct by Defendants was due to Gonzalez's actions taken in furtherance of this action, and Defendants had actual and constructive knowledge of such actions.

292.    Such conduct by Defendants have damaged Gonzalez in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## FIFTEENTH CLAIM

Violations of the New York Labor Law
(NY Labor Law § 741)
Retaliation as Against Relator Gonzalez

293.    Relator Gonzalez incorporates by reference the paragraphs above as if fully set forth herein.

294.    Relator Gonzalez complained of violations of law that constituted a substantial and specific danger to residents' health.

295.    Defendants violated Section 741 of the New York False Claims Act, NY Labor Law § 741.

296.    Defendants' acts and omissions set forth above constitute violations of NY Labor Law § 741.

297.    Such conduct by Defendants have damaged Gonzalez in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## SIXTEENTH CLAIM

Violations of Employment Laws
Intentional Discrimination
(NYCHRL, New York City Administrative Code § 8-107 *et seq.*)
Retaliation and Discrimination on Behalf of All Relators
Lee, Luckie, and Gonzalez

298.    Plaintiffs incorporate the preceding paragraphs as alleged above.

54

299.   This Claim is brought by all Relators Lee, Luckie, and Gonzalez.

300.   Defendant Northern has engaged in an intentional, systematic policy, pattern, and/or practice of discrimination against individuals of non-Russian decent and in particular Afro-Americans and Hispanics.

301.   Plaintiff Lee is of Asian and Hispanic decent

302.   Plaintiff Luckie is an African American of Guyanese decent.

303.   Plaintiff Gonzalez is Hispanic.

304.   Each of the plaintiffs Lee, Luckie, and Gonzalez repeatedly complained to Northern management that African American and Hispanic registrants were being treated harshly in comparison to the Russian registrants.  African American and Hispanic registrants were segregated, excluded from activities like dancing and music, which was sung in Russian.  There was only Russian reading material, such as newspapers.  Food was distributed to Russians before African Americans and Hispanics, such that when food ran out, African Americans and Hispanics were not fed.  The cuisine served to all registrants was Russian catered by a Russian restaurant.  Lectures by nurses were only given in Russian.  Russian television was provided. Russians told African Americans and Hispanics not to speak.  African Americans and Hispanics were forced to sit a tables separate from Russians.  African Americans and Hispanics were forced to sit in a separate room, even while music performances and dancing were provided in the room Russians occupied.

305.   Plaintiffs Lee, Luckie, and Gonzalez were forced from their employment positions because they personally were discriminated against and because they spoke out about the discriminatory practices Northern engaged in against non-Russians and specifically African Americans and Hispanics.

306. Indeed, Luckie's position was filled by a Russian worker.

307. Northern fostered a culture which excluded Hispanics and African Americans, undervalued their culture and contributions to the atmosphere at Northern.

308. Northern failed and refused to take reasonable and adequate step to prevent and correct instances of discrimination.

309. These institutional policies of discrimination were intended and had the effect of:

    a. Denying Plaintiffs business opportunities because of their race;

    b. Denying Plaintiffs compensation because of their race;

    c. Denying Plaintiffs promotions because of their race;

    d. Evaluating their performance more negatively because of their race;

    e. Offering them less administrative support, training, and materials because of their race; and

    f. Providing them with inferior terms and conditions of employment because of their gender.

310. Northern has set and/or maintained these discriminatory policies, patterns, and/or practices during the liability period within the City of New York, and the discriminatory policies, patterns, and/or practices have had a discriminatory impact on African American and Hispanic employees of Northern within the City of New York.

311. As a direct result of Northern's discriminatory policies and/or practices as described above, Plaintiff/Relators have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

312. The foregoing conduct constitutes illegal, intentional discrimination prohibited by the Administrative Code of the City of New York § 8-107 *et seq.*

WHEREFORE, plaintiffs the United States of America and the State of New York *ex rel.* Orlando Lee, Melville Luckie, and Luz Gonzalez request that judgment be entered in their favor and against Defendants as follows:

(a)     On the First, Second, and Third Claims for Relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), (B), and (G), for treble the United States' damages, in an amount to be determined at trial, and an $11,000 penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants; and

(b)     Awarding Relators their Relator's share pursuant to 31 U.S.C. § 3730(d)(1) or (2); and

(c)     On the First, Second, and Third Claims for Relief, an award of costs and attorney's fees pursuant to 31 U.S.C. § 3730(d); and

(d)     On the Fourth, Fifth, and Sixth Claims for relief (Violations of the New York False Claims Act, NY State Finance Law § 180(1)(A), (B), (G) and (I), for treble the State of New York's damages, in an amount to be determined at trial, plus a $12,000 penalty for each false claim; and

(e)     Awarding relators their Relator's share pursuant to NY State Finance Law § 190(6); and

(f)     On the Fourth, Fifth, and Sixth Claims for Relief, an award of costs and attorney's fees pursuant to NY State Finance Law § 190(7); and

(g)     On the Seventh, Eighth, Ninth, Tenth, Twelfth, and Thirteenth Claims for Relief (Violations of the False Claims Act, 31 U.S.C. § 3730(h) and of the

New York False Claims Act, NY State Finance Law § 191 awarding

relators two times back pay and interest on the back pay and all special

damages sustained as a result of the discrimination including but not

limited to litigation costs and reasonable attorneys' fees; and

(h)     On the Eleventh, Fourteenth, and Fifteenth Claims for Relief (Violations of

New York Labor Law § 741) and NYC Labor Law awarding relators

reinstatement to the same position held before the retaliatory personnel

action, or to an equivalent position; the reinstatement of full fringe benefits

and seniority rights, the compensation for lost wages, benefits and other

remuneration; and the payment by the employer of reasonable costs,

disbursements, and attorney's fees; and assessing Defendants a penalty in

the amount of $10,000 to be paid to the Improving Quality of Patient Care

Fund; and

(i)     Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED.**

Dated: New York, New York
    June 25, 2015

SADOWSKI FISCHER PLLC
*Attorneys for Relator Orlando Lee*

By:   /s/ Robert W. Sadowski
    Robert W. Sadowski, Esq.
    39 Broadway Suite 1540
    New York, New York  10006
    Telephone: (212) 913-9678
    Facsimile: (646) 502-5357
    rsadowski@sflawgroup.com

58

Noah Kinigstein, Esq.
*Attorney for Relator Melville Luckie*

/s/ Noah Kinigstein
Noah Kinigstein, Esq.
315 Broadway, Suite 200
New York, NY 10007
Tel. No.: (212) 285-9300

-and-

Petro Zinkovetsky, Esq.
*Attorney for Relator Luz Gonzalez*
432 Park Avenue South
10th Floor
New York, NY 10016
Tel. No.: (212) 729-4090
*Of counsel for the brief*

Frank Hess Esq.
Peckar & Abrahmanson

TO:

United States Attorney for the
Eastern District of New York
271 Cadman Plaza East
Brooklyn NY 11201

Attorney General
Civil Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

New York State Attorney General
Medicaid Fraud Control Unit
120 Broadway, 13th Floor
New York, New York 10271