UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

UNITED STATES OF AMERICA AND NEW
YORK STATE *ex rel.* ORLANDO LEE,
MELVILLE LUCKIE and LUZ GONZALEZ,

                        Plaintiffs,

              v.

NORTHERN ADULT DAILY HEALTH CARE
CENTER and GALENA DEVERMAN,

                        Defendants.

------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CV-4933 (MKB)

MARGO K. BRODIE, United States District Judge:

      On September 4, 2013, Orlando Lee, Melville Luckie and Luz Gonzalez ("Relators")

brought this *qui tam* action on behalf of the United States of America and the State of New York

(the "State") against Defendants Northern Adult Daily Health Care Center ("Northern Adult")[1]

and Galena Deverman,[2] alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the

---

[1]  Northern Manor Adult Day Health Care Program (sued here as Northern Adult Daily Health Care Center) was operated by Northern Manor Multicare Center, Inc., a provider of nursing home services under the New York State Medical Assistance Program.  (Letter Statement of Interest re Def. Mot. to Dismiss ("State Ltr. of Interest") 2 n.1, Docket Entry No. 45.)  Northern Adult notes in its moving papers that "Northern Adult Daily Health Care Center [is] a non-existent entity that had nothing to do with the operation of the adult day care facility," (Mem. of Law in Supp. of Def. Mot. to Dismiss ("Def. Mem.") 6, Docket Entry No. 43-1), but does not elaborate and has not provided any evidence that would lead the Court to conclude that, although misnamed, it is not the correct Defendant in this suit.  Northern Adult instead seeks to use this misnaming as grounds for dismissal under Rule 9(b) of the Federal Rules of Civil Procedure, arguing that Relators have "not even identified a proper defendant." (Def. Mem. 6.)  The Court instead grants Relators leave to file a Second Amended Complaint to correct the naming error.

[2]  A summons was issued as to Deverman on November 17, 2014 (Docket Entry No. 14), but no executed summons was returned.  Relators are ordered to show cause why the action as to

"FCA"), and the New York State False Claims Act, N.Y. State Fin. Law § 187 *et seq.* (the "NYFCA"). (Compl. ¶¶ 175–241, Docket Entry No. 1.) On September 8, 2014, the United States and the State declined to intervene in the action. (Docket Entry Nos. 9–10.) On June 25, 2015, Relators filed an Amended Complaint that included an additional cause of action under the New York City Human Rights Law ("NYCHRL"). (Am. Compl., Docket Entry No. 29.) On October 14, 2015, Northern Adult moved to dismiss the Amended Complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. (Notice of Mot. to Dismiss, Docket Entry No. 43; Mem. of Law in Supp. of Def. Mot. to Dismiss ("Def. Mem."), Docket Entry No. 43-1). For the reasons discussed below, the Court grants in part and denies in part Northern Adult's motion to dismiss.

## I. Background

The facts alleged in the Amended Complaint are accepted as true for the purpose of deciding this motion. According to the Amended Complaint, Northern Adult was an adult day care center that provided "cognitive stimulation," arts and crafts, personal hygiene, and occupational and physical therapy to its elderly and low-income registrants.[3] (Am. Compl. ¶ 12.) As payment, Northern Adult accepted Medicaid, managed-Medicaid, private insurance and private payment. (*Id.*) Northern Adult was obligated to comply with the New York State Health Rules and Regulations, which required Northern Adult, among other things, to give admission priorities to certain registrants, provide nursing and social services, provide assistance

Deverman should not be dismissed for failure to serve pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. *See Meilleur v. Strong*, 682 F.3d 56, 61 (2d Cir. 2012) (affirming the district court's dismissal of a defendant under Rule 4(m) where the defendant had not been served and the plaintiff was given notice and opportunity to show cause).

[3] According to Relators' memorandum in opposition to the motion to dismiss, Northern Adult was closed pursuant to a settlement agreement between the State and the operating entity. (Relators' Mem. of Law in Opp'n to Def. Mot. ("Relators' Mem.") 3, Docket Entry No. 46.)

and supervision for daily living activities, and provide meals and nutritional supplements. (*Id.* ¶¶ 16–23.) As an applicant to participate in the New York State Medicaid Program (the "Medicaid Program"), Northern Adult submitted a certification that it would comply with Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq*. ("Title VI")[4] and all New York State Department of Health ("DOH") and federal Medicaid regulations. (*Id.* ¶ 34.) According to Relators, Northern Adult failed to comply with the DOH and Medicaid regulations despite filing that certification. (*Id.* ¶ 34.)

Relators, who were previously employed by Defendants, allege that Defendants billed the Medicaid Program for "substandard services that were inappropriate, unacceptable, harmful, worthless, and/or unnecessary," in violation of DOH and Medicaid regulations. (*Id.* ¶ 43.) Specifically, Relators allege that Defendants, among other things, failed to supervise registrants — resulting in registrants "wandering unescorted" in Prospect Park and around the Park Slope neighborhood of Brooklyn, New York — failed to provide food that adhered to certain dietary and health restrictions, and failed to provide food to African-American and Latino registrants. (*Id.* ¶ 44.) In addition, Northern Adult allowed registrants to drink alcohol to the point of intoxication, segregated Latino and African-American registrants from white Russian registrants, forced developmentally-disabled registrants to wear "embarrassing costumes for the entertainment and amusement of white Russian registrants," and refused to transport registrants to African-American and Latino neighborhoods. (*Id.*)

Relators also allege that Defendants retaliated against them for reporting Northern Adult's alleged misconduct. Relators claim that (1) Lee was constructively terminated after he

---

[4] Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color and national origin in programs and activities receiving federal financial assistance. *See* 42 U.S.C. §§ 2000d *et seq*.

raised questions and complained about certain violations, including that Northern Adult was treating Latino registrants poorly, (*id.* ¶¶ 177–91); (2) Luckie was demoted and terminated after he complained about Northern Adult's health violations and its disparate treatment of African American and Latino registrants, (*id.* ¶¶ 192–205); and (3) Gonzalez was constructively terminated after complaining about several deficiencies at Northern Adult, including that Northern Adult stopped providing physical therapy to registrants and that it served food to African American and Latino registrants last, (*id.* ¶¶ 206–222).

On June 26, 2014, the State entered into a settlement agreement (the "Settlement Agreement") with Northern Metropolitan Foundation for Health Care, Inc. ("Northern Metropolitan") and Northern Manor Multicare Center, Inc. ("Northern Manor"), respectively the non-profit organization and wholly-owned subsidiary that operated Northern Adult. (State Ltr. of Interest at 2.) According to the State,[5] the Settlement Agreement covered the following conduct, to which Northern Manor admitted: Northern Manor operated Northern Adult "as a medical model [adult day health care] without a qualified social worker on staff to provide required [adult day health care] social services," and "on 63 days, the [adult day health care] program admitted more registrants than it was certified to treat by the New York State Department of Health." (State Ltr. of Interest at 2; *see also* Relators' Mem. of Law in Opp'n to Def. Mot. ("Relators' Mem.") 3, Docket Entry No. 46.) Northern Manor and the State settled the claims for six and a half million dollars, and Northern Manor agreed to close Northern Adult. (*Id.*)

---

[5] While the United States and the State declined to intervene in Relators' action, (*see* Docket Entry Nos. 9, 10), the State filed a Letter of Interest in response to Northern Adult's motion to dismiss, (Docket Entry No. 45).

After the State settled with Northern Metropolitan and Northern Manor, Relators moved for an alternate remedy, arguing that Relators had provided much of the information that led to the settlement agreement and, pursuant to 31 U.S.C. § 3730(d)(1), Relators should be able to recover a share of the settlement amount. (Relators' Mem. 3.) On March 23, 2016, the Court denied Relators' motion as premature and held that Relators could renew their motion for a share of the settlement proceeds if the Court found that they had stated a valid *qui tam* action. *U.S. ex rel. Lee v. N. Adult Daily Health Care Ctr.*, --- F. Supp. 3d ---, ---, 2016 WL 1171545, at *8 (E.D.N.Y. Mar. 23, 2016).

## II. Discussion

### a. Standard of review

#### i. Motion to dismiss

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)); see also *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions"

or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

Moreover, as discussed in greater detail below, "[i]t is self-evident that the FCA is an anti-fraud statute," and therefore "claims brought under the FCA fall within the express scope of Rule 9(b) [of the Federal Rules of Civil Procedure]." *Wood ex rel. U.S. v. Applied Research Associates, Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009) (quoting *Gold v. Morrison–Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir. 1995)); *see Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 43 (2d Cir. 2016) (quoting same). Pleadings subject to Rule 9(b) must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Ladas v. Exelis, Inc.*, --- F.3d ---, ---, 2016 WL 3003674, at *7 (2d Cir. May 25, 2016) (quoting *Shields v. Citytrust Bank Corp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); *Wood*, 328 F. App'x at 747 (quoting same). "Ultimately, whether a complaint satisfies Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013); *see Kane ex rel, U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 383 (S.D.N.Y. 2015) (quoting same); *U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 508 (S.D.N.Y. 2014) (quoting same); *U.S. ex rel. Kester v. Novartis Pharma. Corp.*, 23 F. Supp. 3d 242, 258 (S.D.N.Y. 2014) (quoting same); *see also Rombach v. Chang*, 355 F.3d 164, 171 (discussing the purpose of the particularity requirement and emphasizing fair notice to the defendant).

