UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

UNITED STATES OF AMERICA and NEW YORK
STATE *ex rel.* ORLANDO LEE, MELVILLE
LUCKIE, and LUZ GONZALEZ,

              Plaintiffs,

              v.

NORTHERN METROPOLITAN FOUNDATION
FOR HEALTHCARE, INC., NORTHERN MANOR
MULTICARE CENTER, INC., and NORTHERN
MANOR ADULT DAY HEALTH CARE
PROGRAM,

              Defendants.

------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CV-4933 (MKB)

MARGO K. BRODIE, United States District Judge:

      Relators Orlando Lee, Melville Luckie, and Luz Gonzalez ("Relators") brought this *qui*

*tam* action on behalf of the United States of America and the State of New York (the "State")

against Defendants Northern Adult Daily Health Care Center and Galena Deverman on

September 4, 2013, alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the

"FCA"), and the New York State False Claims Act, N.Y. State Fin. Law § 187 *et seq.* (the

"NYFCA"). (Compl. ¶¶ 175–241, Docket Entry No. 1.) Relators subsequently amended the

Complaint twice, and in the Second Amended Complaint ("SAC") filed on October 7, 2016,

Relators brought claims against Defendants Northern Metropolitan Foundation for Healthcare,

Inc., Northern Manor Multicare Center, Inc., and Northern Manor Adult Day Health Care

Program[1] realleging claims for violations of the FCA and the NYFCA, and, in addition, alleging claims of retaliation under the FCA and NYFCA, and discrimination and retaliation under the New York City Human Rights Law (the "NYCHRL"). (SAC, Docket Entry No. 55.) Defendants moved for summary judgment as to all claims, (Defs. Mot. for Summ. J. ("Defs. Mot."), Docket Entry No. 94; Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 94-1), and Relators opposed the motion, (Relators' Opp'n to Defs. Mem. ("Relators' Opp'n"), Docket Entry No. 98-4.)

Currently before the Court is a report and recommendation from Magistrate Judge James Orenstein, recommending that the Court grant Defendants' motion for summary judgment as to Relators' FCA and NYFCA claims and deny Defendants' motion as to Relators' FCA and NYFCA retaliation claims and NYCHRL discrimination and retaliation claims (the "R&R"). (R&R, Docket Entry No. 105.) Both parties filed objections to the R&R on March 27, 2019, (Relators' Obj. to R&R ("Relators' Obj."), Docket Entry No. 107; Defs. Obj. to R&R ("Defs. Obj."), Docket Entry No. 108), and the parties filed their respective replies on April 9, 2019, (Defs. Reply to Relators' Obj. to R&R, Docket Entry No. 111; Relators' Reply to Defs. Obj. to R&R, Docket Entry No. 112). By Order dated March 31, 2019, the Court granted Defendants' motion and dismissed Relators' FCA and NYFCA retaliation claims and NYCHRL discrimination and retaliation claims. (Order dated Mar. 31, 2019.) The Court reserved decision

---

[1] Northern Manor Adult Day Health Care Program, initially sued under the name Northern Adult Daily Health Care Center, was operated by Northern Manor Multicare Center, Inc., a provider of nursing home services under the New York State Medical Assistance Program. (Letter Statement of Interest re Defs. Mot. to Dismiss ("State Ltr. of Interest") 2 n.1, Docket Entry No. 45.) In addition, Northern Manor Day Metropolitan is a New York Corporation and is the parent company of Northern Manor MultiCare. (SAC ¶ 11.)

as to Relators' *qui tam* claims and scheduled oral argument for April 26, 2019. (*Id.*) The Court explains the reasons for its decision below.

## I. Background

### a. Factual background

The following facts are undisputed unless otherwise noted. Defendants Northern Metropolitan Foundation for Healthcare, Inc., Northern Manor Multicare Center, Inc., and Northern Manor Adult Day Health Care Program operated an adult day care center located in Brooklyn, New York ("Northern Manor"). (Defs. Rule 56.1 Statement of Undisputed Material Facts ("Defs. 56.1") ¶ 2, Docket Entry No. 95.) Relators are former employees of Northern Manor. (Relators' Rule 56.1 Statement of Undisputed Material Facts ("Relators' 56.1") ¶¶ 1, 33, 37, Docket Entry No. 99.) Relators Lee, Luckie, and Gonzalez all worked at Northern Manor at various times and made similar complaints about alleged discriminatory treatment of Asian, African American, and Latino registrants that they observed at Northern Manor. (*See generally* Orlando Lee Dep. ("Lee Dep.") 21–66, annexed to Defs. Mot. as Exhibit Part 01, Docket Entry No. 94-8; Melville Luckie Dep. ("Luckie Dep.") 6–19, annexed to Defs. Mot. as Exhibit Part 01, Docket Entry No. 94-8; Luz Gonzalez Dep. ("Gonzalez Dep.") 28–51, annexed to Defs. Mot. as Exhibit Part 03, Docket Entry No. 94-10.)

#### i. Orlando Lee

Orlando Lee began working for Northern Manor in 2008 and worked at Northern Manor until approximately 2010 or 2011. (Lee Dep. 8:24, 198:4–5; Defs. Resp. to Relators' 56.1 Statement ("Defs. Resp. 56.1") ¶ 1, Docket Entry No. 97.) Because a majority of registrants at Northern Manor were Russian, Lee was responsible for recruiting Latino, Asian, and African American registrants. (Lee Dep. 12:18–13:14; Defs. Resp. to 56.1 ¶ 2.)

Lee testified that while at Northern Manor, he witnessed discrimination against Asian registrants (Lee Dep. 16, 29–30), Latino registrants (Lee Dep. 41:1–43:25; 146–147), and African American registrants (Lee Dep. 50:1–52:25, 146:7–10), (collectively, the "minority registrants"). Lee witnessed segregation of the minority registrants from Russian registrants during meals and group activities (Lee Dep. 18:1–20:25, 41:1–42:25, 50:1–51:25, 85:8–11), exclusion of minority registrants from outings, (Lee Dep. 20:1–22:25, 109:1–117:3), and discriminatory treatment of minority registrants while being transported to and from Northern Manor, (Lee Dep. 51:1–54:25, 73:1–74:25, 83:4–9, 97:1–98:25). Lee observed that Asian and Russian registrants were segregated; Asian registrants "were in [one] part of the facility . . . [and] Russian [registrants] were in another." (Lee Dep. 18:18–25.) In addition to discriminatory treatment of minority registrants, Lee testified at his deposition that Northern Manor did not provide diabetic meals to a diabetic registrant and served him food with "too much salt . . . sugar . . . [and] starches." (Lee Dep. 135:22–138:25.) On one occasion he observed two registrants outside of Northern Manor unattended "and wandering around the [Prospect Park] area." (Lee Dep. 163:1–25.) Lee complained after he encountered the couple, but is unsure whether Galena Deverman[2] was informed of the incident. (Lee Dep. 164:1–25.) Lee also testified that Northern Manor employed two unlicensed social workers. (Lee Dep. 169:1–170:9.)

Lee repeatedly brought up his concerns about discrimination and the adequacy of services provided to registrants with Deverman, and was either ignored or reprimanded. (Lee Dep. 28:1–8.) "Whenever [Lee] brought . . . up that there was something going wrong . . . [and] that [Deverman] need[ed] to pay attention to it, [Deverman] would always push it aside." (Lee Dep.

---

[2] Gelena Deverman became Assistant Director of Northern Manor on December 18, 2008. (Deverman Dep. 78:2–6, annexed to Defs. Mot. as Exhibit Part 03, Docket Entry No. 94-10.)

35:16–25.)  Lee was aware that Northern Manor was not permitted to discriminate on the basis of race, creed, color, or religion, but he did not speak to a compliance officer about discrimination at Northern Manor because he "felt [he] would be fired." (Lee Dep. 38:1–25.) Lee did not want to "rock the boat more than [it was] already rocked." (Lee Dep. 38:19–25.) He was also told by Deverman not to write any email complaints, but to come to her office when he had any issues. (Lee Dep. 110:21–111:9.)

When Lee did send email complaints, Lee did not explicitly mention racism or discrimination to Northern Manor because he wanted to be "diplomatic" and did not want to be characterized as "a militant on [his] job and be fired the next day." (Lee Dep. 155:19–25.) Lee believes that Northern Manor "discriminat[ed] against [him] . . . because [he stood] up for residents. (Lee. Dep. 154:2–25.) Although Deverman never explicitly threatened to fire Lee due to his complaints about discrimination at Northern Manor, Deverman would tell him "look, you're just an employee here . . . keep your nose straight." (Lee Dep. 204:23–205:10.)

Lee left Northern Manor in 2010 or 2011. (Lee Dep. 8:24, 198:4–5; Defs. Resp. 56.1 ¶ 1.) He testified that he left Northern Manor because he was uncomfortable and felt pressured to leave because Deverman gave him a hard time about the Chinese registrants he recruited and would reprimand him whenever he raised any concerns.[3] (Lee Dep. 27:23–24, 148:1–149:25, 34:18–21, 205:5–20). Lee could not "stomach" the "discrimination [he saw] going on in front of [him]," and "felt like a threat was looming over [him]." (Lee Dep. 152:1–6.) Lee also felt like Deverman or one of the Russian staff was "going to take [him], stab [him], [or] hit [him]," because he stood up for the registrants. (Lee Dep. 152:1–154:25.) Lee further testified that he

---

[3] Lee did not specify what concerns he raised to Deverman. (Lee Dep. 27:23–24, 148:1–149:25, 34:18–21, 205:5–20.)

felt physically threatened because he was getting "the look of doom and gloom," at Northern Manor, everyone was "quiet" and "cold," and because Northern Manor had "long passageways," which were dark. (Lee Dep. 152:1–153:25.)

