UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA and NEW YORK
STATE ex rel. ORLANDO LEE, MELVILLE
LUCKIE and LUZ GONZALEZ,                      **MEMORANDUM & ORDER**
                                              13—CV—04933(EK)(RER)
                 Plaintiffs,


           -against-

NORTHERN METROPOLITAN FOUNDATIONN FOR
HEALTHCARE, INC., NORTHERN MANOR
MULTICARE CENTER, INC. and NORTHERN
MANOR ADULT DAY HEALTH CARE PROGRAM,

                 Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

        Relators filed this *qui tam* action in 2013 against

several affiliated companies (collectively, "Northern" or

Defendants).  Northern operated an adult day healthcare center

in Park Slope, Brooklyn, along with other facilities.  The

Relators allege that at the Brooklyn facility, Northern

discriminated against non-Russian registrants on the basis of

national origin and provided all its registrants substandard

care.[1]  After the federal and New York State governments declined

_____

        [1]  New York regulations define a "registrant" of an adult day health
care program as a person: "(1) who is not a resident of a residential health
care facility; is functionally impaired and not homebound; and requires
supervision, monitoring, preventative, diagnostic, therapeutic,
rehabilitative or palliative care or services, but does not require
continuous 24-hour-a-day inpatient care and services; (2) whose assessed
social and health care needs can satisfactorily be met in whole or in part by
the delivery of appropriate services in the community setting; and (3) who

to intervene, the case proceeded to discovery, which began in January 2017 and closed in October 2017.  A bench trial commenced on June 21, 2021.

This Order memorializes certain of the Court's pre-trial rulings on Defendants' motions *in limine*.  These rulings precluded relators from introducing (i) documents they obtained from the New York State Department of Health in March 2021 — more than three years and four months after the close of discovery, and only three months before trial; and (ii) testimony from a former dietician at Northern named Leslie Rosen, whose name Relators disclosed to Defendants in April 2021 (again, long after discovery had closed) despite having had the name in their possession all along.  I explain those decisions, among certain other evidentiary-related issues, more fully here.

## I.   Background

### A.   Department of Health Witness

In August 2019, almost twenty-two months after the close of discovery, the parties filed a proposed joint pretrial order ("JPTO").  ECF No. 117.  In that document, the Relators indicated — for the first time — their intention to call a witness from the New York State Department of Health ("DOH").  According to Relators, this witness (who remained unnamed) would

---

has been admitted to adult day health care program based on an authorized practitioner's order and the adult day health care program's interdisciplinary comprehensive assessment."  10 N.Y.C.R.R. § 425.1.

provide testimony going to the "materiality" element of a claim under the federal False Claims Act and its New York State analogue. *See Universal Health Srvs. v. United States ex. rel. Escobar*, 136 S. Ct. 1989 (2016) (in False Claims Act cases, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable"). Specifically, the DOH witness would testify that "discriminatory treatment of Medicaid beneficiaries is material to the State's decision to reimburse claims for payment." Relators' Br. at 5, ECF No. 125; *see also* Proposed Joint Pretrial Order, ECF No. 117 (DOH witness would testify to "how racial, religious and ethnic discrimination is viewed by the agency").

After the Defendants objected, I directed the Relators to provide a more detailed summary of the DOH witness's expected testimony, *see* June 9, 2020 Min. Entry, ECF No. 143, and to make efforts to identify the particular witness whom the Relators intended to call, *see* Oct. 13, 2020 Min. Entry, ECF No. 147. Relators ultimately reported, however, that their efforts to secure a DOH witness had been unsuccessful. Dec. 11, 2020 Tr. 10:14-18, ECF No. 209 ([Relators' Counsel]: "I think I should tell you that [the Department of Health's] position is because of COVID and other things, they really can't afford or don't want to have someone come down and testify.").