### ii. Documents considered

"In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Wilson v. Kellogg Co.*, 628 F. App'x 59, 60 (2d Cir. 2016) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)). In addition, courts may consider "documents that, although not incorporated by reference, are integral to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)). A court need not consider other information outside the pleadings, but where a court does not exclude extraneous information, it must give notice to the parties and convert the motion to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d); *see also Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 68 (2d Cir. 2014) (Before converting a motion to dismiss into a motion for summary judgment, "the court give sufficient notice to an opposing party and an opportunity for that party to respond."); *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202–03 (2d Cir. 2013) ("[T]he conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is strictly enforce[d] and mandatory.").

### b. Federal and New York False Claims Acts

The FCA imposes liability for, among other things, "knowingly" presenting or causing to be presented, a false or fraudulent claim "for payment or approval." 31 U.S.C. § 3729(a). Although Congress has repeatedly amended the FCA, "its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Universal Health Servs, Inc. v. U.S. ex rel. Escobar*, 579 U.S. ---, ---, 136 S. Ct. 1989, 1996 (2016). A "claim" includes direct requests to the government for payment as well as claims for reimbursement under federal

benefits programs. *Id.* The NYFCA "is closely modeled on the federal FCA," *Bilotta*, 50 F. Supp. 3d at 509 (citation and internal quotation marks omitted), and it imposes liability for "knowingly mak[ing] a false statement or knowingly fil[ing] a false record," *People ex rel. Schneiderman v. Sprint Nextel Corp.*, 26 N.Y.3d 98, 112 (2015). Because the NYFCA mirrors the FCA in many respects, "it is appropriate to look toward federal law when interpreting the New York act." *State ex rel. Seiden v. Utica First Ins. Co.*, 943 N.Y.S.2d 36, 39 (App. Div. 2012) (citing *State of N.Y. ex rel. Jamaica Hosp. Med. Ctr., Inc. v. UnitedHealth Grp., Inc.*, 922 N.Y.S.2d 342, 443 (App. Div. 2011)); *see Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 381 (S.D.N.Y. 2015) ("When interpreting the NYFCA, New York courts rely on federal FCA precedent."); *Bilotta*, 50 F. Supp. 3d at 509 ("New York courts rely on federal FCA precedents when interpreting the NYFCA." (citation omitted)). Pursuant to the private, or *qui tam*, provisions of the FCA and NYFCA, a private person may bring a civil action on behalf of the government, as a "relator," for violations of each act. 31 U.S.C. § 3730(b); N.Y. State Fin. Law § 190(2). If a relator brings such an action under either the FCA or the NYFCA, the government may elect, within a set amount of time, to intervene in the action. 31 U.S.C. § 3730(b)–(c); N.Y. State Fin. Law § 190(2)(b).

The provisions of the FCA invoked by Relators in this case subject to civil liability any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government, 31 U.S.C § 3729(a)(1)(A); "knowingly makes, uses, or causes to be used, a false record or statement material to [such] a false or fraudulent claim," *id.* § 3729(a)(1)(B); or "knowingly makes . . . a false record or statement material to an obligation to pay" the government or "conceals or . . . avoids or decreases an obligation to pay" the government, *id.* § 3729(a)(1)(G). Relators bring substantially the same

claims pursuant to the NYFCA. (Am. Compl. ¶¶ 240, 245, 250 (citing N.Y. State Fin. Law §§ 189(1)(a),(b),(g)).)

To prove a false claim under FCA sections 3729(a)(1)(A) and 3729(a)(1)(B) or NYFCA sections 189(1)(a) and 189(1)(b), a relator must show that the defendant "(1) made a claim, (2) to the [] government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Bishop*, 823 F.3d at 43 (quoting *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001)), *abrogated on other grounds by Universal Health Servs., Inc.*, 579 U.S. at ---, 136 S. Ct. at 2001); *U.S. ex rel. Qazi v. Bushwick United Housing Dev. Fund Corp.*, 977 F. Supp. 2d 235, 239 (E.D.N.Y. 2013) (quoting same). However, neither the FCA nor the NYFCA defines a "false" claim. *See Mikes*, 274 F.3d at 696. Similarly, to prove a "reverse false claim" under FCA section 3729(a)(1)(G) or NYFCA section 189(a)(g), which involves money *owed* to the government rather than money *paid by* the government, a relator must show: "(1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government — a duty to pay money or property." *Kester*, 43 F. Supp. 3d at 367–68 (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) (internal quotation marks omitted)); *see also Wood*, 328 F. App'x at 748.

Relators allege that Defendants billed the Medicaid Program for "substandard services that were inappropriate, unacceptable, harmful, worthless, and/or unnecessary," in violation of DOH and Medicaid regulations. (Am. Compl. ¶ 43.) In particular, Relators allege that Defendants violated provisions of Title 10 and Title 18 of the New York Codes, Rules and Regulations that establish operating conditions for adult day health care facilities, (*id.* ¶¶ 16–26) and that govern Medicaid reimbursement, (*id.* ¶¶ 35–36). Northern Adult argues that Relators' claims are precluded by the settlement agreement between the State, Northern Metropolitan and Northern Manor, (Def. Mem. 3); that Relators have not pled their claims with the particularity

required by Rule 9(b), (*id.* at 5–7); and, in substance, that Relators have not pled falsity within the meaning of the FCA, (*id.* at 4–5).

For the reasons discussed below, the Court grants Northern Adult's motion to dismiss Relators' claims brought pursuant to 31 U.S.C. § 3729(a)(1)(G) and New York State Financial Law § 189(1)(g). The Court denies Northern Adult's motion to dismiss Relators' claims brought pursuant to 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), and New York State Financial Law §§ 189(1)(a) and 189(1)(b).

### i. Preclusion by settlement

Northern Adult argues that the Settlement Agreement resolves Relators' *qui tam* claims, and the claims are thus precluded under section 190(9)(a)(ii) of the NYFCA. (Def. Mem. 3.) Relators attach a copy of the Settlement Agreement to its papers in opposition to Northern Adult's motion. (Settlement Agreement, annexed to Relators' Mem. as Ex. A.) Both the State and Relators argue, separately, that the State, Northern Metropolitan and Northern Manor resolved only two discrete claims that are unrelated to the claims in Relators' *qui tam* action. (State Ltr. of Interest 2; Relators' Mem. 14.)

As explained above, on a motion to dismiss pursuant to Rule 12(b)(6), the Court is limited to "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken," *Wilson*, 2016 WL 143454, at *1, as well as documents integral to the complaint, *L-7 Designs, Inc.*, 647 F.3d at 422. Relators filed the Amended Complaint on June 26, 2015, approximately one year after the Settlement Agreement took effect, and made no mention of the Settlement Agreement in the Amended Complaint. In addition, none of the parties have argued to the Court that the Settlement Agreement is incorporated in, or integral to, the Amended Complaint or that the Court may take judicial notice of the terms of the Settlement Agreement.

Because the Settlement Agreement is not properly before the Court on a motion to dismiss pursuant to Rule 12(b)(6), the Court denies Northern Adult's motion to dismiss the action as precluded by the Settlement Agreement.

## ii. Pleading false claims with particularity

Northern Adult argues that the Amended Complaint does not plead the alleged fraud with particularity. (Def. Mem. 5.) Northern Adult contends that Relators have not pled the "who, what, when, where and how of the alleged fraud," because the Amended Complaint does not identify registrants by name, does not allege attendance dates with particularity and does not provide "dates, names or other details concerning critical billing." (*Id.* at 6–7.) Relators argue that they have detailed the "who, what, when, where and how" of the fraud and have provided representative examples of specific false claims. (Relators' Mem. 6–9.)

"Rule 9(b) requires that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Ladas*, 2016 WL 3003674, at *7 (alteration in original) (quoting Fed. R. Civ. P. 9(b)). "To satisfy this Rule, a complaint alleging fraud must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); *Wood*, 328 F. App'x at 747 (quoting same). "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *U.S. ex rel. Polansky v. Pfizer, Inc.*, No. 04–CV–0704, 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (citation and internal quotation marks omitted). As the Second Circuit has explained:

> The purpose of Rule 9(b) is threefold — it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit. Thus, although Rule 9(b) permits knowledge to be averred

generally, we have repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent. Essentially, while Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges.