Defendants dispute any deliberate segregation of minority registrants from Russian registrants during group activities, dining, or outings, stating that any segregation during meals or activities would have been voluntary due to differences in the languages spoken by the registrants. (Defs. Resp. 56.1 ¶¶ 4–12, 15–18, 30–32.) In addition, Defendants assert that the company responded to complaints regarding transportation by bringing in a third transportation company and then transitioning to having transportation managed in-house. (Deverman Dep. 61:2–5, 84–85, annexed to Defs. Mot. as Exhibit Part 03, Docket Entry No. 94-10.) Further, Defendants assert that its daily menu was approved by a nutritionist and dietician with full knowledge of all of the registrants' needs, (Deverman Dep. 47:1–50:25), and that the regulations at the time did not mandate that social workers be licensed, (Defs. Resp. 56.1 ¶ 29).

Defendants also dispute that Lee truly felt uncomfortable at Northern Manor or that anyone pressured him to leave. (Defs. Resp. 56.1 ¶ 13.) In addition, Defendants dispute that Lee felt that he would be fired if he talked about discrimination with a compliance officer at Northern Manor. (*Id*. ¶ 14.) Defendants asserts that "Lee repeatedly characterized Northern as a wonderful organization," and provided good wishes to Deverman months after his voluntary resignation. (*Id*. ¶ 25.)

### ii. Melville Luckie

#### 1. Employment

Melville Luckie worked at Northern Manor from September 23, 1998 to February 11, 2011. (Relators' 56.1 ¶ 33; Luckie Dep. 6:17–18.) He was promoted to a coordinator position

and was responsible for coordinating the certified nursing assistants (the "CNAs") who worked on the second shift. (Luckie Dep. 7:2–25.)

In August of 2009, after the arrival of Deverman, Luckie was demoted from coordinator and informed by Deverman that she wanted to make "some changes" to the system. (Luckie Dep. 9:2–10:25.) After he was demoted, Luckie observed that during dinner time at Northern Manor, the CNAs would "pass the black [registrants], pass the Spanish [registrants]," and "serve the Russian [registrants] first," and then "serve the Spanish [registrants] and the black [registrants]" last. (Luckie Dep. 19:7–25.) In response, Luckie would stare at the CNAs and finally this practice stopped after a couple of weeks. (Luckie Dep. 20:10–21:19.)

In one instance, Luckie observed several Russian registrants get up to complain to Deverman that a Latino registrant was assigned to their table. (Luckie Dep. 17:12–21.) After the registrants approached Deverman, Luckie was told by his supervisor, Mr. Genatti, to move the Latino registrant to a different table. (Luckie Dep. 17:20–18:4.)

Luckie also learned that some of the registrants were sneaking in bottles of alcohol, (Luckie Dep. 22:16–23:24), but he did not have any evidence that any staff at Northern Manor knowingly allowed the registrants to drink alcohol, (Luckie Dep. 24:16–20). In addition, after Deverman started working at Northern Manor, "she increased . . . the snacks" offered to registrants and the registrants were given eggs, cream cheese, and butter, and as a result, Northern Manor's dietician complained to Luckie about various registrants gaining weight. (Luckie Dep. 12:9–24.) Luckie suggested that the dietician speak with Genatti to encourage Deverman to "decrease . . . the size of the snacks," offered to registrants, "but [Deverman] never listened to [any]body." (Luckie Dep. 12:22–25.) Luckie also observed that various registrants would sneak out of Northern Manor and wander around the neighborhood. (Luckie Dep. 24:21–

25:14.) He testified at his deposition that he was not aware of any evidence that staff at Northern Manor knowingly allowed registrants to do this, and he noted that "Russian staff . . . used to complain about" the registrants sneaking out. (Luckie Dep. 25:23–26:13.)

While employed at Northern Manor, Luckie also became aware that "Spanish and black registrants were complaining that they were not getting occupation[al] therapy," but he did not personally observe this practice. (Luckie Dep. 28:10–29:11.) Luckie reported the complaints regarding lack of occupational therapy to Mr. Genatti, and "most times [Mr. Genatti] said it was not him that was the problem." (Luckie Dep. 29:15–22.) Luckie also testified that many of the registrants "were healthy individuals and not qualified for Medicaid." (Luckie Dep. 30:12–31:4.) He learned that these registrants were not qualified for Medicaid after noticing missing documents from their files and being informed by Genatti that certain individuals were not qualified to come to the center; however, Luckie also testified that he has no familiarity with the Medicaid qualification process. (Luckie 31:2–32:13.)

Luckie testified that at some unspecified time in 2011, Deverman called him in to her office and informed him that she did not have "any hours for [him]"; however she explained that "whenever somebody [went] on vacation or sick leave, she [would] . . . call [him]." (Luckie Dep. 35:11–17.) Luckie never received a call from Deverman and after his meeting with Deverman, he believes that he was subsequently replaced by Julia Chichentskya, a younger white Russian CNA, who had previously been fired for refusing to take a black registrant to the emergency room after he had a seizure. (Luckie Dep. 35:18–37:8, 49:7–18.) Luckie is not sure whether Chichentskya was rehired to work in his position, but he knows that when he left

Northern Manor "she was there." [4] (Luckie Dep. 36:15–17.)

Defendants dispute that (1) Luckie observed segregation during dining at Northern Manor, (Defs. Resp. 56.1 ¶ 50), (2) Northern Manor served unhealthy meals to registrants, (id. ¶ 51), (3) Northern Manor registered individuals who were not qualified to attend, (id. ¶ 46), and (4) Russian registrants were given priority over black and Latino registrants, (id. ¶ 49). Deverman does not recall Luckie raising any issues or complaints about how registrants were treated at Northern Manor. (Deverman Dep. 166:21–25.)

Defendants also contest that Luckie was terminated from Northern Manor on February 11, 2011. (Defs. Resp. 56.1 ¶ 33.) Deverman testified that on some unspecified date, she held a staff meeting at Northern Manor where they discussed schedule changes "because the corporate office had indicated that [Northern Manor] needed to decrease staff hours and [Northern Manor] would go from seven hours of working to [twelve] hour shifts." (Deverman Dep. 157:7–11.) During the meeting, Deverman testified that she extended an offer to Luckie "to work on rotating days," (Deverman Dep. 157:13–21), and Luckie stated "give me my pink slip, I'm leaving," (Deverman Dep. 157:24). Deverman also testified that when Luckie requested his pink slip he did not indicate that he felt he was being discriminated or retaliated against. (Deverman Dep. 158.)

---

[4] In opposition to Defendants' motion for summary judgment, Relators filed a copy of a complaint from an action filed in the Supreme Court of the State of New York, Kings County, where Luckie alleges that he was "subjected to pressure and a continued hostile work environment," and that in January of 2011, he complained about being discriminated against by Deverman to Mr. Gennaidy Goldvekht, his supervisor. (Melville Luckie Aff. ("Luckie Aff.") 16, annexed to Relators' Opp'n as Ex. 4, Docket Entry No. 98-4.) Luckie also alleged that on February 17, 2011, he was called into an unspecified individual's office and was terminated. (*Id.*)

## 2. New York State Division of Human Rights and state court complaints

On May 6, 2011, Luckie filed an administrative complaint with the New York State Division of Human Rights ("NYSDHR") asserting that Northern Manor discriminated against him on the basis of his race and national origin. (Melville Luckie NYSDHR Compl. ("NYSDHR Compl.") 5–10, annexed to Relators' Opp'n as Ex. 4, Docket Entry No. 98-4.) In the NYSHDR Complaint, Luckie alleged that he was demoted from his position as Coordinator of CNAs and ultimately terminated after Deverman joined Northern Manor. (*Id*. at 10.) Luckie also indicated that on February 17, 2011, Deverman called him to her office to inform him that she could no longer offer him full-time work, but would call him to work if another employee reported sick or was on vacation. (*Id*.)

Following an investigation, in a decision dated October 19, 2011, NYSHDR determined that there was no probable cause to believe that Northern Manor discriminated against Luckie. *Luckie v. Northern Adult Day Care Center*, 73 N.Y.S.3d 454 (App. Div. 2018). On February 17, 2012, Luckie commenced a proceeding in the Supreme Court, County of New York pursuant to Article 78 of New York Civil Practice Law and Rules ("CPLR") for review of NYSDHR's determination ("Article 78 Proceeding"). (*Id*; *Luckie v. NYS Division of Human Rights and Northern Adult Day Health Care Center*, No. 113920/2011, at 1 (N.Y. Sup. Ct. New York Cty. June. 12, 2012), annexed to Defs. Mot. as Ex. Part 01, Docket Entry No. 94-8.) In a sworn statement to the state court, Luckie stated that "there is no doubt in [his] mind that [he] was retaliated against after [he] complained about being discriminated against." (Melville Luckie Aff. ("Luckie Aff.") 3, annexed to Relators' Opp'n as Ex. 4, Docket Entry No. 98-4.) The court denied Luckie's petition and dismissed the proceeding. (*Id*.)