3

**B.   Department of Health Documents and Summary Damages Chart**

Also in the JPTO, Relators also indicated their intent to call a summary witness named Sanjay Shah.  They advised that Mr. Shah, a certified public accountant, would testify to a damages calculation under Fed. R. Evid. 1006 (Summaries to Prove Content).  In October 2019, in anticipation of this testimony, Relators filed the first iteration of a proposed trial exhibit setting out Mr. Shah's damages calculation under Rule 1006. Relators' Calculation of Damages Br. at 1, ECF No. 124.  This first summary chart, which provided no indication of what records it purported to summarize, showed a grand total of approximately $1.78 million in damages.  Relators' Calculation of Damages Chart, ECF No. 124-1.  This figure apparently represented the total Medicaid billing for non-Russian registrants between 2008 and 2012, the period alleged in the complaint.  *See id.* (cover letter indicating that "[t]here were 13,210 days that minority registrants were discriminated against . . . .").

It emerged later that the Relators' asserted damages derived from two different theories of liability — first, that Defendants discriminated against non-Russian registrants, and second, that Defendants violated what the Relators termed the "medical model" qualifications for Medicaid-funded adult daycare.  After the Court asked, at an April 2, 2020 conference,

which proportion of their asserted damages derived from which theory, the Relators submitted a revised summary chart in May 2020.  That chart not only broke down the damages calculation according to the applicable theory, however; it also substantially expanded the quantum of damages sought.  The May 2020 summary chart showed approximately $2.1 million in billing for minority registrants (under the discrimination theory) and $37.1 million in billing for all registrants (under the "medical model" theory for substandard care).  ECF No. 137-2.  The total billing for minority registrants increased because, it appears, Relators increased the total number of days billed per each non-Russian registrant by over 2,000 days, without explanation.

      To compile the damages summary on the discrimination theory, Mr. Shah had to identify registrants as Russian or non-Russian.  To that end, he relied on documents the Defendants had produced in discovery — namely, Medicaid claims data and registrants' enrollment records.  Relators' March 19, 2020 Br. at 2-3, ECF No. 160.  In these records, some — but not all — of the registrants had self-identified their ethnicities.  The Relators had not, however, received enrollment records for all registrants, apparently because some such records had been water-damaged in the warehouse where the Defendants were storing them.  *Id*.  For registrants for whom Mr. Shah had no enrollment record, he counted registrants with non-Russian "sounding" last

names toward the damages figure. *See* June 8, 2021 Conf. Tr. 46:17-20. Defendants objected to this on the basis that Shah was conducting a "sur-name analysis," which is generally considered to be expert testimony. Defendants' Oct. 22, 2020 Letter, ECF No. 148 3-4.

The Relators informed the Court at a December 2020 conference that they planned to subpoena additional damages-related documents from the DOH. At the time, trial was scheduled for April 19, 2021. Relators described this subpoena as facilitating "efficiency" because it would seek a records-custodian's certification attesting that Defendants' Medicaid-reimbursement claims submissions satisfied the business-records exception under Fed. R. Evid. 803(6). Dec. 11, 2020 Conf. Tr. 11:12-17; *see also* Relators' Mar. 19, 2021 Letter at 2, ECF No. 160. Thus, it was promised, the subpoena would obviate the need for a live DOH records-custodian's testimony.[2]

The actual subpoena issued in March 2021 was not, however, targeted solely at the business-records issue; the Relators also asked for a number of additional categories of documents. In addition to seeking the business-records certification for Defendants' reimbursement claims, Relators

---

[2] The Court declined the Relators' request to "so-order" the subpoena, which is not necessary under Federal Rule of Civil Procedure 45. Feb. 2, 2021 Min. Entry, ECF No. 157. Magistrate Judge Reyes later denied Defendants' motion to quash the subpoena. Order dated Mar. 19, 2021.

sought, first, "enrollment records for any and all registrants"
for the period "December 2008 to the present." Relators' Mar.
19, 2021 Letter at 2, ECF No. 160; Subpoena at 1, ECF No. 153.
Second, Relators sought copies of all of Defendants'
applications for enrollment as a provider in the New York State
Medicaid program. These documents, according to the Relators,
would show Northern certifying its intent to comply with federal
and state antidiscrimination laws; though Defendants had
produced some such applications in discovery, Relators believed
that still others existed. *Id.* at 3. Third, Relators also
requested that the DOH produce "all Claims detail reports for
the period 2009-2017 for any and all registrants and claims made
for reimbursement [f]or payment." *Id.* The time period for the
first and third such requests was substantially greater than the
period of challenged conduct alleged in the operative complaint.
Defendants' Apr. 23, 2021 at 10.