*Wood*, 328 F. App'x at 747 (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)). "One of the [further] purposes of Rule 9(b) is to discourage the filing of complaints as a pretext for discovery of unknown wrongs. [A relator's] contention, that discovery will unearth information tending to prove his contention of fraud, is precisely what Rule 9(b) attempts to discourage." *Id.* (quoting *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989)).

Courts in this Circuit have held that "allegations as to the existence of an overall fraudulent scheme do not plead fraud with particularity," and that "to satisfy Rule 9(b), an FCA claim must allege the particulars of the false claims themselves." *Bilotta*, 50 F. Supp. 3d at 509; *see also U.S. ex rel. Kester v. Novartis Pharma. Corp.*, 23 F. Supp. 3d 242, 255 ("[A] plaintiff must plead both the particular details of a fraudulent scheme and details that *identify particular false claims for payment* that were submitted to the government." (citation and internal quotation marks omitted)). In other words, FCA pleadings must be "linked to allegations, stated with particularity, of actual false claims submitted to the government." *Bilotta*, 50 F. Supp. 3d at 510 (quoting *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004)).[6] In *Bilotta*, the court noted that:

> [I]n this Circuit, courts have held that the complaint must provide details that identify particular false claims for payment that were

---

[6]  Because the Second Circuit has not articulated the requirements of Rule 9(b) in the context of FCA claims, several district courts in the circuit have relied on the standard articulated by the First Circuit in *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004).

> submitted to the government. . . . [D]etails concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a [plaintiff] to state his or her claims with particularity. These details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint. However . . . some[] of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b).

*Id.* (quoting *Polansky*, 2009 WL 1456582, at *5); *see also Kester*, 23 F. Supp. 3d at 257–58 ("In line with the weight of authority in this Circuit, I adopt the *Karvelas* standard — plaintiffs asserting subsection (a)(1)(A) and (a)(1)(B) claims must plead the submission of a false claim with a high enough degree of particularity that defendants can reasonably identify particular false claims for payment that were submitted to the government." (citation and internal quotation marks omitted)); *Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 301–02 (S.D.N.Y. 2013) (collecting cases).

Nevertheless, "[i]n cases where the alleged fraudulent scheme is extensive and involves numerous transactions that occurred over a long period of time," courts in this Circuit have held that it is "impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct." *Bilotta*, 50 F. Supp. 3d at 517 (quoting *Kester*, 23 F. Supp. 3d at 258)). Rather, "in setting forth a complex and far-reaching scheme," a relator need allege only "representative samples" of fraudulent conduct to satisfy Rule 9(b). *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 481–82 (S.D.N.Y. 2013); *see also United States v. N.Y. Soc'y for the Relief of the Ruptured & Crippled*, No. 07-CV-292, 2014 WL 3905742, at * 14 (S.D.N.Y. Aug. 7, 2014) (collecting cases); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013) (finding that examples of fraudulent statements were necessary to permit a

defendant "to infer with reasonable accuracy the precise claims at issue"). The pleading standard under Rule 9(b) may be relaxed where "(1) the facts are peculiarly within the possession and control of the defendant or (2) where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010); *see also U.S. ex rel. Mooney v. Americare, Inc.*, No. 06-CV-1806, 2013 WL 1346022, at *3 (E.D.N.Y. Apr. 3, 2013) ("The Second Circuit applies a relaxed pleading standard when a plaintiff is not in a position to know specific facts until after discovery and 'when facts are peculiarly within the opposing party's knowledge.'" (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990))).

As discussed below, Relators have adequately pled false claims under sections 3729(a)(1)(A) and 3729(a)(1)(B) of the FCA and parallel sections 189(1)(a) and 189(1)(b) of the NYFCA. (*See* Am. Compl. ¶¶ 223–232, 238–247.) However, Relators have not adequately pled "reverse" false claims under section 3729(a)(1)(G) of the FCA and parallel section 189(1)(g) of the NYFCA, and the Court accordingly dismisses those claims. (*See id.* ¶¶ 233–237, 248–252.)

### 1. Relators' false claims — FCA §§ 3729(a)(1)(A), 3729(a)(1)(B) and NYFCA §§ 189(1)(a), 189(1)(b)

Northern Adult argues that "[t]he most glaring examples of [Relators'] failure to comply with Rule 9(b) is [their] total failure to identify critical details of the billing, particularly in a way that connects the submission of any false claim to [Northern Adult]." (Def. Reply 4.) Northern Adult appears to concede that Relators have argued the "who, what, when, and where" of a fraud scheme, *Polansky*, 2009 WL 1456582, at *4, but argues, citing an out-of-Circuit case, that Relators have failed to allege the "how" of the fraudulent submissions to the government. (Def. Reply 3–4.) Northern Adult spends the better part of its argument noting that Relators have not explained how the provider named on the Recipient Claim Detail Reports — Northern Manor

Geriatric Center — relates to Northern Adult, or how Deverman was involved in the billing. (*Id.* at 4.)

The Court finds Northern Adult's arguments unpersuasive. Here, the alleged fraudulent scheme took place over several years, at the address listed in the Amended Complaint, and began when Deverman became the full-time Assistant Director of Northern Adult. (Am. Compl. ¶¶ 11, 13, 14 (noting that Deverman became the Assistant Director on December 18, 2008, and that "[s]ince [then], Northern has become systematically racist, has failed to provide required medical and health related services, registers non-eligible individuals, and submits false and fraudulent claims for payment to Medicaid").) Relators identify Deverman as the person responsible for: contracting with an outside vendor to provide unhealthy food, (*id.* ¶¶ 49–53), uploading videos of mistreatment of registrants at Northern Adult, (*id.* ¶ 79), cutting staff and eliminating trainings, (*id.* ¶¶ 65, 74), and halting physical therapy and exercise programs for registrants, (*id.* ¶ 62). Relators also identify, by first name and "LNU," or "Last Name Unknown," numerous other personnel who engaged in discriminatory conduct and provided worthless services after Deverman became the full-time Assistant Director of Northern Adult. (*See, e.g.*, *id.* ¶¶ 57, 61, 70, 71.)

The Amended Complaint, which is sixty pages in length, also adequately describes the nature of the misconduct underpinning Relators' *qui tam* claims. Relators allege that Defendants failed to adequately supervise registrants, failed to provide food consistent with dietary restrictions, failed to provide registrants with physical and occupational therapy, discriminated against African-American, Hispanic and Chinese registrants and misappropriated Medicaid reimbursements to fund a "Russian social club" for Russian registrants who were not eligible for Medicaid-funded services. (*See id.* ¶¶ 44–79.) In addition to these allegations, which set forth the deteriorating conditions at Northern Adult from 2010 through 2013, Relators provide sixteen

specific examples of false claims with annexed billing details. (*See id.* ¶¶ 80–176.) For each of these examples, the Amended Complaint provides the registrant's dates of attendance, Defendants' misconduct, and the facts that render Defendants' claims false.

For instance, the Amended Complaint explains that "LQ,"[7] a Chinese-American registrant, attended Northern from January 10, 2010 until April 22, 2010, but was only allowed to attend on Sundays, when no Russians were in attendance. (*Id.* ¶ 90.) The Amended Complaint notes that LQ is diabetic and that Defendants billed for health-related services provided to LQ, and refers to the claims submitted on LQ's behalf. (*See id.* ¶¶ 90–91 (citing Recipient Claim Detail Report ("LQ Claim Report"), annexed to Am. Compl. as Ex. 3).) The LQ Claim Report includes a location code, category code, registrant identification code, the amount paid, a service code, a daily rate and dates of service that correspond to the roughly weekly attendance alleged in the Amended Complaint. (*See* LQ Claim Report; Am. Compl. ¶ 90.) The Amended Complaint also states that the claims submitted on LQ's behalf "were false [because] LQ was not provided health-related services," (Am. Compl. ¶ 92), because "Northern [Adult] misappropriated Medicaid funds intended to provide LQ with services in order to maintain a Russian social club," (*id.* ¶ 93), and because Northern Adult "violated Title VI of the Civil Rights laws and DOH conditions of payment, including the provision of harmful, discriminatory and worthless services," (*id.* ¶ 94). The Amended Complaint provides this level of detail for sixteen representative registrants and corresponding claims. (*See* Am. Compl. ¶¶ 80–176.)

---

[7] Relators have redacted names of registrants to maintain healthcare privacy in compliance with New York law, but have used initials and identifying details where appropriate. (*See* Relators' Mem. 7 n.2.)