In January of 2013, Luckie commenced another action in the Supreme Court, Kings

County, alleging discrimination and retaliation in violation of the NYCHRL (the "Kings County Action"). *Luckie*, 73 N.Y.S.3d 454. The court dismissed Luckie's complaint based on the election of remedies doctrine. *Id*. Luckie appealed this order and the Appellate Division of the Supreme Court affirmed the decision. *Id*.

### iii. Luz Gonzalez

Luz Gonzalez worked at Northern Manor from 2003 to 2013. (Gonzalez Dep. 8:17–23.) Gonzalez worked in the recreation department, where she was "involved in everything" that had to do with "helping with activities [for] all registrants." (Gonzalez Dep. 13:7–10.)

Gonzalez "talked with [her] supervisor, Julia, about all [that] was happening in the center." (Gonzalez Dep. 14:16–18.) She did not remember having frequent conversations with Deverman, because Deverman was "always busy" and Deverman said she did not have much time to talk. (Gonzalez Dep. 14:25.)

At her deposition, Gonzalez testified that after Deverman became director at Northern Manor, the registrants "g[ot] a lot of food . . . [l]ike two, three eggs, bread, cottage cheese, apple juice, orange juice . . . they [] g[o]t a lot on one plate . . . ," so much food "they c[ouldn't] even carry," their plates. (Gonzalez Dep. 34:10–15, 35:2–25.) Before Deverman became director, the registrants got "healthy food," but after Deverman was hired, "some restaurant in Brooklyn" provided all of the food and "[i]t was not healthy." (Gonzalez Dep. 35:8–14.) Gonzalez "complained to the nutritionist" about the food, and "the nutritionist said they [were] going to talk to [Deverman]," but Gonzalez did not "see any result[s]." (Gonzalez Dep. 35:17–19.)

Gonzalez also testified that Northern Manor allowed alcoholic drinks to be consumed by the registrants. (Gonzalez Dep. 37:1–25.) When the registrants would go out to a restaurant to eat, "they [were allowed] to bring alcohol and . . . put [it] on the table [to] drink." (Gonzalez

Dep. 37:18–25.)  Gonzalez also observed that registrants were drinking alcohol at Northern Manor, "when [she saw] the registrants [or] when [she] talk[ed] with them, they smell[ed] like alcohol." (Gonzalez Dep. 38:3–6.) Gonzalez "told . . . Julia" about what she observed and Julia said to "put no mind" to it and to "leave it." (Gonzalez Dep. 38:6–9.) When asked if she had ever spoken to Genatti about the alcohol use, Gonzalez testified that Genatti was part of the group of people who were drinking alcohol at Northern Manor. (Gonzalez Dep. 38:21–24.)

Gonzalez also testified that registrants were allowed to wander the neighborhood. (Gonzalez Dep. 41:14.) Before Deverman joined Northern Manor, "every time [they] walked to the park, . . .the . . . nursing aide[s] [were] in the front. . . . [and the CNAs] took care of the group," while they were outside. (Gonzalez Dep. 41:19–25; 42:2.) This changed once Defendants hired Deverman and "after [Deverman] came to the program, [the CNAs] le[t] the registrants . . . go wherever they want[ed] to go," and registrants were only required to "go to the front desk, sign [a] paper and say they [were] going out, and they [would] return when they want[ed] to return." (Gonzalez Dep. 42:3–7.) Gonzalez complained about registrants wandering around the park to Julia, and Julia would just say that Deverman "let's them go outside." (Gonzalez Dep. 43:1–11.)

Further, Gonzalez testified that after Deverman joined Northern Manor, several Latino and African American registrants complained to her that they were not given an opportunity to have physical therapy. (Gonzalez Dep. 43:17–44:8.) In addition, Latino and African American registrants were not provided the same materials as Russian registrants for arts and crafts. (Gonzalez Dep. 46:2–47:25.) During Gonzalez's employment at Northern Manor she would "stop on some corner and pick [up] newspaper . . . for [the] African Americans and Spanish,"

registrants because "they [had] nothing to read. Nothing to do. Just look at their faces." (Gonzalez Dep. 47:16–25.)

Like Luckie, Gonzalez testified that some of the Russian registrants were "so healthy," and not qualified under Medicaid to attend Northern Manor. (Gonzalez Dep. 48:11–22.) Gonzalez believed that certain Russian registrants were not qualified under Medicaid because she "checked [their] blood pressure," and when she checked their blood sugar, the registrants told her "they [were] not diabetic." (Gonzalez Dep. 48:11–22.) Gonzalez did not check registrants' Medicaid cards, nor did she ask them to show her their Medicaid cards. (Gonzalez Dep. 49:21–50:3.) Gonzalez complained about this to Genatti and he told her he would "take care" of it. (Gonzalez Dep. 48:22–24.)

Gonzalez also observed that Latino, African American, and Chinese registrants were moved from tables where Russian registrants sat. (Gonzalez Dep. 51:7–17.) In addition, when the registrants of Northern Manor would go on trips, there was always "a preference for the Russian[] [registrants] to sign [up]," first and when Latino or African American registrants came to sign up the list would be at capacity. (Gonzalez Dep. 51:18–23.) During offsite trips to a restaurant, Gonzalez noticed that Russian registrants were allowed in the restaurant first and that in some cases, Latino and African American registrants would only get a little food if the food ran out. (Gonzalez Dep. 52:7–19.) Gonzalez always complained about her observations from the restaurant the registrants frequented. (Gonzalez Dep. 52:7–19.)

Gonzalez stopped working at Northern Manor on February 5, 2013. (Gonzalez Dep. 8:19–24.) Gonzalez testified that her employment at Northern Manor ended because she injured her left ankle and was "incapacitated." (Gonzalez Dep. 9:4–10.) Following her ankle injury, Gonzalez had surgery on her right shoulder. (Gonzalez Dep. 9:11.) Gonzalez could not work for

approximately two and a half months. (Gonzalez Dep. 9:8–10:11.) While at home recovering, Gonzalez received a letter from her health insurance company on March 11, 2013 stating that her employment with Northern Manor had been terminated and as a result of that "termination" she no longer had health insurance coverage. (Gonzalez Dep. 10:15–18, 12:12–18; Gonzalez Insurance Letter 1, annexed to Relators' Opp'n as Exhibit 3, Docket Entry No. 98-4.) Gonzalez was never explicitly told that her employment was terminated, but she "tried to call [her] manager[s]" and left a voicemail with her manager Alicia Feliciano. (Gonzalez Dep. 12:20–25.) It is unclear whether Gonzalez was able to get in contact with anyone at Northern Manor during this time. (Gonzalez Dep. 12:20–13:6.)

At some point in November of 2013, Gonzalez went to Northern Manor and spoke with Deverman about returning to Northern Manor. (Gonzalez Dep. 63:19–24.) During her meeting with Deverman, Deverman offered her a job in the kitchen at Northern Manor. (Gonzalez Dep. 63:19–64:10.) When Deverman told her "she was going to give [her] a job, she [knew] her limitation already . . . [and Gonzalez] . . . expected to be accomodat[ed]." (Gonzalez Dep. 64:9–14.) Deverman offered Gonzalez the same salary she received in her previous position at Northern Manor. (Gonzalez Dep. 64:15–21.) Gonzalez agreed to try the position for a day, but the position was too strenuous and "too much for [her] shoulder," because she had to "carry [a lot] of stuff around."[5] (Gonzalez Dep. 65:1–15.) After a day in the new position, Gonzalez called Deverman to inform her that she would not be continuing in her new position, but she was never able to get in touch with her. (Gonzalez Dep. 65:17–24.)

---

[5] During her deposition testimony, Gonzalez testified that she also had difficulty in her previous job in the recreation department at Northern Manor due to a problem with her arm. (Gonzalez Dep. 91:2–25.) In her position with the recreation department, Gonzalez was responsible for taking registrants to the park, and she found it challenging to push registrants in their wheelchairs due to her shoulder injury. (Gonzalez Dep. 91:2–25.)

14

As with the allegations raised by Luckie, Defendants dispute all of the allegations raised by Gonzalez, including that Northern Manor (1) registered individuals who were not Medicaid qualified, (2) served unhealthy meals to registrants, (3) permitted registrants to consume alcohol, and (4) permitted registrants to wander outside. (Defs. Resp. 56.1 ¶¶ 46, 53, 54, 56.) In addition, Defendants dispute Gonzalez's claims that Russian registrants were favored and Latino, African American, and Chinese registrants were excluded from various activities or discriminated against in any capacity. (*Id.* ¶¶ 49, 56, 63, 66, 67, 68.)

Defendants also assert that Gonzalez was not constructively discharged and that Gonzalez left Northern Manor due to an injury, asked for and received her job back in November of 2013, "and again quit after one day of work due to her injury."[6] (*Id.* ¶ 37.)

### b. Procedural background

On September 8, 2014, the United States and the State declined to intervene in the action. (United States Not. of Election to Decline Intervention, Docket Entry No. 9; State of New York's Not. of Election to Decline Intervention, Docket Entry No. 10.) On June 25, 2015, Relators filed an Amended Complaint that included an additional cause of action under the NYCHRL. (Am. Compl., Docket Entry No. 29.) On October 14, 2015, Northern Manor moved to dismiss the Amended Complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure,

---

[6] According to Deverman's testimony, Gonzalez left Northern Manor due to an unspecified injury and was out of work on worker's compensation. (Deverman Dep. 112:1–9.) Gonzalez subsequently contacted Deverman to inform her that she was ready to come back to work. (Deverman Dep. 113:1–25.) Deverman does not recall offering Gonzalez a different position at Northern Manor outside of the recreation department and she testified that Gonzalez never came back to work at Northern Manor. (Deverman Dep. 113:1–114:25.) Notwithstanding Devernman's testimony, Defendants concede that Gonzalez returned to Northern Manor in November of 2013. (Defs. Resp. 56.1 ¶ 37.)