The following month, the DOH produced only the
requested certifications claims data and the Defendants' program
applications in response. DOH advised that it did not collect
or maintain registrants' enrollment records. *See* Relators' Apr.
29, 2021 Br. at 5, ECF No. 167. In addition, despite the
Relators having requested documents through 2017, the DOH
produced documents reflecting Northern's claims data only
through 2014. *Id.* at 3. Relators disclosed these materials,

totaling nearly 50,000 pages, to Defendants the same month (April 2021). Defendants' Supp. Motion *in Limine* at 1, ECF No. 166.

Mr. Shah used the additional claims data to compile a further-revised summary damages chart — his third. This chart, listed on a supplemental JPTO in April but not produced to Defendants and the Court until June 1, 2021, showed approximately $6.5 million in damages for minority registrants and $123.6 million in damages for all registrants — tens of millions of dollars higher than the figures in the April 2020 summary chart. ECF Nos. 163; 174-1. By this new chart, the Relators had effectively increased the scope of the case by several multiples (even before the trebling of damages sought by the complaint). The new amounts represented the total billing for each category of registrants for the given time period, as Mr. Shah assumed (again) that the Department of Health would have paid zero for the registrants in question if they were on notice of the facts alleged by the Relators.

Defendants moved to exclude this third summary chart, and the DOH claims data on which the incremental damages calculations were predicated, because the underlying records had not been produced during discovery and covered a broader time period than the allegations in Relators' complaint. At the June 8 conference, I granted that motion and excluded the DOH

documents, which meant that the Relators would not be permitted to introduce Mr. Shah's third summary damages report.  June 8, 2021 Conf. Tr. 20:3-24.

In addition, to the extent Mr. Shah relied solely on a so-called "last-name" analysis to identify national origin in compiling the damages chart, I granted the Defendants' motion to exclude those incremental calculations from the summary damages exhibit as well.  This decision was predicated on my findings that Mr. Shah, an accountant, lacked the expertise to make such a determination and that he had failed to rely on a scientifically valid methodology.  June 8, 2021 Conf. Tr. 48:3-49:1; *see also* Defendants' Oct. 22, 2020 Br. at 4 (citing *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 476 (E.D. Tex. 2020) (discussing expert's surname analysis and evaluating its reliability)).[3]

Following these rulings, Relators filed a further-revised (fourth) damages chart on June 11 that listed $1.36 million in damages for minority registrants.  ECF No. 183-3. The chart did not include a medical-model damages figure.  At the final pretrial conference, the Defendants agreed to

---

[3] Mr. Shah claimed expertise in discerning Russian surnames because, among other things, he had read "a lot of Russian literature."  *See* Exhibit 1 to Defendants' Oct. 22, 2020 Letter, ECF No. 148.

stipulate to the authenticity of the Medicaid claims data
underlying this chart.  June 14, 2021 Conf. Tr. 14:21-25.

## C.  Leslie Rosen

In April 2021, two months before trial, Relators added
Leslie Rosen to their witness list.  Rosen had worked as a
dietician at Northern until approximately December 2008.  *See*
June 14, 2021 Conf. Tr. 31:24-32:4.  According to Relators,
Rosen would have testified about "the meals served at the
facility."  Second Supp. to Proposed Joint Pretrial Order, ECF
No. 163 at 3.  Defendants moved *in limine* to preclude her
testimony because of the late disclosure.  Defendants' Apr. 23,
2021 at 8, ECF No. 166.

At the June 8 conference, I ruled that Rosen's
testimony would be excluded unless Relators could show a
"substantial justification" under Rule 37(c) for the failure to
name her as a potential witness during discovery.  June 8, 2021
Conf. Tr. 41:23-42:3.  Relators' counsel proffered, in response,
that they (counsel) had only learned of Rosen in or about July
2020 — approximately two years and nine months following the
close of discovery — when one of the Relators found a document
in her possession and sent it to the attorney.  *Id*. at 29:15;
Relators' June 11, 2021 Letter at 3, ECF No. 184.  Relators'
counsel contacted Rosen that same month, and met briefly with
her in early August.  *Id.* at 29:23-30:2.  Relators did not,

however, disclose Ms. Rosen's name to Defendants at that time
under Fed. R. Civ. P. 26(a), nor make any application to re-open
discovery.  Instead, Relators took at least additional nine
months following their initial contact with Rosen to "determine
whether her testimony would be helpful" before making any
disclosure.  *Id.* at 30:13-16.  Relators explained that, because
of the pandemic, they were unable to schedule a second in-person
meeting with Rosen.  *Id.* at 30:16-31:3.