Thus, Relators have alleged an overall fraudulent scheme and have "linked [those] allegations, stated with particularity, [to] actual false claims submitted to the government." *See Bilotta*, 50 F. Supp. 3d at 510 (quoting *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004)). Relators have pled "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, [and] the individuals involved in the billing." *See Bilotta*, 50 F. Supp. 3d at 510 (quoting *Polansky*, 2009 WL 1456582, at *5). Although Relators do not appear to have pled "the length of time between the alleged fraudulent practices and the submission of claims based on those practices," *see id.*, they have pled their claims with a sufficiently high degree of particularity that Northern Adult "can reasonably identify particular false claims for payment that were submitted to the government," *Kester*, 23 F. Supp. 3d at 257–58. To require Relators to plead the details of every fraudulent claim over three years would be "cumbersome, unwieldy, and would accomplish no purpose." *See id.* at 258. This is particularly so because, at this early stage in the litigation, Northern Adult alone has information about the precise dates on which claims were submitted and who at Northern Adult submitted them. *See Arista Records*, 604 F.3d at 120; *Minnie Rose LLC v. Yu*, --- F.3d ---, ---, 2016 WL 1049020, at *3 ("Here, Plaintiff describes the allegedly fraudulent scheme and attaches two of the fraudulent invoices . . . . Information which might tend to establish that the balance of the invoices were similarly inflated is solely within [the d]efendants['] knowledge at this early stage of litigation."). Based on the nature of the case, the ongoing transactions and Relators' lack of access through their prior employment positions to the type of billing information that would prove their allegations in this case, *see Rombach*, 355 F.3d at 170, Relators have satisfied Rule 9(b) by alleging "a complex and far-reaching scheme" and providing "representative samples" of Defendants' misconduct as part of that scheme, *see*

*Bank of N.Y. Mellon*, 941 F. Supp. 2d at 481–82.  The Court denies Northern Adult's motion to dismiss Relators' claims brought pursuant to sections 3729(a)(1)(A) and 3729(a)(1)(B) of the FCA, and sections 189(1)(a) and 189(1)(b) of the NYFCA.

## 2. Relators' "reverse" false claims — FCA § 3729(a)(1)(G) and NYFCA § 189(1)(g)

As explained above, to plead a reverse false claim a relator must show: "(1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government — a duty to pay money or property." *Kester*, 43 F. Supp. 3d at 367–68 (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) (internal quotation marks omitted)).  However, where a complaint "makes no mention of any financial obligation that the [defendants] owed to the government" and "does not specifically reference any false records or statements used to decrease such an obligation," the court should dismiss the reverse false claim. *Id.* (quoting *Wood*, 328 F. App'x at 748).

Relators have not alleged that Defendants made "a false record or statement material to an obligation to pay or transmit money" to the government, or that Defendants knowingly concealed, avoided or decreased such an obligation.  31 U.S.C. § 3729(a)(1)(G).  Nor do Relators "reference any false records or statements used to decrease such an obligation." *See Wood*, 328 F. App'x at 748.  Instead, Relators allege that Defendants sought payment from the government.  The Court therefore dismisses Relators' reverse false claims, brought pursuant to section 3729(a)(1)(G) of the FCA and section 189(1)(g) of the NYFCA. *See U.S. ex rel Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 816 (holding that reverse false claims under the NYFCA fail for the same reasons as do reverse false claims under the FCA).

### iii. Theories of falsity

Separately from its attack on the particularity of the pleadings, Northern Adult argues that Relators bring claims under regulations that cannot support a FCA claim because the regulations merely establish "conditions of participation" or operation in an adult day health care program, "but not conditions of payment" by the government. (Def Mem. 4–5.) The Court understands Northern Adult to argue that Relators have failed to allege falsity under the FCA because, as the Second Circuit has held, the FCA "does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions,"[8] *Mikes*, 274 F.3d at 697. (*See* Def. Mem. 5.)

The Second Circuit has determined that a claim can be false or fraudulent under three theories of liability:

> (1) a factually false theory, under which a claim for payment is made to the government seeking payment for services that were never actually provided or for which the description of the goods or services provided is incorrect; (2) an express false legal certification theory, where a claim for payment of federal funds falsely certifies compliance with a statute or regulation that must be complied with before payment can be made; and (3) an implied false legal certification theory, where, although the claim for payment does not certify compliance with a statute or regulation on its face, compliance is a prerequisite to payment under the express statutory or regulatory terms.

_____

[8] The Second Circuit and district courts in this circuit consider theories of falsity on a motion to dismiss where a defendant has alleged that a plaintiff did not meet his burden to connect widespread fraud to actual false claims submitted to the government. *See, e.g.*, *Bishop*, 823 F.3d at 39 ("Even assuming the relators' accusations of widespread fraud are true, they have not plausibly connected those accusations to express or implied false claims submitted to the government for payment, as required to collect treble damages . . . ."); *Mikes*, 274 F.3d at 696 (considering theories of falsity where, on appeal, "the parties dispute[d] whether [the] defendants' Medicare claims r[o]se to the level of being false or fraudulent"); *cf. U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 926 F. Supp. 2d 510, 522 (S.D.N.Y. 2013) ("The first contention [of falsity] merits only brief discussion at this stage because it is an attack less on the particularity of the pleadings than on the theory of relief.").

*U.S. v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 255 (N.D.N.Y. 2013) (citing *Mikes*, 274 F.3d at 696–700). Based on the Amended Complaint, Relators seem to advance claims under all three theories of FCA liability. (*See* Am. Compl. ¶¶ 33–34, 47.) However, Northern Adult does not address Relators' claims brought under a factually false theory, (*see* Def. Mem. 4–5; Def. Reply 7), which claims allege that Northern Adult provided worthless services and, in some instances, did not provide the services for which it requested reimbursement, (*e.g.*, Am. Compl. ¶¶ 48, 89, 104).[9] Instead, Northern Adult argues that the regulations to which Relators cite are "general requirements for operation" rather than "conditions of payment of a claim." (Def. Reply 7.) The Court accordingly examines only Relators' allegations pursuant to theories of legal certification.

### 1. Express false legal certification theory

Relators repeatedly refer to several rules and regulations with which Northern Adult "expressly and impliedly certified compliance" when it submitted its claims to the government. (*See, e.g.*, Am. Compl. ¶ 34, 47.) As explained above, the Second Circuit has defined express and implied legal certifications as theories of falsity or liability that a plaintiff may raise to describe the manner in which a defendant has defrauded the government. *See Mikes*, 274 F.3d at 697–98.

In *Mikes*, the Second Circuit affirmed the dismissal of a *qui tam* suit alleging that a medical practice had violated the FCA when it requested Medicare reimbursement for procedures that did not meet the requisite standard of care. *Id.* at 697. The Second Circuit held

---

[9] The Second Circuit has held that worthless services claims are "derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided." *Mikes*, 274 F.3d at 703. "In a worthless services claim, the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all," and it thus violates the FCA irrespective of any certification. *Id.*

that "a claim for reimbursement made to the government is not legally false simply because the particular service furnished failed to comply with the mandates of a statute, regulation or contractual term that is only tangential to the service for which reimbursement is sought." *Id.* at 697. Instead, "a claim under the [FCA] is legally false only where a party certifies compliance with a statute or regulation as a condition to governmental payment." *Id.* The court in *Mikes* clarified that under a theory of express certification, a plaintiff must allege that the defendant submitted "a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Id.* at 698.

In the Amended Complaint, Relators allege that Northern Adult:

> specifically certified in a Medicaid Provider Agreement, dated January 14, 2010, that in order to receive payment from the New York Medicaid Program, it was required to comply with Title VI of the Civil Rights Act of 1964, and to comply with all Federal and State law, and regulations of the DOH or the Department of Mental Hygiene, or the Department of Health and Human Services.

(Am. Compl. ¶ 34.) However, Relators do not allege that Northern Adult submitted a *claim* in which it expressly certified such compliance; rather, Relators allege that Northern Adult certified in a Medicaid Provider Agreement that it would comply with state and federal regulations. (*Id.*) Thus, although Northern Adult may have "expressly . . . certified compliance" with DOH rules and regulations, (*id.* ¶ 47), a theory of express false legal certification requires that "a claim . . . falsely certifies compliance," *Mikes*, 274 F.3d at 698; *see U.S. ex rel. Kester v. Novartis Pharma. Corp.*, 43 F. Supp. 3d 332, 361 (S.D.N.Y. 2014) ("Under *Mikes*, a violation does not render a claim 'false' unless (1) compliance with the underlying statute, regulation, or contract is a 'precondition' to payment of the claim, and (2) a party falsely represents (or 'certifies') compliance with the provision *in connection with the claim*." (emphasis added)). Because Relators have not adequately alleged that Northern Adult, in submitting a claim, certified

compliance with particular rules and regulations as conditions to payment, Relators have not stated a claim under a theory of express false legal certification.