(Notice of Mot. to Dismiss, Docket Entry No. 43; Mem. of Law in Supp. of Defs. Mot. to Dismiss ("Defs. Mem."), Docket Entry No. 43-1), and by decision dated September 7, 2016, the Court granted in part and denied in part Northern Manor's motion to dismiss.[7]  (Memorandum and Order dated September 7, 2016 (the "September 2016 Decision"), Docket Entry No. 52; *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 297 (E.D.N.Y. 2016))

Relators filed a Second Amended Complaint on October 7, 2016. (SAC.)  On June 21, 2018, Defendants moved for summary judgment. (Defs. Mot.)  The Court referred the motion to Judge Orenstein on October 4, 2018. (Order dated Oct. 4, 2018.)

## II.  Report and recommendation

By R&R dated March 12, 2019, Judge Orenstein recommended that the Court grant in part and deny in part Defendants' motion for summary judgment.  Judge Orenstein recommended that the Court (1) dismiss Relators' claims pursuant to the FCA and NYFCA because Relators failed to show scienter as required by statute, and (2) deny Defendants' motion for summary judgement as to Relators' retaliation and discrimination claims under the FCA and NYCHRL.  (R&R 30.)

---

[7]  The Court granted in part and denied in part Northern Manor's motion to dismiss Plaintiff's Amended Complaint. (September 2016 Decision.)  The Court denied Northern Manor's motion to dismiss Relators' FCA and NYFCA claims under 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B) and New York State Financial Law §§ 189(1)(a) and 189(1)(b); Relators' retaliation claims, under 31 U.S.C. § 3730(h) and New York State Financial Law § 191, as to Lee and Luckie; and Relators' claims for discriminatory and retaliatory discharge under NYCHRL § 8-107 as to Luckie and Gonzalez. (*Id*. at 40.)  The Court granted Northern Manor's motion to dismiss Relators' FCA and NYFCA claims under 31 U.S.C § 3729(a)(1)(G) and New York State Financial Law § 189(1)(g); Relators' retaliation claims, under 31 U.S.C § 3730(h) and New York State Financial Law § 191, as to Gonzalez; Relators' retaliation claims under New York Labor Law § 741 as to Lee, Luckie, and Gonzalez; and Relators' claim for discriminatory and retaliatory discharge under NYCHRL § 8107 as to Lee. (*Id*.)

### a.  False Claims Act under federal and state law

#### i.  Procedural bars

As a threshold issue, Judge Orenstein found that Relators' FCA and the NYFCA claims were not procedurally barred. (*Id.* at 13.)

Judge Orenstein found that Relators' claims were not barred pursuant to the NYFCA provision barring pending administrative actions, because Northern had "blatantly mischaracterized" the Medicaid Fraud Control Unit ("MFCU") investigation[8] as an administrative action, when it was neither a civil nor administrative action, as required under the applicable provision. (*Id.* at 14.)

Judge Orenstein also concluded that Relators' claims were not based on the "allegations or transactions" which were the subject of the settlement agreement between Northern Manor and the State, and therefore, Relators' claims were not resolved by that settlement. (*Id.* at 15.)

Lastly, Judge Orenstein found that Relators' claims were not barred by the public disclosure bar because the information that Relators' claims are based on was not actually disclosed publicly. (*Id.* at 17–18.) Judge Orenstein found that although the alleged conduct may have been apparent to Northern Manor employees other than Relators, this "d[id] not constitute a public disclosure that precludes *qui tam* claims," because "there is no evidence in the record that the MFCU investigators disclosed information about the conduct about which the Relators complain to the Relators or any other Northern employees," nor evidence that allegations of fraud were revealed to individuals with no prior knowledge of the alleged fraud. (*Id.*)

---

[8] In 2010, the New York State Attorney General's Medicaid Fraud Control Unit ("MFCU") began an investigation of Northern Manor's Medicaid reimbursement practices. (Defs. 56.1 ¶ 3.) The parties dispute what information was revealed during the investigation and the scope of the investigation itself. (*Id.* ¶¶ 3, 5; Relators' Resp. to Defs. 56.1 ¶¶ 3, 5, Docket Entry No. 98.)

Therefore, Judge Orenstein concluded that the FCA "does not preclude [the Court] from exercising jurisdiction over [Relators'] claims." (*Id.* at 18.)

### ii. Scienter

Judge Orenstein analyzed the merits of Relators' claims and recommended that the Court dismiss Relators' FCA and NYFCA claims because Relators' failed to adequately show scienter. (*Id.*)

Judge Orenstein noted that "to succeed on their *qui tam* claims under a theory of implied false certification or a theory of factual falsity, the Relators must prove that Northern [Manor] had 'actual knowledge of the information' about which they complain," and that Northern [Manor] "acted 'in deliberate ignorance of the truth or falsity of [that] information' or that it acted 'in reckless disregard of the truth or falsity of [that] information.'" (*Id.* at 19.) Judge Orenstein described the scienter requirement as "rigorous," and stated that the burden of proof rests on Relators to prove scienter. (*Id.*) Finding that "there appears to be nothing in the record that identifies any individual or group of individuals with knowledge of Northern [Manor]'s Medicaid billing process, let alone their knowledge that any submitted claims were false," and that "there is literally no evidence in the record that Northern [Manor] knowingly submitted a false claim or a false record material to a false claim for payment to the government," Judge Orenstein recommended that Relators' *qui tam* claims be dismissed. (*Id.* at 20, 22.)

### iii. Retaliation claims

Judge Orenstein found that a material issue of fact existed as to whether Relators Lee and Luckie were forced to leave their jobs as retaliation under the FCA and NYFCA, and therefore recommended that the Court deny Defendants' motion to dismiss their FCA retaliation claims. (*Id.* at 25.) Judge Orenstein explained that to prove retaliatory discharge under the FCA, a

plaintiff must show "(1) that she engaged in conduct under the statute; (2) that [the] defendants were aware of her conduct; and (3) that she was terminated in retaliation for that conduct." (*Id.* at 23 (citing *N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 297.) Judge Orenstein noted that the third element can be shown by proof of termination or proof that an employer "directly, intentionally create[d] a work atmosphere so intolerable that [s]he was forced to quit involuntarily." (R&R 23 (citing *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003)).)

### 1. Lee

Judge Orenstein found that there was a genuine issue of fact as to whether Lee resigned voluntarily. (*Id.* at 24.) He also found that there was a genuine issue of fact regarding whether Lee suffered damages from leaving his job at Northern Manor. (*Id.*) Judge Orenstein concluded that the "evidence would allow a reasonable jury to find that Northern [Manor] was aware that Lee engaged in protected conduct" and was forced to leave his job because of it. (*Id.*) Judge Orenstein therefore recommended that the Court deny Defendants' motion for summary judgment as to Lee's retaliation claim under the FCA. (*Id.* at 25.)

### 2. Luckie

Judge Orenstein similarly found that a genuine issue of fact existed "about the circumstances of Luckie's departure from Northern [Manor]." (*Id.*) Judge Orenstein concluded that a jury could reasonably find that Luckie had been discharged in violation of the FCA, and recommended denying Defendants' motion to dismiss as to this claim. (*Id.*)

### b. NYCHRL discrimination and retaliation claims

Judge Orenstein also recommended that the Court deny Defendants' motion to dismiss Relators' NYCHRL claims. (*Id.* at 26.) In reaching this conclusion, Judge Orenstein noted that the standards for discrimination and retaliation under the NYCHRL are "less exacting" than the

corresponding federal law, and that courts must therefore analyze NYCHRL claims broadly. (*Id.*)

### i. Discrimination

Judge Orenstein recommended that the Court deny summary judgment as to Luckie's discrimination claim because a reasonable jury could find that Northern Manor "acted at least in part on the basis of race in demoting Luckie" from his position as a CNA supervisor and hiring a person of Russian descent to fill Luckie's position. (*Id*. at 27–28.)

Likewise, as to Gonzalez's discrimination claim, Judge Orenstein found that, "a reasonable jury could conclude that Northern [Manor] treated Gonzalez differently because of her ethnicity — just as it allegedly treated registrants differently on that basis." (*Id*. at 28.) Further, Judge Orenstein found that "Northern has not established as a matter of law that its failure to accommodate Gonzalez's injury was non-discriminatory," and therefore recommended that the Court deny Defendants' motion for summary judgment as to Gonzalez's discrimination claim. (*Id.*)

### ii. Retaliation

Addressing Relators' retaliation claims under the NYCHRL, Judge Orenstein found that "because [he] conclude[ed] that the [C]ourt should deny [Defendants'] motion as to Luckie's FCA retaliation claim, [he] necessarily conclude[s] that the [C]ourt should likewise deny the motion under the less exacting NYCHRL." (*Id*. at 29.)

Judge Orenstein reached the same conclusion with respect to Gonzalez's retaliation claim under the NYCHRL. (*Id*.) Addressing Defendants' arguments that Gonzalez left Northern Manor due to an injury and that Gonzalez never brought any concern about retaliation or wrongful conduct to a compliance officer's attention, Judge Orenstein noted that a reasonable

jury could find that (1) Gonzalez was forced to leave her job when Deverman reassigned her to a position that proved difficult as a result of her injury, and (2) that Gonzalez engaged in a protected activity when she reported discrimination at Northern Manor to her supervisor. (*Id.* at 29–30.)