When pressed on the decision not to disclose for so
long, even in "the interests of caution," *id.* at 31:4-5,
Relators' counsel conceded there was no "good explanation" for
the failure.  *Id.* at 31:13-14.  In the end, Relators' counsel
*never* made the Rule 26 disclosure required in civil discovery as
to Ms. Rosen, never made her available to the Defendants in any
fashion, and never sought to reopen discovery — they simply
added her to the proposed pretrial order without comment.

I excluded Rosen's testimony, applying the *Patterson*
factors identified by the Second Circuit for preclusion under
Rule 37(c).  *Id.* at 42:14-21 (citing *Patterson v. Balsamico*, 440
F.3d 104, 117 (2d Cir. 2006)).

## II.  Discussion

### A.  Department of Health Documents

As noted, the Relators sought to introduce two types
of documents that Northern submitted to the New York Department

11

of health: Northern's applications to participate in the
Medicaid program, and Medicaid claims for reimbursement. Not
having sought or obtained the bulk of these documents in
discovery, Relators obtained them shortly before the scheduled
trial through the use of a Rule 45 subpoena.

Rule 45 subpoenas may not, however, be used to
circumvent discovery deadlines. *Wantanabe Realty Corp. v. City
of New York*, 159 Fed. Appx. 235, 240 n.2 (2d Cir. 2005). A
party may not employ Rule 45 to seek documents after the close
of discovery where "the scope of the request is broad and
clearly is designed for discovery, not last-minute trial needs
(such as for originals of documents where copies were produced
in discovery and there is a need for the original at trial)."
*Dodson v. CBS Broad., Inc.*, No. 02-CV-9270, 2005 WL 3177723, at
*2 (S.D.N.Y. Nov. 29, 2005). *Accord, e.g.,* 9 Moore's Federal
Practice, § 45.02 (Matthew Bender 3d ed. 2005) ("Several courts
have concluded that after the discovery deadline a party may not
use a subpoena to obtain materials from third parties that could
have been produced during discovery.") (citing cases); *Playboy
Enter. Int'l Inc. v. OnLine Entm't, Inc.*, No. 00-Civ.-6618, 2003
WL 1567120 at *1-2 (E.D.N.Y. Mar. 13, 2003). This applies to
the discovery of documents from both parties and non-parties.
*E.g., Anderson v. Bungee Int'l Mfg. Corp.*, No. 96-CV-0186, 1999
WL 219904, at *2 (S.D.N.Y. Apr. 14, 1999).

The Relators proffered that the subpoena was directed in part to the sort of "last-minute trial needs" posited by *Dodson*, *supra* — specifically, that some of the documents produced by the DOH were "certified copies" of the 411 pages of claims data that Defendants had produced in discovery.  The Relators ultimately had no need to issue the subpoena for this purpose, however, as the Defendants agreed (shortly before trial) to stipulate that the claims data are business records. June 14, 2021 Conf. Tr. 14:21-25.  In any event, the vast bulk of the subpoenaed records fell well outside the "last-minute trial needs" category.  Beyond the minor certification issue, the subpoena to DOH occasioned the return of almost 50,000 pages of (i) Medicaid claims data, including data falling outside of the period of time at issue in the complaint, and (ii) Defendants' program application forms.

Plaintiff's trial subpoena was thus employed in a manner that was "broad" and "clearly . . . designed for discovery," rather than for a proper purpose under Rule 45. *Dodson*, 2005 WL 3177723, at *2.  Accordingly, I construed the request to admit this previously unproduced evidence as a request to re-open discovery, even though the Relators never actually requested such relief.