## 2. Implied false legal certification theory

Relators allege throughout the Amended Complaint that Northern Adult submitted "impliedly false" claims that were noncompliant with Title VI and DOH conditions of payment. (*See, e.g.*, Am. Compl. ¶¶ 43, 47, 48, 84, 89, 94, 99.)

The Second Circuit in *Mikes* noted that only in limited circumstances should a medical provider be found to have implicitly certified compliance with a particular rule as a condition of reimbursement — specifically, "only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid." *Id.* at 700. Since the decision in *Mikes*, the Second Circuit and district courts in the circuit have relied heavily on that decision as having established the *sine qua non* of an implied false certification claim. *See, e.g.*, *Bishop*, 823 F.3d at 48–49 (affirming the *Mikes* test to state a claim under a theory of implied false certification); *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 114 (2d Cir. 2010) (analyzing implied false certification claims by comparison to *Mikes*); *Qazi*, 977 F. Supp. at 239, 242 (relying on *Mikes* to dismiss FCA claims brought under express and implied false certification theories); *U.S. ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 653 (S.D.N.Y. 2011) (distinguishing the implied false certification claims before it from those in *Mikes*).

Since the parties briefed this motion, the Supreme Court has issued a ruling that abrogates the Second Circuit's implied false certification analysis in *Mikes*. *See Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. at 2001–02. In *Universal Health*, the Supreme Court "granted certiorari to resolve the disagreement among the Courts of Appeals over the validity and scope of the implied false certification theory of liability." *Id.* at 1998. The alleged false

claims before the Supreme Court arose within the Medicaid program and involved a teenage

beneficiary of Massachusetts' Medicaid program who received counseling services from Arbour

Counseling Services ("Arbour"). *Id.* at 1997. Counselors at Arbour intermittently treated the

teenager YR and prescribed medication, to which YR reacted adversely on several occasions. *Id.*

YR died from a seizure at the age of seventeen. *Id.* Thereafter, an Arbour counselor revealed to

YR's parents that few Arbour employees were licensed to provide mental health counseling and

many performed medical services without required supervision. *Id.* YR's parents filed a *qui tam*

suit under an implied false certification theory of liability. *Id.*

The Supreme Court held that the implied false certification theory can be a basis for

liability where two conditions are satisfied: "first, the claim does not merely request payment,

but also makes specific representations about the goods or services provided; and second, the

defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual

requirements makes those representations misleading half-truths." *Id.* at 2001. The

misrepresentation "must be material to the Government's payment decision in order to be

actionable under the [FCA]," and the "materiality standard is demanding." *Id.* at 2003. Thus,

contrary to the Second Circuit's decision in *Mikes*, the Supreme Court held that "[w]hether a

provision is labeled a condition of payment is relevant to but not dispositive of the materiality

inquiry." *Id.* at 2001. The Supreme Court further explained:

> In sum, when evaluating materiality under the False Claims Act,
> the Government's decision to expressly identify a provision as a
> condition of payment is relevant, but not automatically dispositive.
> Likewise, proof of materiality can include, but is not necessarily
> limited to, evidence that the defendant knows that the Government
> consistently refuses to pay claims in the mine run of cases based on
> noncompliance with the particular statutory, regulatory, or
> contractual requirement. Conversely, if the Government pays a
> particular claim in full despite its actual knowledge that certain
> requirements were violated, that is very strong evidence that those
> requirements are not material.

*Id.* at 2003. The Supreme Court vacated the judgment of the First Circuit Court of Appeals and remanded for a determination of whether the mental health facility requirements were "so central to the provision of mental health counseling that the Medicaid program would not have paid the[] claims had it known of the[] violations." *Id.* at 2004.

Northern Adult's argument that Title VI and the DOH regulations do not provide "conditions of payment" to which they falsely certified, and Relators' argument that Title VI and DOH regulations *do* provide "conditions of payment" to which Defendants certified, are therefore no longer determinative of Relators' claims under the implied false certification theory. To the extent that Relators allege that Northern Adult impliedly certified compliance with Title VI and DOH regulations, (*see* Am. Compl. ¶¶ 34–35, 43–45, 54–56, 78, 80), Relators' claims do not meet the newly articulated standard in *Universal Health*. Relators do not separate their allegations pursuant to factually false and implied false certification theories of liability. Nevertheless, the Court understands Relators to accuse Northern Adult of billing the government for inappropriate and discriminatory services, some of which are not consistent with Medicaid standards and some of which violate Title VI. (*See generally* Am. Compl. ¶¶ 44–79; Relators' Mem. 12–13.) In their opposition to the motion, Relators distinguish between these claims, which were false "because Defendants failed to fulfill prerequisites for payment by Medicaid," (Relators' Mem. 12), and claims brought under a factually false theory, which were false because they were "fraudulent on their face" when Defendants "improperly bill[ed] for services not provided or worthless services," (*id.* at 11).

Relators argue that Northern Adult submitted false claims for payment, and Relators have incorporated examples of such claims into the Amended Complaint. (*See* Recipient Claim Detail Reports, annexed to Am. Compl. as Exs. 1–10.) As in *Universal Health*, the claims for payment use codes that correspond to specific services, satisfying the first condition for an implied

certification theory of liability. *Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. at 2000–01 (noting that "by submitting claims for payment using payment codes that corresponded to specific counseling services, [Arbour] represented that it had provided individual therapy . . . and other types of treatment," and that those claims constituted misrepresentations because Arbour "us[ed] payment and other codes that conveyed this information without disclosing Arbour's many violations of basic staff and licensing requirements for mental health facilities").

However, Relators do not allege, as they are now required to do under *Universal Health*, that Northern Adult's misrepresentations were material and that the government would have refused reimbursement had it known of Northern Adult's noncompliance with Title VI and the cited DOH regulations. Instead, Relators argue that Northern Adult certified its compliance with regulations on which the government conditioned Medicaid reimbursement. (Am. Compl. ¶ 34). While Relators' argument may have sufficed to support an implied false certification claim under the standard in *Mikes*, it no longer suffices under the standard in *Universal Health*. *See Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. at 2001 (holding that "statutory, regulatory and contractual requirements are not automatically material, even if they are labeled conditions of payment"). Because Relators have not alleged that noncompliance with Title VI and the DOH regulations listed in the Amended Complaint would have influenced the government's decision to reimburse Northern Adult, Relators have not stated a claim under an implied false certification theory of liability. *See id.* at 2003–04 (explaining how a plaintiff might prove that compliance is material to the government).

When the Amended Complaint was drafted, Relators did not have the benefit of the Supreme Court's recent guidance on materiality. To the extent that Relators wish to pursue this theory, the pleading is inadequate, and Relators are granted leave to amend the Amended Complaint within thirty (30) days of this decision.

### c. Retaliation

Relators allege that Defendants retaliated against them in violation of the "whistleblower" provisions of the FCA, 31 U.S.C. § 3730(h), the NYFCA[10], N.Y. State Fin. Law § 191, and the New York Labor Law, N.Y. Labor Law § 741. (Am. Compl. ¶¶ 253–297.) Specifically, Relators allege that (1) Lee was constructively terminated after he raised questions and complained about certain violations, including that Northern Adult was treating Latino registrants poorly, (*id.* ¶¶ 177–91); (2) Luckie was demoted and terminated after he complained about Northern Adult's health violations and its disparate treatment of African American and Latino registrants, (*id.* ¶¶ 192–205); and (3) Gonzalez was constructively terminated after complaining about several deficiencies at Northern Adult, including that it stopped providing physical therapy and that it served African American and Latino registrants' food last, (*id.* ¶¶ 206–222). For the reasons discussed below, the Court dismisses Gonzalez's retaliation claims under the FCA and NYFCA. The Court also dismisses all Relators' claims under the New York Labor Law. The Court denies Defendants' motion as to the retaliation claims by Lee and Luckie pursuant to the FCA and the NYFCA.

### i. Retaliation — FCA and NYFCA

Northern Adult argues that Relators have not alleged that they "notified their employer that they were engaged in protected activity, or that they intended to bring a *qui tam* action," a necessary prerequisite to Relators' retaliation claims under the FCA and NYFCA. (Def. Mem.

---

[10] The whistleblower provision of the NYFCA is "essentially identical in language and substance to its federal counterpart." *Forkell v. Lott Assisted Living Corp.*, No. 10-CV-5765, 2012 WL 1901199, at *13 (S.D.N.Y. May 21, 2012). The provision protects, in relevant part, a current or former employee who is discharged "because of lawful acts done by the employee . . . in furtherance of an action brought under the [NYFCA] or other efforts to stop one or more violations of the [NYFCA]." N.Y. State Fin. Law § 191(1). The Court therefore analyzes Relators' FCA and NYFCA retaliation claims within the FCA framework.