## III. Discussion

### a. Standards of review

#### i. Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews de novo the parts of the report and recommendation to which the party objected. *Id.*; *see also United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. *John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1 (E.D.N.Y. Nov. 24, 2015). The clear error standard also applies when a party makes only conclusory or general objections. *Benitez v. Parmer*, 654 F. App'x 502, 503–04 (2d Cir. 2016) (holding that "general objection[s] [are] insufficient to obtain de novo review by [a] district court" (citations omitted)); *see* Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [magistrate judge's] proposed findings and recommendations." (emphasis added)); *see also Colvin v. Berryhill*, 734 F. App'x 756, 758, (2d Cir. 2018) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d

758, 766 (2d Cir. 2002))).

### ii. Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Relators' objections

Relators object to Judge Orenstein's finding that they have failed to establish the requisite element of scienter with respect to their FCA and NYFCA claims. (Relators' Obj. 1.) Relators argue that Judge Orenstein "narrowly focus[ed] on certain individuals with knowledge of [Northern Manor's] Medicaid billing process" but the FCA and NYFCA "do not require that the individuals who perform the bookkeeping functions of assembling and transmitting electronic Medicaid billing must be the individuals with the requisite knowledge to establish scienter." (*Id.*

at 2.) Further, because Deverman served as an "executive agent of [Northern Manor], [and] oversaw the operation of [Northern Manor] on a daily basis," Relators argue that Deverman's knowledge of the "day-to-day operations, the demographics of the census, [and her submission of] the census to the billing company," establishes the requisite scienter under the NYFCA and FCA. (*Id*. at 2–3.)

### c. Defendants' objections

Defendants object to Judge Orenstein's finding that Relators' claims were not procedurally barred by the public disclosure bar or the settlement agreement between Northern Manor and the MFCU, (Defs. Obj. 1–6); however, Defendants assert that Judge Orenstein correctly recommended dismissal of Relators' FCA and NYFCA claims for lack of scienter, (*id*. at 4).

With respect to Lee's retaliation claims under the FCA and NYFCA, Defendants argue that Judge Orenstein erred in failing to grant summary judgment because Lee has not provided sufficient evidence to support his claim of constructive discharge. (*Id*. at 6.) Defendants argue that the Second Circuit, in *Terry*, 336 F.3d at 151–152, found constructive discharge on much different facts, and in Lee's case, "there is no evidence whatsoever of pervasive, unabated harassment, no evidence of threats to Lee, and no evidence that Northern [Manor] even wanted him to leave." (*Id*.) As such, Defendants contend that Lee cannot prove an adverse action with respect to his retaliation claim.

Defendants also argue that Judge Orenstein erred in recommending denial of summary judgment as to Luckie's FCA and NYFCA retaliation claims because Luckie has failed to prove that he was terminated, and in the alternative, Luckie has failed to establish a causal connection between his alleged protected conduct and his alleged termination. (*Id*. at 7.)

As to Luckie's discrimination and retaliation claims under the NYCHRL, Defendants argue that NYSDHR's finding of no probable cause bars Luckie from bringing this claim. (*Id*. at 8.) In addition, Defendants argue that Luckie's claims are barred "as a result of his failure to successful[ly] appeal [NYSDHR's] adverse decision in the state fora." (*Id*. at 9.)

With respect to Gonzalez's discrimination claim under the NYCHRL, Defendants argue that "Gonzalez points to nothing that would establish any discriminatory motive against her." (*Id*. at 8.) Further, Defendants argue that Relators have not established a "failure to accommodate" theory of discrimination and that Relators' failed to plead this theory in the SAC, thus, it should not be considered. (*Id*.) Lastly, with respect to Gonzalez's retaliation claim under NYCHRL, Defendants argue that "no jury can credib[ly] conclude that an employ[ee] who quit work, and then successfully returned to work after six months was a victim [of] retaliation." (*Id*. at 9.)

### d. Retaliation claims under the FCA and NYFCA

To sustain an action for retaliatory discharge under the FCA, a plaintiff must establish "(1) that he engaged in conduct protected under the statute; (2) that the employer was aware of such activity; and (3) that the employer took adverse action against him because he engaged in the protected activity."[9] *Dhaliwal v. Salix Pharmaceuticals, Ltd.*, 752 F. App'x 99, 100 (2d.

---

[9] Although the Second Circuit has yet to articulate a test for deciding when a plaintiff has set forth a claim for retaliation under the FCA, the Second Circuit has observed without deciding the issue, that district courts in the Second Circuit, as well as sister circuits, have generally required plaintiffs to show that "(1) [plaintiff] engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." *See United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017); *see also Weslowski v. Zugibe*, 626 F. App'x 20, 22 (2d Cir. 2015) ("Although this Court has yet to articulate a test for deciding when a plaintiff has set forth a claim for retaliation under section 3730(h), we need not do so here. Even assuming that [the plaintiff] engaged in protected activity, he did not

2019) (quoting *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med.*
*Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017)). In addition, "because the NYFCA follows the
federal False Claims Act, New York courts look toward federal law when interpreting the New
York act." *Id.* at 100 (internal quotation marks omitted) (citing *State ex rel. Seiden v. Utica First
Ins.*, 943 N.Y.S.2d 36, 39 (App. Div. 2012)). A court's analysis of retaliation under the FCA
thus equally applies to a plaintiff's NYFCA claims of retaliation. *Id.* Under the FCA and
NYFCA, protected conduct is defined as "lawful acts done by the employee . . . in furtherance of
. . . efforts to stop [one] or more violations of the FCA." *Chorches for Bankr. Estate of Fabula*,
865 F.3d at 95; *see Ortiz v. Todres & Co., LLP*, No. 15-CV-1506, 2019 WL 1207856, at *4
(S.D.N.Y. Mar. 14, 2019) ("Under the FCA, protected activity includes (1) lawful acts done by
the employee, contractor, agent or associated others in furtherance of an action under the FCA,
and (2) other efforts to stop one or more violations of the FCA." (internal quotation marks
omitted) (quoting *Swanson v. Battery Park City Auth.*, No. 15-CV-6938, 2016 WL 3198309, at
*3 (S.D.N.Y. June 8, 2016) (citing 31 U.S.C. § 3730(h)(1))).

### i. Lee's retaliation claim under the FCA and NYFCA

Defendants object only to Judge Orenstein's finding that Lee was terminated or
constructively discharged, i.e., that he suffered an adverse action because he engaged in
protected activity. (Defs. Obj. 6.) In support, Defendants argue "[t]here is no evidence
whatsoever of pervasive, unabated harassment, no evidence of threats to Lee, and no evidence
that Northern even wanted him to leave." (*Id.*) Defendants therefore argue that Lee fails to
satisfy the third element of a retaliation claim under the FCA or NYFCA. (*Id.*)

---

adequately allege that the [defendant] was aware that his refusal to approve the contract at issue
was in furtherance of efforts to prevent a violation of the FCA.").

To satisfy the third element of a retaliation claim under the FCA, a plaintiff must show that the defendant retaliated against him "because of the protected conduct." *Dhaliwal*, 752 F. App'x at 100. "Although not squarely addressing the issue, the Second Circuit has implicitly endorsed the application of the *McDonnell Douglas* framework to Section 3730(h) claims." *Forkell v. Lott Assisted Living Corp.*, No. 10-CV-5765, 2012 WL 1901199, at *10 (S.D.N.Y. May 21, 2012) (citing *Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 F. App'x 137, 139 (2d Cir. 2010)); *see also Liburd*, 372 F. App'x at 139 (holding that even if the plaintiff engaged in protected conduct under the FCA, "defendants proffered a legitimate, non-retaliatory reason for [the plaintiff's] termination and [the plaintiff] failed to raise a genuine issue of material fact as to whether that reason was a pretext for retaliation").

Where a plaintiff states that he has been discharged in retaliation for engaging in protected conduct, he must establish a *prima facie* case that he was directly terminated or that "his employer, rather than discharging him directly, intentionally create[d] a work atmosphere so intolerable that he [was] forced to quit involuntarily." *Terry*, 336 F.3d at 151–52.

Constructive discharge claims require "the employee to show both (1) that there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign, and (2) that the evidence shows that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign." *Makinen v. City of New York*, 722 F. App'x 50, 52 (2d Cir. 2018) (quoting *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 308 (2d Cir. 2017)); *see also Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49–50 (2d Cir. 2014) (stating that constructive discharge is a "high standard to establish" as an employee must "show both (1) that there is evidence of the employer's intent to create an 'intolerable' environment that forces the employee to resign, and (2) that the evidence

shows that a reasonable person would have found the work conditions so intolerable that he 'would have felt compelled to resign'") (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004)); *United States v. Bank of Am. Corp.*, No. 12-CV-08399, 2016 WL 1298985, at *12 (S.D.N.Y. Mar. 31, 2016) ("A plaintiff can successfully plead the third element [of a retaliation claim under the FCA] by showing that he was constructively discharged by his employer."). When alleging constructive discharge, plaintiffs "face a demanding standard." *See Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (stating that the standard for constructive discharge is a "demanding one").