A court's Rule 16 scheduling order, which sets discovery deadlines, "shall not be modified except upon a

13

showing of good cause." *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (citing Fed. R. Civ. P. 16(b)).  "As a general rule," therefore, "discovery should only be re-opened for good cause, depending on the diligence of the moving party." *Krawec v. Kiewit Constructors Inc.*, No. 11-CV-0123, 2013 WL 1104414, at *8 (S.D.N.Y. Mar. 1, 2013) (citing *Grochowski*, 318 F.3d at 86).  In addition to the question of cause, district courts look to several factors in determining whether to reopen discovery:

> 1) the imminence of trial; 2) whether the request
> is opposed; 3) whether the moving party foresaw
> the need for additional discovery, in light of
> the discovery deadline set by the court;
> 4) prejudice to the non-moving party; and 5)
> whether further discovery is likely to lead to
> relevant evidence.

*Krawec*, 2013 WL 1104414, at *8; *see also, e.g.*, *Spencer v. Int'l Shoppes, Inc.*, No. 06-CV-2637, 2011 WL 3625582, at *1 (E.D.N.Y. Aug. 16, 2011); *Bakalar v. Vavra,* 851 F.Supp. 2d 489, 493 (S.D.N.Y. 2011).

        Relators did not demonstrate good cause for the failure to seek these documents during discovery, and the above-enumerated factors cut strongly against reopening discovery. First, trial was imminent — merely three months away — when Relators served the DOH with a document subpoena in March 2021. Indeed, the trial would have already concluded by that point, had the COVID-19 pandemic not required its postponement.

Second, Defendants objected.  They moved to quash the subpoena, and later moved *in limine* to preclude the documents. Defendants' Jan. 21, 2021 Letter, ECF No. 154; Defendants' Motion to Quash, ECF No. 159; Defendants' Apr. 23, 2021 Br. at 3-7.

Third, the Relators' need for the documents was utterly foreseeable.  It should go without saying that in a False Claims Act case, records demonstrating (i) the nature of the false statements to the government and (ii) the amount of payment claimed and paid will form the core of the trial evidence.  31 U.S.C. § 3729(a)(1)(A) (False Claims Act establishes liability for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval").  The Relators should have been thinking about how they would obtain and admit this evidence from the moment they filed their case in 2013.  The decision to wait, instead, until March 2021 to employ a trial subpoena — after the initially scheduled trial date had come and gone, and only three months before the rescheduled trial date — is simply unintelligible. *See Lundstedt v. JP Morgan Chase Bank, N.A.*, 853 F. App'x 704, 708 (2d Cir. 2021) ("[T]he district court did not abuse its discretion in declining to reopen discovery for the disclosure of an expert witness because the request came more than a year after the close of discovery, nearly two years after the

deadline for such disclosures, and less than two months prior to trial.*"); Barclay v. New York*, 602 F. App'x 7, 11 (2d Cir. 2015) (affirming decision to deny motion where party moved to re-open discovery "nearly four years" after summary judgment and "less than two months before the scheduled trial date"); *Jackson v. Fed. Exp.*, 766 F.3d 189, 199 (2d Cir. 2014) (district court did not abuse its discretion in refusing to reopen discovery where "[t]he scheduled time for discovery was over, and a fully briefed motion for summary judgment was pending").

In an attempt to explain the delay, Relators argue that they expected to obtain the applications and claims data from the Defendants in discovery, but that expectation went unmet because some of the records were water-damaged in warehouse storage. Relators' March 19, 2021 Br. at 2, ECF No. 160. This response is a red herring: the records that were water-damaged were not the same records as those ultimately obtained by DOH through the trial subpoena. Relators' Apr. 29, 2021 Br. at 5 ("[T]he Defendant does not provide and DOH does not collect registrants' enrollment records").[4]

---

[4] Even if the Relators were seeking documents that had been damaged or destroyed while in the Defendants' care, a trial subpoena would not have been the appropriate vehicle. The "appropriate response to a failure of a party to comply with discovery demands is a timely motion to compel," not a trial subpoena. *See Playboy Enterprises*, 2003 WL 1567120, at *1. Where the documents are in the possession of a third party, a subpoena should be served "during the discovery period." *Id.*

As to the application forms, Relators concede that
they did receive some during discovery.  They offer no reason
why they did not request the remainder from the State sooner.
They could of course have requested these documents from the
State during discovery.  Parties can seek productions from third
parties, including government agencies, during discovery.  *See
e.g.*, *Fan v. United States*, No. 15-CV-4169, 2019 WL 2503995, at
*1 (E.D.N.Y. June 17, 2019.  The Relators also received Medicaid
reimbursement claims from Defendants.  Having received this
material, they would have known precisely what to ask the State
for, had they pursued that avenue in discovery.