7.)  Northern Adult also argues that the acts of retaliation "lack a temporal relationship" to the protected activity and, by extension, cannot support a retaliation claim.  (*Id*. at 8.)  Relators argue that they repeatedly complained to Northern Adult management "about [Northern Adult's] unlawful behavior" and that, as a result, Northern Adult knew that Relators were engaged in protected activity.  (Relators' Mem. 19.)  Relators do not address the temporal proximity of their complaints to the alleged retaliatory acts.

To sustain an action for retaliatory discharge under the FCA, a plaintiff must establish: "(1) that she engaged in conduct protected under the statute; (2) that [the] defendants were aware of her conduct; and (3) that she was terminated in retaliation for that conduct."  *Mooney*, 2013 WL 1346022, at *8; *Empire Educ. Corp.*, 959 F. Supp. 2d at 256; *Johnson v. Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 268 (W.D.N.Y. 2010); *Mikes v. Strauss*, 889 F. Supp. 746, 752 (S.D.N.Y. 1995).[11]  A plaintiff need not plead an FCA retaliation claim with particularity because no showing of fraud is required.  *Mooney*, 2013 WL 1346022, at *8; *Garcia v. Aspira of N.Y., Inc.*, No. 07-CV-5600, 2011 WL 1458155, at *3 n.1 (S.D.N.Y. Apr. 13, 2011).  Under the current version of the FCA whistleblower provision, section 3730(h), already in effect at the time of the alleged conduct,[12] protected conduct is defined as "lawful acts done by the employee,

---

[11]  The Second Circuit "has yet to articulate a test for deciding when a plaintiff has set forth a claim for retaliation under section 3730(h)."  *Weslowski v. Zugibe*, 626 F. App'x 20, 22 (2d Cir. 2015).

[12]  Section 3730(h) provides, in pertinent part:
> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others *in furtherance of an action under this section or other efforts to stop 1 [one] or more violations of this subchapter.*

contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 [one] or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). The category of protected conduct is "interpreted broadly and encompasses two kinds of conduct: (1) lawful acts done by the employee . . . in furtherance of an action under the FCA, and (2) other efforts to stop one or more violations of the FCA." *Swanson v. Battery Park City Auth.*, No. 15-CV-6938, 2016 WL 3198309, at *3 (S.D.N.Y. June 8, 2016) (citations and internal quotation marks omitted). Within this second category of protected conduct, "a retaliation claim can be stated so long as the employee was engaged in efforts to stop an FCA violation, even if the employee's actions were not necessarily in furtherance of an FCA claim." *Id.* (quoting *Malanga v. N.Y.U. Langone Med. Ctr.*, No. 14-CV-9681, 2015 WL 7019819, at *2 (S.D.N.Y. Nov. 12, 2015)). Moreover, a plaintiff "need not prevail on his underlying FCA claims," but he must "demonstrate that he had been investigating matters that were calculated, or reasonably could have [led], to a viable FCA action." *Empire Educ. Corp.*, 959 F. Supp. 2d at 256 (citing *U.S. ex rel. Sasaki v. N.Y.U. Med.*, No. 05-CV-6163, 2012 WL 220219, at *12 (S.D.N.Y. Jan. 25, 2012)).

A plaintiff must also allege that "his employer was aware that he was engaged in" protected conduct. *Weslowski v. Zugibe*, 626 F. App'x 20, 21 (2d Cir. 2015); *see Swanson*, 2016

---

31 U.S.C. § 3730(h)(1) (emphasis added). Until 2009, the provision read differently:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others *in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section*, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (1982) (emphasis added), *amended by* Fraud Enforcement Recovery Act, Pub. L. 111-21 § 4(h)(1), 123 Stat. 1617, 1624–25, effective May 20, 2009. The 2009 amendments to the FCA were followed by analogous changes to the NYFCA.

WL 3198309, at *5. In the absence of Second Circuit guidance on this element of the retaliation

claim, many courts in the Circuit have adopted the positions of the First Circuit Court of Appeals

and the D.C. Circuit Court of Appeals. *Swanson*, 2016 WL 3198309, at *5 (collecting cases);

*see Mooney*, 2013 WL 1346022, at *9 (citing *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423

(D.C. Cir. 2005)); *Sasaki*, 2012 WL 220219, at *12 (citing *U.S. ex rel. Yesudian v. Howard

Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998)); *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58,

105 (D. Conn. 2006) (first citing *Karvelas*, 360 F. 3d at 237; and then citing *Yesudian*, 153 F.3d

at 743). These courts have held that in order to put their employers on notice, "plaintiffs alleging

that performance of their normal job responsibilities constitutes protected activity must

overcome the presumption that they are merely acting in accordance with their employment

obligations." *Swanson*, 2016 WL 3198309, at *5 (internal quotation marks omitted) (quoting

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1260–61 (D.C. Cir. 2004));

*see Fisch v. New Heights Academy Charter Sch.*, No. 12-CV-2033, 2012 WL 4049959, at *6

("Naturally, an employee who simply engages in behavior wholly consistent with his job

description will not, without more, provide notice that he is acting 'in furtherance' of an FCA

action." (citation and internal quotation marks omitted)). As the court in *Yesudian* explained:

> Nonetheless, a plaintiff still must show that his employer was
> aware of his protected activity. Merely grumbling to the employer
> about job dissatisfaction or regulatory violations does not satisfy
> the requirement — just as it does not constitute protected activity
> in the first place. Threatening to file a qui tam suit or to make a
> report to the government, on the other hand, clearly is one way to
> make an employer aware. But it is not the only way.

*Yesudian*, 153 F.3d at 743. However, under the 2009 amendment to the FCA, complaining of

regulatory violations may qualify as an "effort[] to stop 1 or more violations" of the FCA, *see* 31

U.S.C § 3730(h)(1). Thus, the proposition in *Yesudian* that "grumbling to the employer

about . . . regulatory violations . . . does not constitute protected activity," 154 F.3d at 743,

appears to no longer be valid. Accordingly, some courts have observed that "it is doubtful that those heightened [standards for notice] survive [the amendments]" because the decisions propounding the heightened standard "were concerned with ensuring that the employer was on notice of an employee's intentions of *bringing or assisting in an FCA action*," whereas the 2009 amendments broadened the scope of the FCA's whistleblower provision to protect against retaliation in cases where "the employee was engaged *in efforts to stop an FCA violation*," even if those efforts were not necessarily in furtherance of an FCA claim. *Malanga*, 2015 WL 7019819, at *3; *see Swanson*, 2016 WL 3198309, at *6 (noting that the heightened notice standard may not apply after the 2009 amendments to the FCA and NYFCA); *cf. Weslowski*, 626 F. App'x at 22 ("But [the plaintiff] does not allege that he did anything that would have put [his employer] on notice that his [protected conduct] was in furtherance of an effort to stop a violation of the FCA. Accordingly, he failed to allege that he was fired or otherwise discriminated against 'because of' lawful acts done in furtherance of efforts to stop a violation of the FCA.").

Finally, where a plaintiff alleges that he has been discharged in retaliation for engaging in protected conduct, he must plead facts to show that he was directly terminated or that "his employer, rather than discharging him directly, intentionally create[d] a work atmosphere so intolerable that he [was] forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003). The retaliatory discharge must occur *because of* the protected conduct. *Swanson*, 2016 WL 3198039, at *6; *see Garcia*, 2011 WL 1458155, at *5 ("At the motion to dismiss stage, the temporal proximity of plaintiff's [protected conduct] . . . is a sufficient basis to permit the claim to go forward."); *see also McAllan v. Von Essen*, 517 F. Supp. 2d 672, 686 (S.D.N.Y. 2007) (holding that, because the plaintiff continued to work for almost three years after the protected conduct and before the alleged retaliation, "[the] plaintiff has failed to provide

any evidence that would permit a reasonable fact finder to find a nexus between the challenged employment actions and the FCA suit").

### 1. Lee and Luckie

Without fact discovery, the Court cannot conclude that Lee's and Luckie's internal reporting to Northern Adult management, and management's response, do not constitute paradigmatic whistleblowing and retaliation under the FCA and NYFCA. Lee alleges that he complained to management, including Deverman, about the discriminatory treatment toward Hispanic and African-American registrants, (Am. Compl. ¶¶ 180–89), and Luckie additionally alleges that he complained to management, including Deverman, about the unsanitary handling of food, lack of training for food service staff and provision of alcohol to registrants, (*id.* ¶¶195–204). Because Relators claim that Defendants violated the FCA by impliedly certifying compliance with Title VI and DOH regulations, they have adequately pled that their complaints to management about violations of those rules and regulations were "in furtherance of . . . efforts to stop 1 or more violations of [section 3730(h)(1)]," and constitute protected conduct.