Relators have failed to provide sufficient evidence to show that Northern Manor intentionally created an intolerable workplace or that Lee's working conditions were so intolerable that a reasonable person would have felt compelled to resign. Lee testified that he left in part because he felt uncomfortable due to the way Northern Manor discriminated against certain registrants. (Lee Dep. 201:1–25.) However, Relators have produced no evidence to suggest that Northern Manor's alleged treatment of certain registrants was done to intentionally create such an intolerable environment that forced Lee to resign. *See Attali v. City of New York*, No. 15-CV-426, 2018 WL 6597500, at *10 (S.D.N.Y. Sept. 17, 2018) (granting summary judgment on the plaintiff's constructive discharge claim where plaintiff did not adduce evidence that defendant "deliberately acted in such a manner to force [plaintiff's] resignation"); *see also Kader v. Paper Software, Inc.*, 111 F.3d 337, 341 (2d Cir. 1997) ("[Plaintiff] has demonstrated that an uneasy and stressful environment existed, but he has adduced no evidence to support an inference that his employer intentionally created an intolerable workplace.").

Further, Lee testified that Deverman never explicitly threatened to fire him, but would constantly tell him "look, you're just an employee here . . . keep your nose straight." (Lee Dep.

204:23–205:10.) This allegation does not rise to the level of creating an "intolerable" work environment. *See Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996) (finding constructive discharge where "supervisor engaged in a pattern of baseless criticism, said [the plaintiff] would not 'be around,' and that [the plaintiff] would be fired instantly if she did not meet certain ambiguous behavior objectives").

Lee has provided no evidence in support of his conclusory statement that he felt physically threatened or felt he could be physically assaulted at Northern Manor. Lee testified that he felt like Deverman or one of the Russian staff was "going to take [him], stab [him], [or] hit [him]" because he stood up for the registrants by complaining about their treatment, (Lee Dep. 152:1–154:25), and testified that this belief was based upon the "doom and gloom" of Northern Manor, the "coldness of his colleagues," and Deverman's constant micromanagement (Lee Dep. 153:1–25). When assessed objectively, the Court finds that no reasonable employee would feel physically threatened based solely upon a supervisor's micromanagement, being told to "keep their nose clean," or the coldness of their colleagues. *See Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 428 (S.D.N.Y. 2018) (finding the plaintiff's "conclusory assertion about concern for his safety" not explained by any evidence in the record and holding that his "sudden fear of returning to work after he filed his complaint in his action [could not] be a basis for his claim of constructive discharge"); *see also Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 209–10 (E.D.N.Y. 2013) ("The standard for constructive discharge is demanding, and it 'cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer . . . [or that] the employee's working conditions were difficult or unpleasant.'" (quoting *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993)).

The Court finds that Relators have not provided sufficient evidence to support a finding that Lee was constructively discharged. Because the Court finds that Lee was not constructively discharged, Relators have failed to prove an adverse action for purposes of Lee's retaliation claims under the FCA and NYFCA. As a result, the Court dismisses Lee's FCA and NYFCA retaliation claims.

### ii. Luckie's retaliation claim under the FCA and NYFCA

Defendants also object to Judge Orenstein's recommendation that the Court deny Defendants' motion for summary judgment as to Luckie's retaliation claim under FCA and NYFCA because there is no evidence that Luckie was constructively discharged. (Defs. Obj. 7.) However, Relators do not argue that Luckie was constructively discharged, instead, they argue that Luckie was terminated. (Relators' Opp'n 24, 25.)

Although the parties dispute the facts surrounding the end of Luckie's employment at Northern Manor, based on either version of the facts, the Court finds that Luckie suffered an adverse action. Luckie testified that at some unspecified time in 2011, Deverman called him to her office and informed him that she did not have "any hours for [him]"; however, she explained that "whenever somebody [went] on vacation or sick leave, she [would] . . . call [him]." (Luckie Dep. 35.) Luckie also testified that he subsequently never received a call from Deverman. (Luckie Dep. 35–37, 49.) On May 6, 2011, Luckie filed an administrative complaint with NYSDHR asserting that Northern Manor terminated him after Deverman joined Northern Manor. (NYSDHR Compl. 7.)

Defendants assert that Luckie resigned from Northern Manor on February 11, 2011. (Defs. Resp. 56.1 ¶ 33.) Deverman testified that on some unspecified date, she held a staff meeting at Northern Manor where they discussed schedule changes "because the corporate office

had indicated that [Northern Manor] needed to decrease staff hours and [Northern Manor] would go from seven hours of working to [twelve] hour shifts." (Deverman Dep: 157:7–11.) During the meeting, Deverman testified that she extended an offer to Luckie "to work on rotating days," (Deverman Dep. 157:13–21), and Luckie stated "give me my pink slip, I'm leaving," (Deverman Dep. 157:24).

Notwithstanding the factual dispute with respect to Luckie's departure from Northern Manor, there is no dispute that Luckie was told by Deverman that his hours would be decreased, which would result in a decrease in pay and could qualify as an adverse action. *See Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (holding that a significant decrease in pay may constitute an adverse employment action); *see also Evans–Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F. Supp. 2d 386, 400 (S.D.N.Y. 2007) (describing an employee's twenty-four-hour average overtime decrease from a previous year as "a small fluctuation . . . hardly sufficient to make a showing of an adverse employment action").

However, even assuming that Luckie was offered a schedule that resulted in a significant decrease in his pay *or* that Luckie was indeed terminated, Relators have not provided any direct or circumstantial evidence to support a causal connection between Luckie's complaints with respect to the discrimination against registrants he observed and his alleged termination or reduction in his hours at Northern Manor.[10]

---

[10] Relators provided a copy of his complaint filed in the Kings County Action in opposition to defendants' motion for summary judgment. In the complaint, Luckie alleges that he complained to his supervisor, Gennaidy Goldvekht, that he was discriminated against in January 2011 and was subsequently terminated in February of 2011. (Luckie Aff. 16.) However, because these allegations are not complaints to prevent the submission of false claims to the government and instead are only allegations of discrimination that he himself experienced, they are not protected activity. *See Chorches for Bankr. Estate of Fabula*, 865 F.3d at 95 (finding that the plaintiff's refusal to falsify information on a patient care report constituted a

In order to establish a *prima facie* case of retaliation under the *McDonnell Douglas* framework, "a plaintiff must adduce 'evidence sufficient to permit a rational trier of fact to find . . . that a causal connection exists between the protected activity and the [adverse action], *i.e.*, that a retaliatory motive played a part in the'" plaintiff's change in work schedule or termination. *Kessler v. Westchester Cty. Dep't. of Social Serv.*, 461 F.3d 199, 205–06 (2d Cir. 2006) (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)); *see Krause v. Eihab Human Servs., Inc.*, No. 10-CV-898, 2015 WL 4645210, at *9 (E.D.N.Y. Aug. 4, 2015) (holding that the plaintiff must establish a causal connection between his protected activity and his termination for his FCA retaliation claim to survive). "The requirements to establish a *prima facie* case" at this first stage "are 'minimal' . . . and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 130 (2d Cir. 2012) (internal citations omitted).

Assuming Luckie's complaints regarding discrimination at Northern Manor are his protected activity, Relators have provided no evidence to suggest any actions were taken against Luckie in retaliation for his complaints about discriminatory treatment of the registrants. Although Luckie testified that he told his supervisor when witnessing discrimination at Northern Manor, Luckie did not testify that he was reprimanded, received threats of termination or any other negative treatment as a result of his complaints. *See Krause*, 2015 WL 4645210, at *9 (finding that the plaintiffs established a *prima facie* case for retaliation under the FCA because

---

protected activity under the FCA); *see also Fisch v. New Heights Acad. Charter Sch.*, No. 12-CV-2033, 2012 WL 4049959, at *5 (S.D.N.Y. Sept. 13, 2012) ("The plaintiff's investigation must be directed at exposing a fraud upon the government" (internal quotation marks omitted)). As such, the Court cannot draw a causal connection between his alleged complaints about the discrimination he faced with his termination for purposes of his retaliation claim under the FCA or NYFCA.

they "provided evidence of a number of retaliatory statements made and actions taken against them, following their meeting with the auditors, including threats of termination, offers of raises in exchange for retractions . . .").

Moreover, Relators offer no evidence to establish temporal proximity between Luckie's complaints and his alleged termination, or his meeting with Deverman where he was informed about his schedule change. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("[A] plaintiff can indirectly establish a connection to support . . . a retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment action]." (alteration in original) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenctady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001))).

Therefore, even if a reasonable jury could find that Luckie was terminated *or* the reduction in his hours qualified as an adverse action, the Court finds that a reasonable jury could not conclude (other than by speculation) that there was a causal connection between Luckie's alleged protected activities and the alleged adverse actions. Accordingly, the Court grants Defendants' motion for summary judgment as to Luckies' FCA and NYFCA retaliation claims.

### e. NYCHRL discrimination and retaliation claims

Relators' allege that Gonzalez and Luckie were discriminated and retaliated against in violation of the NYCHRL. (SAC ¶ 279.)