Relators' lack of diligence counsels against re-
opening discovery.  "[W]here a plaintiff is aware of the
existence of documents before the close of discovery and issues
discovery requests subsequent to the discovery deadline, the
discovery requests should be denied."  *In re Health Mgmt.*, No.
96-CV-0889, 1999 WL 33594132, at *5 (E.D.N.Y. Sept. 25, 1999)

Fourth, allowing these documents to be introduced at
trial would have been highly prejudicial to Defendants' trial
preparation.  The Defendants had only two months before trial to
review over 50,000 pages of documents.  By April 2021, when
Defendants received the records in question, the opportunity to
question witnesses about the material in depositions had passed.
*Cf. Am. Friends of Yeshivat Ohr Yerushalayim, Inc. v. United*

17

*States*, No. 04-CV-1798, 2009 WL 1617773, at *7 (E.D.N.Y. June 9, 2009) ("If [Plaintiffs] were permitted to rely on the previously undisclosed general ledger and tuition checks, the Court would then be constrained to reopen discovery, which would likely include . . . additional depositions[.]").  The subpoena was also overbroad – returning documents dated through 2014, two years after the damages period alleged in the complaint (2008 to 2012).

The fifth factor — whether further discovery would likely to lead to relevant evidence — is the only one that favored the Relators, even if some of the discovery sought by the Rule 45 subpoena fell outside the time period alleged in the complaint.  All other *Krawec* factors, *supra*, weighed strongly against reopening discovery.

Relators thus improperly deployed a Rule 45 subpoena to obtain evidence that should have been sought and produced in discovery.  Subsequently, they were unable to demonstrate good cause or to satisfy the applicable test for reopening discovery.  For that reason, the Court granted Defendants' motion to preclude the use of the late-emerging DOH documents at trial.

**B.   Leslie Rosen**

Parties must disclose in discovery "the name . . . of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or

defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(i).  This obligation is ongoing.  Rule 26(e) imposes a continuing duty to "supplement or correct [a] disclosure" if a party obtains actual knowledge that one is incorrect or incomplete.  Fed. R. Civ. P. 26(e)(1).

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "The purpose of the rule is to prevent the practice of 'sandbagging' an adversary with new evidence."  *Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000).  When applying Rule 37(c)(1), courts should consider four factors in assessing the admissibility of testimony when a party has violated its disclosure obligations:

> (1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006).  A court "must consider less drastic responses" before ordering

preclusion.  *Outley v. City of N.Y.*, 837 F.2d 587, 591 (2d Cir. 1988).[5]

Relators have proffered no substantial justification for the failure to disclose Ms. Rosen's name in a timely manner. While the Court understands that Rosen was only "identified" after discovery, her name was in Relators' possession all along. *See* Relators' June 11, 2021 Letter at 3.  "Plaintiff's own 'oversight' in failing to identify" the witness to its own counsel "until this late juncture in the case" is not "an acceptable excuse."  *Leong v. 127 Glen Head Inc.*, No. 13-CV-5528, 2016 WL 845325, at *6 (E.D.N.Y. Mar. 2, 2016).

Even after they learned her name, Relators' counsel waited for the better part of a year, *after* contacting her multiple times in July and August 2020.  Counsel conceded that there was no "good explanation" for this protracted failure. June 14, 2021 Conf. Tr. 31:13-14.  The nine-month delay in complying with their disclosure obligations, which remains unexplained, weighs heavily against Relators in its own right — even putting aside the Relators' late discovery of Ms. Rosen's name.  *Gotlin v. Lederman*, No. 04-CV-3736, 2009 WL 2843380, at

---

[5] This analysis turns on different standards from the analysis of the Department of Health documents, described above.  Rule 37(c)(1) and *Patterson* pertain only to "required disclosures" pursuant to Rule 26(a).  These include witnesses that "the disclosing party may use to support its claims or defenses" and documents "that the disclosing party has in its possession, custody, or control . . . ."  Fed. R. Civ. P. 26(a).  The DOH documents were not in Relators' control.