On the issue of notice, Northern Adult argues that "there is no allegation that any relator was engaged in activity other than what they were hired and expected to do," and "[n]one of the complaints can reasonably be construed as putting Northern [Adult] management on notice of any intent to bring a *qui tam* lawsuit, as required by case law." (Def. Mem. 8.) Northern Adult misstates the law. As explained above, Relators were not required to give management "notice of an[] intent to bring a *qui tam* lawsuit," and it is no longer clear that Relators could not bring an action for retaliation having engaged in activity that they were "hired and expected to do." (*Id.*) Irrespective of the standard for notice, however, the Court cannot conclude from the allegations in the Amended Complaint that the protected conduct that Lee and Luckie engaged in was, in

fact, within their employment responsibilities, instead of requiring them to act beyond those responsibilities or to report beyond their usual chain of command. *See Swanson*, 2016 WL 3198309, at *6; *Malanga*, 2015 WL 7019819, at *3 ("Accepting her allegation as true, this Court cannot determine whether [the plaintiff] qualified as a 'fraud alert' employee on this [12(b)(6)] motion."); *Mooney*, 2013 WL 1346022, at *9 (holding, with reference to the pre-2009 FCA, that "[a]t the motion to dismiss stage . . . it is sufficient for a plaintiff — even one employed to investigate her employer's financial practices — to allege that she was investigating matters which are calculated, or reasonably could lead, to a viable FCA action"); *Fisch*, 2012 WL 4049959, at *5–6 (rejecting the defendants' argument that the plaintiff's "actions do not constitute protected conduct because, in investigating the [defendants'] finances and audit procedures, he was simply acting in his capacity as COO").

Northern Adult's argument that Relators' retaliation claims "lack a temporal relationship between any protected activity and the retaliation" is similarly unavailing. (Def. Mem. 8.) The Amended Complaint sets forth facts tending to show that Deverman met with Lee in January of 2010 to respond to his complaints and that Lee was constructively discharged in April of 2010. (Am. Compl. ¶¶ 189–190.) *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (holding, in the context of a Title VII claim, that "[t]hough this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship"). Although the Amended Complaint does not provide the dates of Luckie's protected conduct, it states that Luckie was terminated in February of 2011 and demoted prior to that date, (Am. Compl. ¶¶ 193–94), and alleges that he complained of misconduct that the Amended Complaint elsewhere dates between 2008 and 2011, (*see id*. ¶¶ 196–204). Therefore, both Lee and Luckie have adequately alleged that their

respective discharges occurred *because of* their protected conduct, *see McAllan*, 517 F. Supp. at 686, and the Court therefore denies Defendant's motion to dismiss their FCA and NYFCA retaliation claims.

### 2. Gonzalez

Unlike Lee and Luckie, Gonzalez has not stated facts to support a claim for retaliation because, at least at the time of filing, she had been neither discharged nor constructively discharged from her position at Northern Adult. *See Mooney*, 2013 WL 1346022, at *8 (holding that a plaintiff must establish: "(1) that she engaged in conduct protected under the statute; (2) that [the] defendants were aware of her conduct; and (3) that she was terminated in retaliation for that conduct"). The only retaliatory action Gonzalez pleads in the Amended Complaint is constructive discharge, and it is pled with a single sentence: "Gonzalez has been out of the office since breaking her arm earlier this year, but Deverman has made it quite unclear as to whether she will have a job when she returns." (Am. Compl. ¶ 221.)

The Court has found no legal support for Gonzalez's presumable argument that Deverman "[making] it quite unclear as to whether [Gonzalez] will have a job when she returns" constitutes constructive discharge. *See, e.g.*, *Petrosino v. Bell Atl.*, 385 F.3d 210, 231 (2d Cir. 2004) (holding no constructive discharge where the plaintiff was dissatisfied with his failure to receive a bonus); *United States v. Bank of Am. Corp.*, No 12-CV-8399, 2016 WL 1298985, at *12 (S.D.N.Y. Mar. 31, 2016) (holding that the plaintiff was not constructively discharged because his supervisor treated him coldly, threatened to take away his assistant and denied him a bonus).[13] However, assuming Gonzalez were able to plead that Northern Adult "intentionally

---

[13] Relators cite a single, unpublished case from another jurisdiction to support their argument that constructive discharge "is far broader than actually being fired." (Relators' Mem. 20 (citing *Ingle v. Janick*, No. 14-CV-544, 2014 WL 6469412, at *5 (M.D. Fla. Nov. 17, 2014).)

create[d] a work atmosphere so intolerable that [s]he [was] forced to quit involuntarily," *Terry*, 336 F.3d at 151–52, the single conclusory statement is insufficient to allow the Court to draw a reasonable inference that Northern Adult is liable for retaliation, *see Matson*, 631 F.3d at 63 (quoting *Iqbal*, 556 U.S. at 678)).  Although Relators correctly note that "a relator may be [retaliated against] in numerous ways other than termination," (Relators' Mem. 20), Gonzalez has not pled facts to support an inference that Defendants retaliated against her in any manner. The Amended Complaint states, in passing, that "Defendants have intentionally retaliated against Gonzalez by constructively discharging her and withholding pay," (Am. Compl. ¶ 285), and "by constructively terminating her and withholding her health benefits," (*id*. ¶ 290), but Gonzalez has alleged no supporting facts for these assertions.  The Court therefore dismisses Gonzalez's retaliation claims under the FCA and NYFCA.

### ii.  Retaliation — Health Care Whistleblower Law

Northern Adult argues that Relators' claims under New York Labor Law section 741, known as the "Health Care Whistleblower Law," are barred by the two-year statute of limitations applicable to that provision.  (Def. Mem. 10).  Northern Adult also argues that Relators have not adequately pled their claims for retaliation under the Health Care Whistleblower Law because they were not "protected employees" who performed health care services.  (*Id*. at 9).

The Health Care Whistleblower Law affords a health care "employee," as defined in the statute, a cause of action against the employer for "retaliatory action" taken because the employee does any of the following:

---

In *Ingle*, the court concluded that the plaintiff had adequately pled constructive discharge by alleging that her work environment was so hostile that it "caused her to suffer serious medical and emotional complications which caused her to take sick leave from work." *Ingle*, 2014 WL 6469412, at *1, 5.  Gonzalez has not alleged that her work environment at Northern Adult was so hostile that she suffered medical or emotional problems as a result, and *Ingle* is therefore inapposite.

> (a) discloses or threatens to disclose to a supervisor, or to a public
> body an activity, policy or practice of the employer or agent that
> the employee, in good faith, reasonably believes constitutes
> improper quality of patient care; or
>
> (b) objects to, or refuses to participate in any activity, policy or
> practice of the employer or agent that the employee, in good faith,
> reasonably believes constitutes improper quality of patient care.

N.Y. Labor Law § 741(2)(a)–(b); *see Reddington v. Staten Island Univ. Hosp.*, 543 F.3d 91, 93–94 (2d Cir. 2008) (holding that section 741 applies to "employees who actually supply health care services," but not those who "merely coordinate with those who do" (quoting *Reddington v. Staten Island Univ. Hosp.*, 11 N.Y.3d 80, 91 (2008))). The Health Care Whistleblower Law contemplates enforcement through the private right of action established in New York's general Whistleblower Law, Labor Law § 740. *See Reddington*, 11 N.Y.3d at 88 (discussing the "uniquely interconnected elements of sections 740 and 741; specifically, every section 741 claim expressly relies on and incorporates section 740 for purposes of enforcement").

Of particular relevance here, section 740(4)(d) states that "a health care employee who has been the subject of a retaliatory action by a health care employer in violation of [section 741] of this article may institute a civil action . . . within two years after the alleged retaliatory personnel action was taken." N.Y. Labor Law § 740(4)(d).

The Complaint was filed on September 4, 2013.[14] (Docket Entry No. 1.) Lee was constructively discharged on April 1, 2010, (Am. Compl. ¶ 190), and Luckie was discharged in February of 2011, (Am. Compl. ¶ 193). Both Lee and Luckie's claims are therefore time-barred

---

[14] Although Northern Adult argues that Relators' Health Care Whistleblower Law claims were filed in September of 2014, (Def. Mem. 10), all except Lee's were filed on September 4, 2013. Lee's claim for retaliation under the Health Care Whistleblower Law was filed in the Amended Complaint, on June 25, 2015. The Court does not consider here whether Lee's claim might relate back to the original filing date because such an analysis would not alter the outcome of this motion.

by the statute of limitations applicable to the Health Care Whistleblower Law. *See* N.Y. Labor Law § 740(4)(d). Because Gonzalez has not properly alleged a retaliatory act from which a statute of limitations would begin to run, Gonzalez's claim under the Health Care Whistleblower Law also fails. The Court therefore dismisses all of Relators' claims for retaliation brought pursuant to section 741 of the New York Labor Law.