The Second Circuit has reserved decision as to whether the *McDonnell Douglas* burden-shifting analysis applies to NYCHRL claims. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (stating that "it is unclear whether, and to what extent, the McDonnell Douglas burden-shifting analysis has been modified for NYCHRL claims," and reserving decision as to whether the *McDonnell Douglas* burden-shifting analysis applies to

NYCHRL claims). However, the Second Circuit has stated that to prevail on a discrimination claim under the NYCHRL, a plaintiff must "show that he has been treated less well at least in part because of [his protected characteristic]." *Mathew v. N. Shore-Long Island Jewish Health Sys., Inc.*, 582 F. App'x 70, 71 (2d Cir. 2014) (quoting *Mihalik*, 715 F.3d at 110); *see also White v. Andy Frain Servs., Inc.*, 629 F. App'x 131, 133 (2d Cir. 2015) ("NYCHRL . . . only prohibits discrimination in the 'terms, conditions or privileges of employment' when such discrimination is 'because of a protected characteristic.'" (quoting N.Y.C. Admin. Code § 8-107(1)(a) and citing *Mihalik*, 715 F.3d at 109)). After the plaintiff establishes his *prima facie* case, the defendant then has the opportunity to offer legitimate reasons for its actions. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (stating that under the NYCHRL "the plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions"); *see also Mihalik*, 715 F.3d at 111 ("Even if the plaintiff establishes that she was treated 'less well' because of her gender, defendants may assert an affirmative defense whereby [they] can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." (citation and internal quotation marks omitted)). "If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's 'reasons were pretextual,' or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least 'in part on discrimination.'" *Ya-Chen Chen*, 805 F.3d at 75 (citing *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 35, 41 (App. Div. 2012)). "In evaluating both the plaintiff's claim and the defendant's affirmative defense, courts must consider the 'totality of the circumstances.'" *Mihalik*, 715 F.3d at 111 (quoting *Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 58

(App. Div. 2012)).

"[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Gachette v. Metro N.-High Bridge*, 722 F. App'x 17, 21 (2d Cir. 2018) (quoting *Mihalik*, 715 F.3d at 112) (internal citations omitted); *see also Ya-Chen Chen*, 805 F.3d at 76 (stating that the NYCHRL retaliation provision "protect[s] plaintiffs who oppose any practice forbidden under the law form conduct reasonably likely to deter a person engaging in such action") (alterations, citations, and internal quotation marks omitted). The NYCHRL requires a plaintiff to show a causal link between their protected activity and the defendant's retaliatory actions. *Gachette*, 722 F. App'x at 21; *see also Forrester v. Corizon Health, Inc.*, 752 F. App'x 64, 66 (2d Cir. 2018) ("A plaintiff who brings a retaliation claim under the NYCHRL still must adduce admissible evidence that retaliation was at least a partial motivating factor . . . evidence of temporal proximity alone is not enough to demonstrate retaliation under the NYCHRL." (first citing *Mihalik*, 715 F.3d at 113, 116; and then citing *Ya-Chen Chen*, 805 F.3d at 76–77)).

Like NYCHRL discrimination claims, "the plaintiff must establish a *prima facie* case, and the defendant then has the opportunity to offer legitimate reasons for its actions . . ." and if the defendant satisfies that burden, "summary judgment is appropriate if 'the record establishes as a matter of law' that . . . retaliation 'play[ed] no role' in the defendant's actions." *Ya-Chen Chen*, 805 F.3d at 76 (citing *Mihalik*, 715 F.3d at 109)).

The "NYCHRL is not a general civility code . . . and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives . . . or if the defendant proves the conduct was nothing more than 'petty slights or trivial

inconveniences.'" *Mihalik*, 715 F.3d 102 at 113 (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 40–41 (1st Dep't 2009)).

### i. Gonzalez's discrimination claim

Notwithstanding the liberal construction for establishing NYCHRL claims, the Court finds, that Gonzalez has failed to establish that her alleged termination was based at least in part on discrimination.

In the Second Amended Complaint, Gonzalez identifies as "Hispanic," (SAC ¶ 282), which is a protected characteristic. *See Vill. of Freeport v. Barrella*, 814 F.3d 594, 610 (2d Cir. 2016) (finding that a person who identifies as Hispanic is part of a protected class); *see also Gonzalez v. N.Y. State Dep't of Corr. Servs. Fishkill Corr. Facility*, 122 F. Supp. 2d 335, 342 (N.D.N.Y. 2000) (finding that the plaintiff's self-identification as Hispanic was sufficient to constitute a protected characteristic).

Although the parties contest whether Gonzalez was terminated, Gonzalez is not required to prove a materially adverse employment action under NYCHRL, but only differential treatment or that she was treated "less well" due to being "Hispanic." *Mihalik*, 715 F.3d at 110.

Assuming, without deciding, that Gonzalez was terminated, Relators have nevertheless failed to establish that Gonzalez's termination was caused even in part, by discrimination. *See Keles v. Yearwood*, No. 15-CV-03880, 2019 WL 1298480, at *5 (E.D.N.Y. Mar. 20, 2019) ("[A] plaintiff alleging discrimination [under the NYCHRL] still bears the burden of showing that the conduct is caused by a discriminatory motive." (citation and internal quotation marks omitted)). Gonzalez testified that her employment at Northern Manor ended because she injured her left ankle and was incapacitated. (Gonzalez Dep. 9:4–10.) Although the parties dispute whether or not Gonzalez was terminated at this point in time, in November of 2013, Gonzalez returned to

Northern Manor, worked in a new position for a day, but left the position because it was too strenuous and "too much for [her] shoulder," because she had to "carry [a lot] of stuff around." (Gonzalez Dep. 65:1–15.) Based on these facts, Relators have failed to establish any connection between any allegations of discriminatory treatment and Gonzalez not working after her injury or in November of 2013.[11]

Accordingly, the Court dismisses Gonzalez's claim of discrimination under the NYCHRL.

### ii. Gonzalez's retaliation claim

Relators assert that Gonzalez was terminated as of March 10, 2013.[12] (Relators' 56.1 ¶ 37.) Defendants argue that summary judgment is appropriate because Gonzalez "admitted during her deposition that after she left Northern Manor because of her injury, she sought to

---

[11] Although Judge Orenstein analyzed Gonzalez's NYCHRL discrimination claim under a "failure to accommodate" theory, Relators did not plead this theory in the SAC, nor did they argue it in their opposition to Defendants' motion for summary judgment. Relators' included facts stating that Deverman refused to discuss an accommodation with Gonzalez only in their 56.1 statement. (*See generally* Relators' 56.1 ¶¶ 38–40.) Because Relators failed to plead and argue a claim of discrimination under a failure to accommodate theory, the court declines to address this issue. *See* Fed. R. Civ. P. 8(a) (stating that a claim must be set forth in the pleadings, in order to give defendants fair notice of the nature of the plaintiff's claim); *see also Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (holding that the district court did not err in disregarding allegations regarding an alleged hostile work environment that the plaintiff raised for the first time in response to the defendant's motion for summary judgment) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)); *see also Wright*, 152 F.3d at 178 (2d Cir. 1998) (recognizing that a party may not use its opposition to a dispositive motion as a means to amend the complaint).

[12] In the SAC, Relators allege that "Defendants have intentionally retaliated against Gonzalez by constructively discharging her and withholding pay," (SAC ¶ 270), however in Relators' opposition to Defendants' motion for summary judgment, Relators argue that Gonzalez "was not constructively discharged," (Relators' Opp'n 31). Despite this inconsistency, the Court nevertheless finds that Gonzalez's retaliation claim under the NYCHRL fails because Relators have not produced sufficient evidence to prove a causal connection between her complaints to her supervisor and her alleged termination.

return to Northern Manor . . . was granted the job . . . [and] again left due to the ongoing effects of her injury." (Defs. Mem. 24.) Defendants contend that Gonzalez's "request to be rehired, as well as Northern Manor's granting of that request hardly forms the basis for any valid claim against Northern Manor." (*Id.*)

Whether or not Gonzalez was terminated from her position at Northern Manor raises a material issue of fact as Relators argue that Gonzalez was terminated as of March 10, 2013, (Relators' 56.1 ¶ 37), and Defendants assert that Gonzalez left Northern Manor due to an injury, asked for and received her job back in November of 2013, "and again quit after one day of work due to her injury," (Defs. Resp. 56.1 ¶ 37).

However, even assuming that Gonzalez was terminated, the Court finds that Gonzalez has not produced sufficient evidence to prove a causal connection between her complaints to her supervisor and her alleged termination. Even under the NYCHRL's liberal standard of liability, Gonzalez must still provide evidence showing a causal link between her complaints and Defendants' allegedly retaliatory actions. *See Forrester*, 752 F. App'x at 66 ("Although the NYCHRL's retaliation provision is broader than at least some federal anti-discrimination laws, a plaintiff bringing a retaliation claim under the NYCHRL still must adduce admissible evidence that retaliation was at least a partial motivating factor . . . evidence of temporal proximity alone is not enough to demonstrate retaliation under the NYCHRL," (first citing *Mihalik*, 715 F.3d at 113, 116; and then citing *Ya-Chen Chen*, 805 F.3d at 76–77)); *see also Gachette*, 722 F. App'x at 21 ("The NYCHRL . . . requires [the plaintiff] to show a causal link between his overtime complaints and [his employer's] retaliatory actions, which . . . [the plaintiff] is unable to do.").

Gonzalez testified that she complained to her supervisor about the discrimination Latino and African American registrants were subjected to at Northern Manor, (Gonzalez Dep. 52),

however Relators provide no evidence to establish a causal connection between Gonzalez's complaints to her supervisor and her alleged termination. Because Relators offer no evidence connecting Gonzalez's alleged complaints to her alleged termination, the Court dismisses Gonzalez's retaliation claim under NYCHRL.