*4 (E.D.N.Y. Sept. 1, 2009) (holding that "attorney neglect or oversight is not an acceptable explanation for failure to disclose" and "weighs very heavily in favor of preclusion"); *see also Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) ("Although the late discovery of [a possible witness] was apparently due to plaintiff's counsel's neglect and not 'bad faith,' bad faith is not required and counsel has offered no adequate explanation for this untimely disclosure.").

Relators also failed to demonstrate the relevance of Rosen's testimony to their case.  Her tenure at Northern ended around the time Gelena Deverman, the Northern employee allegedly responsible for Defendants' false claims, first assumed her position in December 2008.  June 14, 2021 Conf. Tr. 32:1-4 (Rosen "worked until Galina Deverman — when there was a change of stewardship there and Galina Deverman came on").  Relators sought to use Rosen to prove the declining nutritional quality of meals at Northern, but she simply had no working relationship with Northern for almost all of the Relators' damages period. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").  In other words, her testimony would not "go directly to the claims at issue in this litigation[]." *Leong*, 2016 WL 845325, at *6.

And the prejudice suffered by Defendants could have been significant, had Rosen been permitted to testify.  The Relators' failure to disclose prevented the Defendants from deposing the witness and otherwise preparing to rebut her testimony.  *E.g.*, *D'Amico v. Dep't of Child. & Fams.*, No. 16-CV-00655, 2018 WL 650371, at *2 (D. Conn. Jan. 31, 2018) ("Nor is the harm of failing to disclose limited to preventing the other party from deposing the witness; disclosure enables the opposing party to build its theory of the case, to plan its strategies, and to find other evidence to use at trial."); *see also Downey v. Adloox Inc.*, No. 16-CV-1689, 2018 WL 794592, at *2 (S.D.N.Y. Feb. 8, 2018) ("By waiting until two months after the close of fact discovery, Plaintiffs 'essentially sandbagged' Defendants."); *Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste Alientari S.P.A.*, No. 08-CV-2540, 2011 WL 1239867, at *4 (E.D.N.Y. Mar. 30, 2011) (prejudice to plaintiff would have been particularly great because discovery had closed).

Other courts have precluded testimony where, as here, the witness was disclosed shortly before trial.  *Compare Williams v. Bethel Springvale Nurson Home, Inc.*, No. 14-CV-09383, 2018 WL 1662644, at *5 (S.D.N.Y. Apr. 5, 2018) (precluding witness disclosed "a few weeks" before trial); *Rodriguez v. Vill. of Port Chester*, No. 19-CV-04728, 2021 WL 1644226, at *6 (S.D.N.Y. Apr. 26, 2021) (excluding witness where

"trial [was] set to commence in less than a month"), with *Kokoska v. City of Hartford*, No. 12-CV-01111, 2014 WL 4724875, at *5 (D. Conn. Sept. 23, 2014) (no prejudice where defendants disclosed witnesses more than eight months prior to trial).

The possibility of a continuance was limited.  At the time this trial was scheduled, the Court was just beginning to work through a backlog of trials that amassed during the COVID-19 pandemic, and potential dates for a multi-week trial were few and far between.  This case is over eight years old.  Indeed, Relators' ability to secure Rosen's testimony was only enabled by the trial date's several previous COVID-19 related postponements: originally scheduled in August 2020, the trial was moved first to April 2021 and then to June 2021.  Relators should have been trial-ready well before Rosen was disclosed, so the final *Patterson* factor strongly favors preclusion.

At bottom, each of the *Patterson* factors guides the Court to exclude Rosen's testimony.

### III. Conclusion

For the reasons set forth above, Defendants' motions *in limine* to exclude the Relators' recently acquired New York

State Department of Health documents and the testimony of Leslie
Rosen were granted.


        SO ORDERED.


                              __/s Eric Komitee_____
                              ERIC KOMITEE
                              United States District Judge

Dated:     August 16, 2021
           Brooklyn, New York