### d. Discrimination and Retaliation — NYCHRL

Northern Adult argues that Relators' discrimination claims under the NYCHRL are barred by the three-year statute of limitations applicable to that provision. (Def. Mem. 9–10.) Relators allege that Northern Adult "forced [them] from their employment positions because they personally were discriminated against and because they spoke out about the discriminatory practices Northern [Adult] engaged in against non-Russians and specifically African Americans and Hispanics." (Am. Compl. ¶ 55.) Construing the Amended Complaint in Relators' favor, the Court understands Relators to bring claims of employment discrimination under section 8-107(1) of the NYCHRL, (*see id*. ¶ 309), and retaliation under section 8-107(7) of the NYCHRL, (*see id*. ¶¶ 305–306). Relators do not address the statute-of-limitations argument in their opposition papers to this motion.

As an initial matter, the Court agrees with Northern Adult that Relators did not include in the Complaint any allegations of discriminatory or retaliatory termination of employment under the NYCHRL. Accordingly, for these newly added claims to survive a motion to dismiss, they must either fall within the applicable statute of limitations or relate back to the date of the original complaint.

Claims brought pursuant to the NYCHRL are subject to a three-year limitations period. *See* N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d). That time period begins to run from "the time of the discriminatory act." *Delaney v. Farley*, 623 F. App'x 14, 16 (2d Cir. 2015)

(citing *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981)). Although "the lapse of a limitations period is an affirmative defense that a defendant must plead and prove," a statute of limitations defense may be raised "in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Lefebvre v. Morgan*, --- F. Supp. 3d ---, ---, 2016 WL 1274584, at *16 (S.D.N.Y. 2016) (internal quotation marks omitted) (quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008)); *Zhongwei Zhou v. Wu*, No. 14-CV-1775, 2015 WL 925962, at *3 (S.D.N.Y. Mar. 3, 2015) (quoting same); *see also Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) ("[B]ecause the defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." (alteration in original) (internal quotation marks omitted)).

Relators filed the original Complaint on September 4, 2013, (*see* Docket Entry No. 1), and filed the Amended Complaint, which alleges discrimination and retaliation under the NYCHRL, on June 25, 2015, (*see* Docket Entry No. 29). Under a three-year statute of limitations, Relators' claims are time-barred if they are based on retaliation or discrimination that occurred prior to June 25, 2012, unless their claims relate back to the original Complaint. If Relators' claims do relate back to the original Complaint, their claims are time-barred to the extent that they are based on retaliation or discrimination that occurred prior to September 4, 2010. *See* N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d).

### 1. Discrimination and retaliation — Lee

Lee alleges that he was constructively discharged on April 1, 2010. (Am. Compl. ¶ 190.) Because even a relation-back of his claims to the date of the filing of the original Complaint would not cure the untimeliness of his discrimination and retaliation claims, the Court grants Defendant's motion to dismiss Lee's claims under the NYCHRL.

## 2. Discrimination and retaliation — Luckie

Luckie alleges that he was discharged in February of 2011, (Am Compl. ¶ 193), therefore his discrimination and retaliation claims are only timely if they relate back to the date of the original complaint. Rule 15(c)(1)(A) of the Federal Rules of Civil Procedure allows an amendment to a pleading to relate back to the date of the original pleading when the law that provides the applicable statute of limitations allows relation back. Fed. R. Civ. P. 15(c)(1)(A). Courts must examine the "controlling *body* of limitations law," and apply state law if it provides "a more forgiving principle of relation back than the one provided" by Rule 15(c). *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013) (quoting Fed. R. Civ. P. 15, Advisory Comm. Notes 1991) (internal quotation marks omitted); *see also Amaya v. Garden City Irrigation, Inc.*, 645 F. Supp. 2d 116, 121 (E.D.N.Y. 2009) (rejecting defendant's argument that more stringent relation-back requirements of Rule 15(c) should apply where the underlying state law expressly provided the applicable statute of limitations, and concluding that "it is of no moment that plaintiffs' claims against [defendant] would not relate back under Rule 15(c)(1)(C)" because "it matters only whether those claims relate back under New York law"). "The Second Circuit has not decided whether Rule 15(c)(1)(C) is more or less forgiving than New York's general relation back law, [section] 203 of the CPLR. Courts in this Circuit have either found [section] 203 to be more forgiving or assessed both laws and applied the more forgiving of the two." *Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 482 (E.D.N.Y. 2015) (quoting *Strada v. City of New York*, No. 11-CV-5735, 2014 WL 3490306, at *6 n.5 (E.D.N.Y. July 11, 2014)).

Under New York law, a claim asserted in an amended pleading relates back "unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading." N.Y. C.P.L.R. § 203. "The 'linchpin' of the relation back doctrine is notice to the defendant within the applicable limitations

period." *Strada*, 2014 WL 3490306, at *6 (quoting *Kirk ex rel. Kirk v. Univ. OB–GYN Assocs., Inc.*, 960 N.Y.S.2d 793, 795 (App. Div. 2013)).

Luckie's claims for retaliatory and discriminatory discharge clearly arise from the same conduct set forth in the original complaint. Indeed, Luckie has not asserted any additional facts to plead his claims under the NYCHRL than he had already included to plead his claims for retaliation under the FCA, NYFCA and Health Care Whistleblower Law. (*See* Am. Compl. ¶¶ 192–205.) Defendants were therefore on notice of the facts to support Luckie's claims of retaliatory and discriminatory discharge from the filing of the original complaint. *Strada*, 2014 WL 3490306, at *6. The Court accordingly finds that Luckie's claims are timely under the NYCHRL.[15] *See Flum v. Dep't of Educ. of N.Y.C.*, 83 F. Supp. 3d 494, 498 (S.D.N.Y. 2015) ("[T]he central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." (internal quotation marks omitted) (quoting *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006))).

### 3. Discrimination and retaliation — Gonzalez

Gonzalez has not alleged that she was discharged or discriminated against on any particular date. Because a statute of limitations defense is not apparent from the face of Gonzalez's claims, Northern Adult is not able to raise it in a 12(b)(6) motion to dismiss. *See Lefebvre*, --- F. Supp. 3d at ----, 2016 WL 1274574, at *16. Northern Adult bears the burden of proving its affirmative defense, and in the absence of such a defense, Northern Adult bears the

---

[15] The Court notes that it is unclear whether Relators' claims for discrimination under the NYCHRL are limited to the alleged discriminatory discharge. (*Compare* Am. Compl. ¶¶ 190, 193 *with* ¶ 309.) To the extent that Relators intended to bring claims under the NYCHRL alleging discriminatory conduct other than discharge, those claims are time-barred because Relators had not (and still have not) pled facts to support claims of discrimination separate and apart from discriminatory discharge.

burden of arguing that Gonzalez has failed to state a claim as to discrimination and retaliation under the NYCHRL. *See id.*; *see also Mosdos Chofetz Chaim, Inc.*, 14 F. Supp. 3d at 209. Northern Adult has failed to make any argument as to the sufficiency of Gonzalez's claims for discrimination and retaliation, and the Court therefore denies Northern Adult's motion to dismiss Gonzalez's claims under the NYCHRL.[16]

## III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Northern Adult's motion to dismiss the Amended Complaint. The Court denies Northern Adult's motion to dismiss Relators' FCA and NYFCA claims under 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B) and New York State Financial Law §§ 189(1)(a) and 189(1)(b); Relators' retaliation claims, under 31 U.S.C. § 3730(h) and New York State Financial Law § 191, as to Lee and Luckie; and Relators' claims for discriminatory and retaliatory discharge under NYCHRL § 8-107 as to Luckie and Gonzalez. The Court grants Northern Adult's motion to dismiss Relators' FCA and NYFCA claims under 31 U.S.C § 3729(a)(1)(G) and New York State Financial Law § 189(1)(g); Relators' retaliation claims, under 31 U.S.C § 3730(h) and New York State Financial Law § 191, as to Gonzalez; Relators' retaliation claims under New York Labor Law § 741 as to Lee, Luckie and Gonzalez; and Relators' claim for discriminatory and retaliatory discharge under NYCHRL § 8-107 as to Lee.

---

[16] Although the Court earlier reached the merits of Gonzalez's retaliation claims under the FCA and NYFCA, it did so only where Northern Adult's arguments addressed the merits of the retaliation claims. As to Gonzalez's claim under the NYCHRL, however, Northern Adult has argued only an affirmative defense, and the Court accordingly declines to *sua sponte* dismiss Gonzalez's claim under the NYCHRL where Northern Adult has not first presented substantive arguments on that claim.

Relators are granted thirty days to file a Second Amended Complaint that correctly names the Defendant and that sets forth an implied false certification theory of liability, to the extent that they wish to pursue that theory. Relators are granted fourteen days to show cause why the Court should not dismiss Deverman from the action pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 7, 2016
      Brooklyn, New York