### iii. Luckie's retaliation and discrimination claims

Defendants argue that summary judgment is appropriate as to Luckie's claims of discrimination and retaliation under NYCHRL because (1) Luckie's retaliation and discrimination claims are barred by the election of remedies doctrine, (Defs. Reply 9), (2) "there is no competent evidence" to support Luckie's claim that he was terminated, (Defs. Mem. 23), and (3) "at no time did [Luckie] bring any instances of retaliation or discrimination to the attention of the Compliance Officer" at Northern Manor, (*id*). Defendants object to Judge Orenstein's recommendation that the Court deny Defendants' motion for summary judgment as to Luckie's NYCHRL claims because "Luckie's claims [are] barred as a result of his failure to successfully appeal the adverse decision in the state fora." (Defs. Obj. 9.)

In opposition, Relators argue that the NYSDHR's determination of no probable cause with respect to Luckie's discrimination claim has no bearing on Luckie's claim under the NYCHRL. (Relators' Opp'n 28.) Relators also argue that (1) Luckie's claims are not barred by *res judicata* because in the Article 78 Proceeding, the New York Supreme Court "refused to consider the issue regarding retaliation holding it was not alleged in the NYSDHR's complaint," (Relators' Opp'n 32–33), (2) Luckie did not resign, but was terminated, and (3) Luckie informed his supervisor, Mr. Gennadiy Goldvekht, that he was being discriminated against at Northern Manor by Deverman, (*id*. at 32).

38

## 1. The election of remedies doctrine bars Luckie's NYCHRL discrimination and retaliation claims

Under both the NYSHRL and the NYCHRL, an individual who files a complaint with the NYSDHR is jurisdictionally barred from filing a lawsuit in state or federal court for the same claims. *See* N.Y. Exec. Law § 297(9); N.Y.C. Admin. Code § 8-502(a);[13] *see also DuBois v. Macy's Retail Holdings, Inc.*, 533 F. App'x 40, 41 (2d Cir. 2013) ("Furthermore, the election of remedies doctrine under both the [NYSHRL] and [NYCHRL] precludes a plaintiff from pursuing his discrimination claims in a court of law when the same claims were previously brought before a local administrative agency." (citing N.Y. Exec. Law § 297(9) and N.Y.C. Admin. Code § 8–502)); *Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 187 (S.D.N.Y. 2011) ("The election of remedies bar also precludes consideration of any claim — whether brought under the NYSHRL or the NYCHRL — arising out of the same incident on which [the plaintiff's] [NY]SDHR complaint was based."). Courts have interpreted "same claims" as those arising out of the same incidents or "operative events" from which the NYSDHR complaint was based. *Chakraborty v. Soto*, No. 16-CV-9128, 2017 WL 5157616, at *81 (S.D.N.Y. Nov. 6, 2017); *see, e.g., Yong Chul Son v. Chu Cha Lee*, 559 F. App'x 81, 82 (2d Cir. 2014) (affirming dismissal of NYSHRL and NYCHRL claims when NYSDHR had reviewed NYSHRL and Title

---

[13] In relevant part, section 8-502(a) states that:

> Except as otherwise provided by law, any person claiming to be a person aggrieved by an unlawful discriminatory practice as defined in chapter 1 of this title or by an act of discriminatory harassment or violence as set forth in chapter 6 of this title shall have a cause of action in any court of competent jurisdiction for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate, unless such person has filed a complaint with the city commission on human rights or with the state division of human rights with respect to such alleged unlawful discriminatory practice or act of discriminatory harassment or violence.

N.Y.C. Admin. Code § 8-502(a).

VII claims on the same facts); *Carroll v. U.P.S.*, No. 00-CV-7032, 2000 WL 1185583, at *3 (2d Cir. Aug. 21, 2000) (Summary Order) ("Because [plaintiff's] two sets of claims arise out of the same group of facts, the matter before this court is jurisdictionally barred."); *McCalla v. City of New York*, No. 15-CV-8002, 2017 WL 3601182, at *37 (S.D.N.Y. Aug. 14, 2017) ("[The] election of remedies [doctrine], is not limited to the precise claims brought in the administrative proceeding, but extends to all claims arising out of the same events." (citation and internal quotation marks omitted)), *report and recommendation adopted*, No. 15-CV-8002, 2017 WL 4277182 (S.D.N.Y. Sept. 22, 2017). Because the bar is jurisdictional, claims dismissed pursuant to the doctrine "must be dismissed under Fed. R. Civ. P. 12(b)(1) rather than 12(b)(6)." *Higgins*, 836 F. Supp. 2d at 187 (citing *Moodie v. Fed. Reserve Bank*, 58 F.3d 879, 882 (2d Cir. 1995)).

Courts recognize two primary exceptions to the election of remedies doctrine, neither of which apply in this case.[14] *See York v. Ass'n of the Bar*, 286 F.3d 122, 127 n.2 (2d Cir. 2002); *Levi v. RSM McGladrey, Inc.*, No. 12-CV-8787, 2014 WL 4809942, at *3 n.4 (S.D.N.Y. Sept. 24, 2014). "First, where a complaint filed with the administrative agency is dismissed for administrative convenience rather than on the merits, a plaintiff is not barred from filing a lawsuit in federal court." *Williams v. City of New York*, 916 F. Supp. 2d 517, 522–23 (S.D.N.Y. 2013) (citation omitted); *York v. Ass'n of Bar of City of New York*, 286 F.3d 122, 127 n.2 (2d. Cir. 2002). The second exception "applies when a claim is filed directly with the EEOC rather than with the [NY]SDHR, and is only thereafter filed with the [NY]SDHR by the EEOC in accordance with Title VII requirements that all complaints filed with the EEOC be referred to the

---

[14] Section 297(9) of the New York Executive Law lists the administrative convenience, untimeliness, and annulment of the election of remedies as exceptions. N.Y. Exec. Law § 297(9); *Jiles v. Rochester Genesee Reg'l Transportation Auth.*, No. 17-CV-06345, 2018 WL 3432836, at *3 (W.D.N.Y. July 10, 2018).

local agency." *Williams*, 916 F. Supp. 2d at 522–23 (citation omitted); *York*, 286 F.3d at 127 n.2.

Luckie's NYCHRL claims for discrimination and retaliation are both barred by the election of remedies doctrine. In the NYSDHR Complaint, Luckie relied on the same operative facts as in the current action in asserting NYCHR discrimination and retaliation claims. Luckie alleged in the NYSDHR Complaint that he was demoted from being a CNA coordinator, he was replaced by Julia Chicheinitskya, and that he was fired on February 17, 2011. (NYSDHR Compl. 7.) He also alleged that Deverman informed him that she could no longer offer him full-time work, but would call him if any of the employees reported sick or were on vacation. (*Id*.)

Luckie's discrimination claim based on his demotion is raised in the NYSDHR Complaint. Further, although not specifically included in the NYSDHR Complaint, Luckie's retaliation claim is nevertheless premised on his termination, the same incident that formed the basis of his discrimination claim in the NYSDHR action and is therefore also barred. *See Carroll*, 2000 WL 1185583, at *3 ("A '[c]laimant cannot avoid the jurisdictional bar [presented by § 297(9) ] by merely adding additional elements of damage arising out of the same underlying conduct [or] by changing his legal theory.'" (quoting *Bhagalia v. State*, 644 N.Y.S.2d 398, 399 (App. Div. 1996))); *Rosario v. New York City Dep't of Educ.*, No. 10-CV-6160, 2011 WL 1465763, at *2 (S.D.N.Y. Apr. 15, 2011) ("'[A]ttempts to recover for [the same] injuries under . . . slightly different labels are subject to dismissal." (quoting Horowitz v. Aetna Life Ins., 539 N.Y.S.2d 50, 52 (App. Div. 1989))).

Further, Luckie's sworn statement in the Article 78 Proceeding also demonstrates that Luckie's NYSDHR Complaint was premised on the same incident as Luckie stated in his affidavit to the court that "there is no doubt in [his] mind that [he] was retaliated against after

41

[he] complained about being discriminated against." (Luckie Aff. 3) In addition, on May 9, 2018, the Appellate Division found that Luckie's claim of discrimination and retaliation in violation of NYCHRL were barred by the election of remedies doctrine. Luckie, 73 N.Y.S.3d at 454 (finding that "the plaintiff's causes of action are based on the same allegedly discriminatory conduct asserted in the proceedings before the [NYSDHR]. Therefore, the plaintiff is barred from asserting those claims under the NYCHRL").

Because there is no evidence in the record that suggests that any of the exceptions to the election of remedies doctrine apply, the Court dismisses Luckie's NYCHRL claims for lack of jurisdiction pursuant to the election of remedies doctrine. *See Guardino v. Vill. of Scarsdale Police Dep't*, 815 F. Supp. 2d 643, 646 (S.D.N.Y. 2011) ("When the New York State Division of Human Rights has issued a finding of 'no probable cause . . . plaintiff's claims . . . are barred by the law['s] election of remedies provisions because she has already litigated the claims before the Division of Human Rights. The bar is jurisdictional, and the claims must be dismissed pursuant to Rule 12(b)(1), Fed. R. Civ. P.'" (citations omitted)).

## IV.  Conclusion

For the foregoing reasons, the Court grants Defendants' summary judgment motion as to Relators' employment discrimination and retaliation claims.  The Court reserves decision on Relators' qui tam claims and schedules oral argument on the qui tam claims for April 26, 2019 at 11:00 AM.

Dated: April 14, 2019
       Brooklyn, New York

SO ORDERED:

_____ s/ MKB _____
MARGO K. BRODIE
United States District Judge