UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------x

UNITED STATES OF AMERICA and NEW
YORK STATE ex rel. ORLANDO LEE,
MELVILLE LUCKIE and LUZ GONZALEZ,

       Plaintiffs,

              -against-         **MEMORANDUM & ORDER**
                               13—CV—4933(EK)(RER)

NORTHERN METROPOLITAN FOUNDATION FOR
HEALTHCARE, INC., NORTHERN MANOR
MULTICARE CENTER, INC. and NORTHERN
MANOR ADULT DAY HEALTH CARE
PROGRAM,

       Defendants.

--------------------------------x

ERIC KOMITEE, United States District Judge:

       Orlando Lee, Melville Luckie, and Luz Gonzalez (the "Relators") brought this *qui tam* action in 2013 against their former employer, a Medicaid provider called Northern Manor Adult Day Health Care Program, and several affiliated companies (collectively, "Northern" or Defendants). The Relators allege violations of the federal False Claims Act, 31 U.S.C. §§ 3729-3732, and its New York analogue, N.Y. State Fin. Law §§ 187-194. The Court began a bench trial in June of this year. Following the close of the Relators' case-in-chief, Defendants asked the Court to find (among other things) that the Relators had failed to carry their burden of proving the materiality element of their claims, and to enter judgment and dismiss the Relators'

case on that basis.  ECF No. 199.  For the reasons set forth in this Order, the motion is GRANTED.

## I.   Background

Northern operated a so-called "medical model" adult day health care ("ADHC") program in Park Slope, Brooklyn serving elderly, low-income individuals.[1]  To be an ADHC facility, Northern had to apply to, and receive approval from, the New York State Department of Health ("DOH").  10 N.Y.C.R.R. § 425.2. Northern also applied for enrollment in the New York State Medicaid Program, which administers federal Medicaid funding through the DOH and other cooperating agencies.[2]  Once certified by the DOH, Northern was authorized to seek reimbursement for providing day care and health services to qualified "registrants."[3]

---

[1] An adult day care operating under New York State's "medical model" — as opposed to a "social model" — offers health care in addition to social activities.  *See* Second Amended Complaint ¶ 15.

[2] "Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals."  *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990); *see also* 42 U.S.C. § 1396b.  "The federal and state governments share the cost of Medicaid, but each state government administers its own Medicaid plan."  *Shakhnes v. Berlin*, 689 F.3d 244, 247 (2d Cir. 2012).

[3] New York regulations define "registrant" as a person: "(1) who is not a resident of a residential health care facility; is functionally impaired and not homebound, and requires supervision, monitoring, preventative, diagnostic, therapeutic, rehabilitative or palliative care or services but does not require continuous 24-hour-a-day inpatient care and services . . . ; (2) whose assessed social and health care needs can satisfactorily be met in whole or in part by the delivery of appropriate services in the community setting; and (3) who has been accepted by an adult day health care program based on an authorized practitioner's order . . . and a comprehensive

This case commenced in September 2013. In August 2014, the New York State Attorney General ("NYAG") revealed a "long-term" investigation into misconduct at Northern's Brooklyn facility.  Press Release, Office of the New York Attorney General, A.G. Schneiderman Announces Four Arrests and $6.5 Million Settlement for Medicaid Fraud at Brooklyn Adult Day Health Care Facility (Aug. 12, 2014).  The investigation culminated in a civil settlement with Northern.  *Id.*  Under the settlement agreement, Northern admitted to operating a medical-model program without a qualified social worker on staff between July 2010 and June 2011, and to treating more registrants than it was certified to serve at one time.  *Id.*  Northern agreed to pay $6.5 million to the State and close its facility.  *Id.*  The state and federal governments declined to intervene in this action one month later, on September 8, 2014.  ECF Nos. 9-10.

The Relators allege here that Northern discriminated against its non-Russian registrants on the basis of national origin and provided all its registrants substandard care, in violation of various federal and state statutes.  The Court assumes familiarity with the facts and the long procedural history of this case, which are set forth in prior orders.  *See* ECF Nos. 52; 114; 140-1 (April 26, 2019 Oral Argument Tr.); 218.

---

assessment conducted by the adult day health care program . . . ."
10 N.Y.C.R.R. § 425.1.

In April 2019, the Honorable Margo K. Brodie (to whom this case was previously assigned) granted Defendants' motion for summary judgment in part.  ECF Nos. 109; 114; Min. Order dated April 26, 2019.  The only counts to survive that order were the alleged violations of the federal False Claims Act and its New York State equivalent.[4]

In addition to dismissing several claims, Judge Brodie also limited the theory of liability that the Relators could pursue on their False Claims Act claims.  The Relators had argued three such theories of liability: (1) the "factually false theory," under which a claim is made to the government seeking payment for services that were never actually provided or for which the description of the services provided is incorrect, *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001), abrogated on other grounds by *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016) ("*Escobar*"); (2) the "express false certification theory," for a claim that explicitly "falsely certifies compliance with a particular statute, regulation or contractual term," *id*. at 698; and (3) the "implied false certification theory," where "a defendant makes representations in submitting a claim but omits its

---

[4] The Relators also brought a number of claims based in employment law. Judge Brodie dismissed all of these claims: the Relators' causes of action for retaliation under the federal False Claims Act and its state analogue, and discrimination and retaliation under the New York City Human Rights Law.

violations of statutory, regulatory, or contractual requirements," and those omissions are "material to the Government's payment decision." *Escobar*, 136 S. Ct. at 1996, 1999.

Judge Brodie allowed the Relators to proceed only on the "implied false certification" theory. Apr. 26, 2019 Tr. 11:4-6 (the Court notes that the implied false certification theory "is the only theory that survived the motion to dismiss in this case"). Under that theory, Relators contend that Northern's discrimination and medical-model failures violate the false claims statutes because when Northern sought reimbursement, it "impliedly" (and falsely) certified its compliance with various laws prohibiting such failures. *See* Second Amended Compl. ¶¶ 15-26 (citing 10 N.Y.C.R.R. §§ 425.1, 425.4, 425.5, 425.6, 425.11; 18 N.Y.C.R.R. §§ 492.3, 492.5, 492.6); *id.* ¶ 28 (citing Title VI of the Civil Rights Act and 18 N.Y.C.R.R. § 491.7(d)(1)); *id.* ¶¶ 47-48 (asserting implied-certification theory).

The bench trial commenced on June 21, 2021. After the Relators presented their case-in-chief in its entirety, the Defendants moved for judgment under Federal Rule of Civil Procedure 52(c) (Judgment on Partial Findings), arguing that Relators failed to meet their burden of proof on all required elements of their federal and state causes of action.

I make certain findings of fact and draw certain conclusions of law below in accordance with Rules 52(a) and (c). Given my finding that the Relators failed to prove the materiality element by a preponderance of the evidence, I do not analyze other questions of fact or law in detail.  Instead, I set forth other factual findings (especially regarding Relators' allegations of discrimination) only as necessary for context, and discuss briefly two other ways in which the Relators' trial evidence was (in the alternative) legally insufficient.

## II.  Legal Standard

### A.   Federal Rule of Civil Procedure 52(c)

In a bench trial, the court may enter judgment against a party on a given claim if: (i) the party has been fully heard on an issue; (ii) the court finds against the party on that issue; and (iii) "under the controlling law, [the claim] can be maintained or defeated only with a favorable finding on that issue."  Fed. R. Civ. P. 52(c).  A court considering a Rule 52(c) motion "does not consider the evidence in the light most favorable to the non-moving party, but rather weighs the evidence, resolves any conflicts and determines for itself where the preponderance of evidence lies."  *Pal v. N.Y. Univ.*, No. 06-CV-5892, 2013 WL 4001525, at *7 (S.D.N.Y. Aug. 6, 2013) (internal quotations omitted), *aff'd*, 583 F. App'x 7 (2d Cir. 2014).  The preponderance standard "simply requires the trier of

fact to believe that the existence of a fact is more probable than its nonexistence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997).  "A judgment on partial findings must be supported by findings of fact and conclusions of law."  Fed. R. Civ. P. 52(a)(1), (c).

## B. The Federal and State False Claims Acts

The federal False Claims Act ("FCA") establishes liability for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B).  The State of New York has its own false claims statute, the New York False Claims Act ("NYFCA"), which is modeled on the federal act.[5]  N.Y. State Fin. Law §§ 187-194; *U.S. ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 816 (S.D.N.Y. 2010).  "The NYFCA follows the federal False Claims Act . . . . and therefore it is appropriate to look toward federal law when interpreting the New York act."  *State ex rel. Seiden v. Utica First Ins. Co.*, 96 A.D.3d 67, 71 (1st Dep't 2012).  A court considering claims

---

[5] The elements of a claim under the New York FCA are the same as the elements of a federal FCA claim.  N.Y. State Fin. Law § 189(1)(a), (b) (the NYFCA applies to any person who "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim").

asserted under both statutes can resolve those claims together. *Pervez*, 736 F. Supp. 2d at 816.

A "false or fraudulent" claim under the FCA may be factually false or legally false.  *State v. MedImmune, Inc.*, 342 F. Supp. 3d 544, 553 (S.D.N.Y. 2018); *United States ex rel. Forcier v. Computer Scis. Corp.*, No. 12-CV-1750, 2017 WL 3616665, at *7 (S.D.N.Y. Aug. 10, 2017).  Legal falsity encompasses "express false certification" and "implied false certification," as described above.  In keeping with Judge Brodie's order, the only theory presented at trial was that of "implied false certification."

As noted, the implied false certification theory applies when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements."  *Escobar*, 136 S. Ct. at 1999.  In such circumstances, the omissions can give rise to liability "if they render the defendant's representations misleading with respect to the goods or services provided."  *Id*.  This theory

> can be a basis for [FCA] liability, at least where two
> conditions are satisfied: first, the claim does not
> merely request payment, but also makes specific
> representations about the goods or services provided;
> and second, the defendant's failure to disclose
> noncompliance with statutory, regulatory, or
> contractual requirements makes those representations
> misleading half-truths.

*Id.* at 2001.  The noncompliance must be "material" to the government's payment decision.  *Id.* at 1996.  The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

The FCA also contains a scienter requirement that extends not only to knowledge of the claim's alleged falsity, but also to *knowledge of materiality*: the defendant must have "knowingly violated a requirement that the defendant knows is material to the Government's payment decision."  *Id.* at 1996 (emphasis added).

### III.  Relators' Case-in-Chief: Findings of Fact

As set forth in this section, I find that Northern did discriminate — at various times and in various ways — in the provision of services to Russian and non-Russian registrants.  I am also left to recognize, however, the incontrovertible fact that the Relators introduced essentially no evidence whatsoever in satisfaction of the materiality element.  Given that the failure of proof on materiality precludes a verdict in the Relators' favor, I do not need to make comprehensive findings of fact on every other disputed issue.  *See* Fed. R. Civ. P. 52(c). Generally speaking, I consider only facts established by

admissible evidence.  *See e.g.*, *Beck Chevrolet Co. v. Gen. Motors LLC*, 787 F.3d 663, 679 (2d Cir. 2015).

Northern operated an adult day health care center in Brooklyn.  The registrants were predominately Russian, Tr. 33:17-19, as was the staff, though Northern also recruited and served people of other nationalities.  *E.g.*, Tr. 33:12-16; 35:12-14.  Northern provided health and recreational services, including transportation to and from the facility (through independent contractors); meals; nursing services; arts and crafts; physical and occupational therapy; and trips to museums and restaurants.  Tr. 84:20-22; 128:2-5; 156:12-19; 179:15-17; 180:4-6; 181:5-6; 218:11-17.

The Relators, all three of whom testified at trial, are former Northern employees.  Orlando Lee's role was to market Northern's services to senior citizens.  Tr. 29:18-25.  Lee recruited Black, Hispanic, and Chinese individuals to Northern. Tr. 33:12-16; 88:2-3.  Melville Lucky and Luiz Gonzalez served as Certified Nursing Assistants ("CNAs") at Northern, though Gonzalez was later promoted to a position in the "recreation" department.  Tr. 152:22-23; 259:2-6.

Gelena Deverman served as the Director of the facility during the time period alleged in the complaint (2008 to 2012). *See, e.g.*, Tr. 155:10-16.  Relators did not call Deverman, or any other member of Northern's leadership team, to testify.  The

Relators also opted not to call any registrant, despite having
listed over forty registrants as witnesses in the Joint Pre-
Trial Order.  ECF No. 117.  In addition, although the JPTO had
indicated the Relators' intent to call a witness from the New
York State Department of Health, the Relators later indicated
that they were unable to secure such a witness.  Dec. 11, 2020
Tr. 10:14-18, ECF No. 209 (Relators' Counsel: "I think I should
tell you that [the Department of Health's] position is because
of COVID and other things, that they really can't afford or
don't want to have someone come down and testify.").[6]

## A. Evidence of Discrimination

        Given that the Relators have argued that the
discrimination in this case is *per-se* material — that is,
material as a matter of law, without the need to introduce
evidence of the type that *Escobar* and other cases call for on
materiality — it is worth setting out a somewhat more detailed
summary of the discrimination evidence introduced.

        In their trial testimony, the Relators spoke to
several disparities in the way Northern treated Russian and non-
Russian registrants.  All three Relators, for example, testified
that the registrants at Northern were typically (though not

---

        [6] The Relators' inability to produce a witness from the New York DOH
came as the culmination of a long series of discovery failures, some of which
were detailed in the Court's Memorandum and Order of August 16, 2021.  ECF
No. 218.

always) segregated by nationality — Russian registrants in a
front room, and non-Russian registrants in a room at the back of
the facility that was separated by a "long passageway." Tr.
38:6-13. Some registrants self-segregated, Tr. 182:6-11, but
there were instances in which staff members aggravated the
separation. Relator Gonzalez testified about an incident in
which a social worker named Yulia Kusyuk, sitting at a table in
the "main room" with both Russian-speaking and Hispanic
residents, "scream[ed]" at the Hispanic registrants. Tr.
227:12-228:8. The social worker had been speaking Russian to
the Russian registrants and became angry at the Hispanic
registrants for talking amongst themselves at the same time.
*Id.* She started "screaming" and "knocking on the table," and
"said to move those people from there because those people were
so noisy." *Id.*

The Relators' testimony also established that Russian
registrants had preferential access to certain resources and
opportunities. For example, Northern subscribed to a Russian-
language newspaper delivery, Tr. 243:23-25, but Spanish- and
Cantonese-language newspapers were not consistently available:
Northern subscribed to a Spanish newspaper only briefly, and
made Chinese-language newspapers available only when Lee
purchased them (with Northern providing reimbursement). Tr.
141:2-11 (Lee would pick up Chinese language newspapers and

snacks in the morning; Northern reimbursed him after he filled out vouchers); 275:16-21 (Gonzalez testified that it "was only [for] two months, I think," that Northern maintained a subscription to *El Diario*).  Likewise, Russian registrants had access to the "new" sewing machine, while the "old machine," which was "not good," was for the non-Russian registrants.  Tr. 223:17-22; 224:6-10.  Gonzalez complained to Yulia, her direct supervisor "in recreation," about this, but Yulia did "nothing." Tr. 224:15-19.[7]

Relator Lee was hired to recruit non-Russian registrants, but he testified that on two occasions in particular, he was discouraged from doing so too assertively. As discussed below, however, this testimony was ambiguous and vigorously contested.

On direct examination, Lee stated that his duties included "marketing in the Hispanic, in the bilingual market." Tr. 32:21-23.  He attended "health fairs" and presentations at "senior buildings," handing out "advertisement flyers" and "tchotchkes" like pill cases to recruit Hispanic and African-American registrants.  Tr. 32:23-33:11.  The "census" — *i.e.*, the number of daily registrants in attendance — "was low" when Lee began at Northern, "below a hundred, and they wanted to

---

[7] Non-Russian registrants were provided certain activities that Russian registrants were not.  For example, Chinese-speaking registrants played mah-jong.  Tr. 140:15-21.

raise it."  Tr. 35:23-36:3.  But one day, when Lee brought in a large number of new, Spanish-speaking residents at once, a nurse doing the "enrollment" paperwork got "very upset" and was "very nasty" to Lee; she said that he "shouldn't bring any Hispanics." Tr. 101:10-18; *see also* Tr. 102:15-16 (testifying that the nurse stated: "You shouldn't bring this many Hispanics.  We have enough already of them here").

The import of this testimony, however, was constrained by a number of factors.  First, Lee acknowledged — even in his direct testimony — that the nurse was upset with him largely because of the bottleneck in workload created when he arrived with so many new registrants at once (irrespective of their ethnicity).  Lee testified that the nurse in question (and the entire nursing department) were

> very upset that I brought about seven or eight Hispanics; and they had to do all the assessments, all the paperwork, and do all the enrollment.  It takes a while to do each one.  So they never had that many all in one shot to sign up and enroll . . . .
>
> And she said basically they were upset of all the work that they had to do.  They had a lot of examinations to do, they had the blood, you know, not just the blood pressure but they had a whole assessment, medical assessment to do . . . .
>
> So in order to be enrolled and also for the state department or Medicare department, you have to have these assessments.  They weren't just going to the doctor and spending five minutes and, oh, let me check your blood pressure.  So they had a lot of information to fill out, and those records

> are there not just for those Hispanics but for
> any person that would join any medical adult day
> care center.

Tr. 101:11-18; 102:18-103:4.

Second, Lee's testimony about this incident was vague.
He could not remember, for example, the name of the nurse who
had the alleged outburst.  Tr. 101:6-8 (Lee testified that "off
the tip of my head, no," he could not recall the nurse's name);
Tr. 101:23-102:2 (asked by Relators' counsel "what ethnicity"
the nurse was, Lee replied that "she was from a part of
Russia . . . [where] they spoke Russian, but they were also
Muslims, you know, Muslim religion").

Third, Lee's testimony on this subject was in tension
with his acknowledgment that he was hired to increase the
enrollment of Hispanic registrants.  Tr. 29:22-25 (Lee was hired
at Northern after responding to a job posting indicating that
"they needed a bilingual representative, marketing
representative"); 33:12-16 ("In the beginning," Lee marketed
Northern to "mostly Hispanic and also black" people.).
Notwithstanding Lee's testimony about the nurse's outburst (and
certain testimony described below), there was no evidence
introduced that it was Northern's policy to restrict Hispanic or
other non-Russian enrollment, and there was substantial evidence
(including Lee's own testimony) that he was charged with
increasing enrollment from various non-Russian populations.  For

15

these reasons, Lee's testimony failed to establish that the institutional defendants directed him not to recruit Hispanic registrants.

Lee also recruited Chinese registrants to Northern. He testified that the head of the recreation department, who was Russian, told him that Northern "would not be able to have any Asian people" because "Russian people don't like that" and "we don't want it." Tr. 86:21-87:2.  Deverman, however, did not object to Lee's effort to recruit Asian registrants. *See* Tr. 88:2-18.  Lee did testify that Deverman told him to sign up Chinese registrants only for Sunday sessions, *id.*, and this limitation meant that Asian registrants could not attend "excursions" to museums and restaurants because those excursions did not occur on Sundays.  Tr. 85:11-19.  (The only Sunday excursions were visits to Prospect Park, which was across the street from Northern's facility.  Tr. 135:8-18.)

Again, however, Lee gave conflicting testimony on the motivation for the Sundays-only limitation.  He acknowledged on cross-examination that Northern had Cantonese-speaking nursing assistants in attendance on Sundays only.  Tr. 124:18-125:15.  Lee also acknowledged that Deverman pushed to recruit Sunday-only registrants because, she said, Sunday was "the slowest day of the week in terms of [the] census" so "that would be a good

day for them to start," and then "expand it to other days."  Tr. 88:6-18.

Relator Luckie testified that non-Russians were excluded from physical therapy at Northern, but he was unable to support this assertion with testimony predicated on his personal knowledge.  Luckie had to go past the physical therapy room to get to the bathroom, and would "see" only Russian individuals in attendance.  Tr. 180:14-17; 185:10-186:2.  But Luckie did not work in the therapy department, and he did not know whether any non-Russian registrant had the required doctor's prescription for therapy but did not receive it.  Tr. 204:13-19.  In the end, his testimony was based on his anecdotal observations, made in passing, and I cannot find from it that Northern excluded non-Russian registrants from physical therapy.

Finally, Lee testified that the bus company with which Northern contracted provided sub-standard service to non-Russian registrants.  Tr. 55:11-19; 112:1-7.  Lee testified that on a number of occasions, the bus company failed to pick up or drive home a Hispanic or Black registrant.  *See* Tr. 55-62.  There were two instances in which Lee had to drive a registrant home because the bus did not.  Tr. 59:24-60:25; 62:6-23.  He alerted management, including Deverman, of the transportation issues.  Tr. 51:1-4; 53:9-16; 55:18-25.  Lee did not know, however, if the Russian registrants had similar transportation problems.

17

Tr. 116:10-17.[8]  This testimony, again, was anecdotal in nature
and devoid of any personal observation of discriminatory
behavior or evidence of discriminatory animus.  Thus I do not
find that Northern caused, or knowingly permitted,
discriminatory treatment of registrants by its busing
contractor.

**B. Evidence of "Medical Model" Shortcomings**

        The Relators also testified to certain shortcomings in
the standard of care provided to registrants after Deverman
arrived.  According to Relator Luckie, the healthfulness of the
food declined.  Before Deverman's arrival, Northern had prepared
food on premises for the registrants, who had the option of
choosing between a variety of dishes and could order soft or
low-sodium food if medically necessary.  Tr. 155:21—156:1;
256:23-257:13.  When Deverman became Director, however, Northern
began to order food in "bulk" from a Russian restaurant called
Euphoria.  Tr. 160:7-11.  Registrants no longer had the option
to choose their entrees.  Tr. 155:21-156:1; 160:12-14.  At
times, they were served "double" portions.  Tr. 155:1-9.  The
outgoing dietician at Northern, Leslie Rosen, told Luckie that

---

[8] Much of Lee's testimony on this subject, and the context surrounding
it, was rank hearsay.  He testified to what registrants had told him about
their experiences on the bus, but acknowledged that he was never on the bus
himself.  Tr. 79:15-17 (Lee testified that he "wasn't allowed to ride the
buses at all").

"elderly people were not supposed to have [this] amount of food."  Tr. 154:3-155:9.

The Relators also testified to certain improper food-handling practices.  Employees serving the registrants "had no training in food handling" according to Relator Luckie, though he did not explain the basis for this assertion.  Tr. 161:18-21. They handled food and kitchenware without gloves for a time, though at some point rubber gloves were provided.  Tr. 161:18-23; 162:9-10.  Northern did not have enough hairnets at one point, but more were later supplied.  Tr. 162:16-25; 210:12-14.

There were also some shortcomings in the level of supervision that Northern provided to the registrants. Registrants would drink alcohol on premises.  Tr. 215:12-17 (Northern maintenance person told Gonzales he found alcoholic beverages in the trash, and Gonzalez reported this to the head nurse).  Registrants would occasionally leave Northern and "go out on the road" or to the park alone and without permission. Tr. 186:8-17.

## C. Evidence of Materiality

As noted above, the leading Supreme Court case on the elements of the False Claims Act is *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016).  In remanding "for further proceedings consistent with" the Court's opinion, *Escobar* directed the lower courts' attention to

specific varieties of evidence that would be probative of an implied false certification's materiality:  namely, (a) whether the government "expressly identified" a statutory, regulatory, or contractual requirement as a "condition of payment"; (b) the government's response to the noncompliance at issue in the "mine run" of prior cases involving similar allegations; and (c) whether the "noncompliance" at issue "is minor or insubstantial."  *Id.* at 2002-04.  The Second Circuit considered these same factors in *Strock*.  982 F.3d at 62-65.

Relators introduced no evidence whatsoever on these factors, despite this Court's several inquiries on the subject in the lead-up to trial.  As discussed in greater detail below, they presented no evidence that Northern certified compliance with any anti-discrimination statute or any adult day care regulation.  They called no government witness to discuss what the government had done in the past, or would have done in this case, in light of noncompliance of this variety.  And they presented no evidence or testimony about whether the noncompliance here went to the essence of the Department of Health's bargain.

## D. **Evidence of Scienter and Specific Representations**

Apart from the absence of evidence concerning materiality, Relators also offered virtually no evidence that Defendants "knowingly" failed to disclose noncompliance with a

statutory, regulatory, or contractual requirement, *see Escobar*, 136 S. Ct. at 1995, let alone that Defendants knew that this omission would be material to DOH's payment decision. *Id*. at 1996. They called no Northern employee responsible for submitting claims to Medicaid. No Relator claimed to have been responsible for submitting Medicaid reimbursement claims, and no Relator testified about the knowledge of any employee who was (or any other Northern employee).

The Relators also had to demonstrate that Northern submitted claims to Medicaid that made "*specific* representations about the . . . services provided." *Id*. at 2001. Again, there was a glaring absence of testimony and other proof on this subject. The only document Relators moved into evidence on this element was a 411-page spreadsheet of Medicaid "claims data," ECF No. 178-1, as discussed below. They introduced no actual Medicaid claim into evidence. *See* Tr. 355:19-24.

## IV.  Application of Law to the Evidence

**A. Materiality**

As set forth above, the implied certification theory applies when "the defendant knowingly violate[s] a requirement that the defendant knows is *material* to the Government's payment decision." *Escobar*, 136 S. Ct. at 1996 (emphasis added). The materiality standard "looks to the effect on the likely or actual behavior of the recipient of the alleged

misrepresentation," — here, the DOH — "rather than superficial designations." *Strock*, 982 F.3d at 59 (quoting *Escobar*, 136 S. Ct. at 2002). The Supreme Court set a high bar on materiality in *Escobar*, holding that the "materiality standard is demanding." 136 S. Ct. at 2003. "[S]trict enforcement of the Act's materiality" requirement ensures that the FCA cannot be used to subject a defendant to "open-ended liability" or to deprive it of "fair notice" of the conditions for liability. *Id.* at 2002.

In the end, the Supreme Court counseled, "[t]he False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003 (internal quotations and citation omitted).[9]

The Court directed in *Escobar* that the materiality inquiry should focus on three factors in particular. These factors are: (a) whether the government "expressly identified" a statutory, regulatory, or contractual requirement as a

_____

[9] If the FCA is not an "all-purpose antifraud statute" despite having been "aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War," *see United States v. Bornstein*, 423 U.S. 303, 309 (1976), then it surely is not an all-purpose antidiscrimination statute either. This is a function of the same limits that *Escobar* set and that guide this decision. As one commentator who urged the use of the FCA as an antidiscrimination tool acknowledged, even before *Escobar*: "The element of materiality has the potential to create significant problems for an antidiscrimination FCA relator." Ralph Mayrell, Note, *Blowing the Whistle on Civil Rights: Analyzing the False Claims Act as an Alternative Enforcement Method for Civil Rights Laws*, 91 TEXAS L. REV. 449 (2012).

"condition of payment"; (b) the government's response to the noncompliance at issue in the "mine run" of prior cases involving similar allegations; and (c) whether the "noncompliance" at issue "is minor or insubstantial."  *Id.* at 2002-04.  I apply the law of materiality (primarily guided by *Escobar*) to each of these materiality factors in turn.

    1. <u>Discrimination Evidence — Application of the *Escobar* Factors</u>

Relators did not prove that the Defendants materially misled the federal and state governments by omitting mention of the asserted violations of anti-discrimination statutes when submitting claims for Medicaid payment.

    a. Express Condition of Payment

The first materiality factor under *Escobar* is whether the government "expressly identified" a statutory, regulatory, or contractual requirement as a "condition of payment." *Escobar*, 136 S. Ct. at 2003.  This factor is important but not necessarily dispositive.  "[E]ven when a requirement is expressly designated a condition of payment," "not every violation of such a requirement gives rise to liability." *Id.* at 1996; *see also id.* at 2001 (even when an obligation is an express condition of payment, a violation of that obligation is not "automatically material"). *Escobar* noted, by way of example, that if the government required a provider to "aver

their compliance with the entire U.S. Code and Code of Federal Regulations," it would not follow that "failing to mention noncompliance with any [one] of those requirements would always be material." *Id.* at 2004.  That would be an "extraordinarily," and impermissibly, "expansive view of liability." *Id.*

With respect to this first factor, Relators failed to establish that the anti-discrimination provisions were an "express" condition of payment.  Relators introduced no evidence that Defendants certified compliance with any anti-discrimination statute, despite having alluded to documents containing such certifications before trial.[10]  Prior to trial, the Relators invoked the New York State *form* of "Certification Statement" for Medicaid Providers, for example.  The Court could take judicial notice of that document, which is available online (even though the Relators did not ask me to do so).[11]  The form, as it appears on the web, currently requires health providers to "compl[y] with the Federal Civil Rights Act of 1964 and with

---

[10] Relators attempted to obtain additional copies of Defendants' applications for enrollment as a provider in the New York State Medicaid program through a Rule 45 subpoena.  Relators' Mar. 19, 2021 Letter at 3, ECF No. 160; Subpoena at 1, ECF No. 153.  The Court granted the Defendants' motion *in limine* to exclude those documents, however, in part because discovery had closed more than three years earlier and the Relators violated provisions of the Federal Rules of Civil Procedure in their effort to introduce them.  Aug. 16, 2021 Order, ECF No. 218.

[11] eMedNY/Medicaid Management Information System, Certification Statement for Provider Billing Medicaid, https://www.emedny.org/info/ProviderEnrollment/ProviderMaintForms/490501_ETIN _CERT_Certification_Statement_Cert_Instructions_for_Existing_ETINs.pdf (last visited Aug. 20, 2021).

section 504 of the Federal Rehabilitation Act of 1973, as amended, which forbid discrimination on the basis of race, color, national origin, handicap, age, sex and religion."  But Relators have submitted no evidence that those certifications were contained in the Certification Statement (or anywhere else in the provider agreement) when Northern submitted its application to the DOH before beginning operations in the Brooklyn facility.

As an aside, I note that even if the Relators had managed to introduce Northern's program applications to Medicaid, and even if those had shown Northern certifying that it would comply with the non-discrimination statutes at issue, that may not necessarily have established that the New York DOH regards such compliance as a condition of payment.  In *United States ex rel. Jackson v. DePaul Health Sys.*, 454 F. Supp. 3d 481, 501 (E.D. Pa. 2020), for example, the court differentiated a "prerequisite" for participation in a program from a condition of payment: "It is true that '[a] certificate of compliance with federal health care law is a prerequisite to eligibility under the Medicare program.'  But Jackson has not provided any evidence that compliance with the federal standard of care or state regulations is a condition of payment . . . ."  *Id.* (quoting *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d

235, 243 (3d Cir. 2004)).  That distinction applies here as well.

   b. DOH Responses to Similar Misrepresentations

      The second factor concerns the "government's response" to the noncompliance at issue.  *Strock*, 982 F.3d at 62.  "*Escobar* directs examination of the government's reaction to noncompliance both 'in the mine run of cases,' as well as in the 'particular' case at issue."  *Id.* (quoting *Escobar*, 136 S. Ct. at 2003).  Finders of fact should look to the presence or absence of "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement."  *Escobar*, 136 S. Ct. at 2003.

      Of particular importance to the materiality analysis are what *Strock* called "mid-contract refusals to pay" — meaning documented instances in which the agency in question, having learned that the claimant is in violation of a statute or regulation, refuses *ab initio* to pay a claim for reimbursement.  *Strock*, 982 F.3d at 63-64.  These mid-contract refusals are more probative than "post hoc enforcement," *Strock* held, because the government could potentially game the latter option in a belated

effort to "engage in . . . materiality manufacturing." *Id*. at 63.

Critically, the Relators adduced no evidence in this case — literally none whatsoever — as to what action the New York Department of Health has taken or would take upon learning that a provider was discriminating against registrants in the manner outlined above.  Relators called no DOH witness and cited no past payment- or enforcement-related action.  (As noted above, Relators had initially indicated their intent to call a witness from the New York State DOH, but the agency reportedly indicated that they "can't afford to or don't want to" send someone.  Dec. 11, 2020 Tr. 10:14-18, ECF No. 209.)  There was thus no evidence from which to assess the government's response to "the mine run of cases" involving such discrimination. *Escobar*, 136 S. Ct. at 2003.

The Second Circuit, applying *Escobar* in 2020, broke that "mine run of cases" into two sub-categories: cases in which the agency acts *during* the life of the reimbursement relationship at issue, and cases in which the government acts after the fact. *Strock*, 982 F.3d at 63-64.  In *Strock*, the United States government brought suit under the False Claims Act to recover money paid to a contractor under federal programs designed to benefit injured veterans.  The defendant there had received millions of dollars in government contracts that were

reserved for "service-disabled veteran-owned small businesses,"
or "SDVOSBs"; but the government alleged that the defendant's
"SDVOSB status was a sham." *Id.* at 57.  The defendant argued
that the alleged misrepresentation — that the defendant
qualified as an SDVOSB — was immaterial.  The district court
granted a motion to dismiss the complaint for failure to
adequately allege materiality, but the Second Circuit reversed.

The Court of Appeals focused first on actions taken
during the contracting and payment process: namely, "the
numerous steps the government takes to ensure an applicant is
[actually an SDVOSB] before awarding a contract."  *Id.* at 64.
The Court also noted that the government invoked the actual
names of "multiple contracting officers or specialists who
allegedly would not have awarded contracts" to the defendant
"had they been aware" that it was not an SDVOSB.  *Id.*  These
allegations gave rise to a "reasonable inference" that the
government generally does "not award contracts to companies that
it knows" are not SDVSOBs, which "suggest[ed]" that the
misrepresentations at issue were material.  *Id.*

The Court of Appeals was less impressed, however, with
the government's allegation that it "regularly prosecuted"
entities that "fraudulently obtain SDVOSB set-aside contracts."
*Id.* at 63.  Citing *Escobar*, the Court opined that after-the-fact
enforcement was "at best only neutral with regard to a finding

of materiality," *id.* at 64, because "[a]llowing the government to rely on post hoc enforcement efforts to satisfy the materiality requirement would allow the government to engage in . . . materiality manufacturing, and at relatively low cost." *Id.* at 63.  This low cost contrasted with the higher costs the government incurs via "mid-contract refusals to pay," which can put a project or service at risk of delay.  *Id.*

The care with which the Circuit parsed the *Strock* allegations concerning agencies' responses to similar misrepresentations is obviously instructive; it shows the critical importance of such evidence to the materiality determination.  Here, the Relators simply provided no evidence in either category — neither mid-contract refusals to pay, nor post-hoc enforcement of any kind.  Their witnesses said nothing about the Department of Health's standards or process for reviewing applications or claims.  Relators were unable to point to a single case in which a government agency engaged in post-hoc enforcement against a Medicare or Medicaid provider for discrimination in violation of federal or state civil rights laws.  Trial Tr. 400:14-25.  And they produced no evidence showing that a federal or New York State agency ever refused to pay (in whole or in part), or ever attempted to claw money back from, a Medicare or Medicaid provider on that basis.  The Relators simply stated — before and during trial — that such

29

testimony was not necessary.  *See, e.g.*, June 14, 2021
Conference Tr. 51:2-5, ECF No. 191 (Relators' Counsel: "I don't
think we need an expert to say this is discriminatory behavior
that the government should not pay for.").

        In support of their materiality argument, the Relators
did point to one enforcement action — namely, the 2014
settlement between the New York Attorney General's Office and
Northern itself.  But (i) they did not introduce the settlement
agreement at trial (rather, they ask me to take judicial notice
of it now); and (ii) that action did not involve allegations of
discrimination (instead, it covered allegations that Northern
operated without a qualified social worker and, on certain days,
exceeded the maximum number of authorized registrants on site).

        As an example of prior enforcement, however, the 2014
settlement actually hurts the Relators' case (if anything) more
than it helps because its timing suggests that New York State
was on notice of the Relators' claims and made no change in its
reimbursement of Northern as a result.  The Relators initiated
this action on September 4, 2013, on behalf of the United States
and the State of New York.  Where a private person initiates a
*qui tam* case, the FCA requires that "[a] copy of the complaint
and written disclosure of substantially all material evidence
and information the person possesses shall be served on the
Government" pursuant to Rule 4 of the Federal Rules of Civil

Procedure — meaning within ninety days.  31 U.S.C. § 3730(b)(2).
The New York State FCA follows substantially similar procedures.
N.Y. State Fin. Law § 190(2)(b).  The federal and state
governments were thus on notice of this action by December 2013
at the latest.

There is no indication, however, that the DOH stopped
making Medicaid payments to Northern.  Indeed, the Relators
attempted to offer into evidence Medicaid claims data through
December 2014 — a full year later.  *See* Revised JPTO, ECF No.
193-1 (describing Relators' proposed Exhibit 63 as "[t]humb
drives of all Medicaid Claims made by Defendants for all
registrants from 12/1/2008 to 12/31/2014").[12]  "[C]ontinued
payment by the federal government after it learns of the alleged
fraud substantially increases the burden on the relator in
establishing materiality."  *United States ex rel. Harman v.
Trinity Indus.*, 872 F.3d 645, 663 (5th Cir. 2017).  The Relators
had not carried their burden even before this potentially
substantial increase in it, *see id.*, and they do not help their
case by invoking the 2014 settlement.

Other cases also support the notion that materiality
should not be presumed, absent evidence of a government agency's
specific response to similar misrepresentations.  In *Ruckh v.*

_____

[12] I excluded this evidence because it post-dated the complaint's
damages period.  Aug. 16, 2021 Order at 13, 18.

*Salus Rehabilitation, LLC*, for example, the court of appeals
held that materiality had not been established, relying in part
on the following failure of proof:

> The relator testified that when she informed her
> direct supervisors at La Vie Management that her
> patient files lacked care plans, they self-reported
> the deficiencies to the state.  There was no evidence,
> however, that the state refused reimbursement or
> sought recoupment after this self-reporting.  And
> there was no evidence that the state ever declines
> payment for, or otherwise enforces, these types of
> violations.

963 F.3d 1089, 1109 (11th Cir. 2020); *see also Jackson*, 454 F.
Supp. 3d at 501 and n.31 (granting partial summary judgment
where the relator had not "provided any evidence that the
government has declined payment for failure to comply with these
regulations," among other failures of proof).

    For the foregoing reasons, this factor cuts heavily
against a finding of materiality.

    c. The "Essence" of the Bargain

    Escobar's third materiality factor requires a court to
consider whether the "noncompliance is minor or insubstantial."
*Escobar*, 136 S. Ct. at 2003.  Courts ask whether the requirement
rests at the "very heart" of the statutory or regulatory regime
and thus "noncompliance deprived the government of the intended
benefits" of the contract.  *Strock*, 982 F.3d at 65 (internal
quotations omitted).  In other words, the question is whether
the breach struck at "the very essence of the [government's]

32

bargain" with the defendant.  *Escobar*, 136 S. Ct. at 2003 n.5

(quoting *Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400

(1931)).[13]  *Escobar* and subsequent cases teach that this factor

turns on whether the alleged failings go to the "very essence"

of the bargain between the government agency and the payee.  *Id*.

at 2003–04 and n.5.[14]

Relators introduced no evidence at trial on this third

factor.  Despite that failure of proof, this is still the

materiality factor on which the Relators fare best: given this

country's history, there is no doubt that anti-discrimination

law is at the bedrock of modern American legal doctrine, and the

Court of course recognizes that body of law and its application

to the provision of government services.  But Northern's status

as a Medicaid provider was, at its core, about providing adult

---

[13] Relators asked the Court before and during trial to apply a "reasonable man" standard in evaluating materiality, and simply assess whether a reasonable person would view the discrimination and medical-model failures here as material in the abstract.  *See, e.g.*, Tr. 407:16-25; Relators' Opp. Br. at 8-9, ECF No. 201.  This approach is at odds with *Escobar*'s call for specific varieties of evidence of materiality, 136 S. Ct. at 2003-04, and with the Second Circuit's application of *Escobar* in *Strock*. 982 F.3d at 62-65.

[14] *See also Janssen v. Lawrence Memorial Hosp.*, 949 F.3d 533, 541 (10th Cir. 2020) (considering whether noncompliance went "to the very essence of the bargain or [was] only minor or insubstantial" (internal quotations omitted)); *Ruckh v. Salus Rehab, LLC*, 963 F.3d 1089, 1105 (11th Cir. 2020) (Medicaid-related practice was "material" because it "[went] to the essence of the parties' economic relationship"); *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 831 (6th Cir. 2018) (considering whether the non-compliance was "minor or insubstantial or if it goes to the very essence of the bargain" (internal quotations omitted)); *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 701 (S.D.N.Y. 2018) (considering whether the defendant's misrepresentation "went to the very essence of the bargain" (internal quotations omitted)).

day care and health services to low-income individuals in a day
care setting.  *See, e.g.*, 10 N.Y.C.R.R. § 425.1 ("Adult day
health care is defined as the health care services and
activities provided to a group of registrants with functional
impairments to maintain their health status and enable them to
remain in the community."); 10 N.Y.C.R.R. § 425.5 ("At least the
following program components must be available [in ADHC]: (1)
case management; (2) health education; (3) interdisciplinary
care planning; (4) nursing services; (5) nutrition; (6) social
services; (7) assistance and supervision with the activities of
daily living . . . ; (8) planned therapeutic or recreational
activities . . . ; (9) pharmaceutical services; and (10)
referrals for necessary dental services and sub-specialty
care.").  These supervisory- and health-related services are the
most obvious manifestation of the "essence" of the adult day
health care bargain.  And there is no dispute here that Northern
did provide meals, on-staff nursing professionals, recreational
activities, transportation to and from the facility, and other
services.

$$\ast \qquad \ast \qquad \ast \qquad \ast \qquad \ast$$

Relators submitted a post-trial brief at the Court's
request, setting forth proposed findings of fact and conclusions
of law.  ECF No. 208.  In the fourteen-page section titled
"Materiality," *see id.* at 44-57, the Relators cite *only one*

piece of record evidence from the entire trial — registrants'
enrollment records, which they say "show[] for almost every
minority resident diet restrictions of 'low fat', 'NSA' (no salt
added), [and other diet restrictions] . . . . Despite this,
every resident received the same bulk-delivered Russian cuisine
prepared by Euphoria catering." *Id.* at 53.

This exhibit constitutes evidence of discrimination
and medical-model shortcomings, as noted above. But it is not
evidence of *materiality*, by the standard set by *Escobar* or any
other case. Materiality is an element of an FCA violation in
its own right, and the Relators' proof at trial simply side-
stepped it entirely. To state the obvious, the failure to
adduce sufficient evidence on an essential element — here,
materiality — is fatal to a civil plaintiff's case. *E.g.*,
*Nick's Garage Inc. v. Progressive Casualty Insurance Company*,
875 F.3d 107, 115 (2d Cir. 2017) (noting that in a civil trial,
"the plaintiff bears the burden of proving every essential
element of its claim").

Relators ultimately ask the Court to conclude, as a
matter of law, that the discrimination presented at trial rises
to the level of materiality. *See* Tr. 398:15-18 (Relators'
Counsel: "[W]hat I'm arguing [is] that discrimination is so
fundamental in the law that makes it, as a matter of law,
material."). Relators point to no case, however, that supports

35

this notion of *per se* materiality.[15]   Indeed, *Escobar* explicitly
advises against such sweeping liability.   Even if labeled an
express condition of payment, the violation of a "statutory,
regulatory, and contractual requirement[] [is] not automatically
material."   *Escobar*, 136 S. Ct. at 2001.   "[M]ateriality cannot
rest on 'a single fact or occurrence as always determinative.'"
*Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S.
27, 39 (2011)).   Such a standard would erode the fair notice to
defendants that the Supreme Court took care to protect.[16]

---

[15] The Relators point to statements by Judge Brodie at the summary-
judgment stage of this case in support of their *per-se* theory of materiality.
See Relators' Proposed Findings of Fact and Conclusions of Law at 23.   But
Judge Brodie made clear, contrary to Relators' position, that materiality
would be an issue for the finder of fact.   *See* Nov. 27, 2019 Tr. 28:10-14
("[Y]ou disagree . . . that the fact that Plaintiffs alleged that the
Defendants discriminated against their registrants, you argue that's not
material and Plaintiffs argue that's very material.   *That's the issue the
jury has to decide.*") (emphasis added).   And she explicitly anticipated
(based on Relators' counsel's representations) that the Relators would be
calling a witness from the New York DOH to testify on the subject:

> But as I understand, the purpose for this witness [from the DOH]
> is simply to discuss what, if any, factors they consider in
> determining whether or not to pay a claim, and, in this case
> specifically, whether or not knowing that the employer has
> engaged in conduct that Plaintiffs allege is discriminatory would
> have any effect on the determination of whether or not to pay the
> claim; is that correct?

Nov. 27, 2019 Tr. 27:4-10.   That witness, as noted above, did not testify.

[16] It bears noting that Relators' counsel argued that discrimination is
*per-se* material, but also conceded (in advance of trial) that not *all*
discrimination would qualify as such.   This concession came in response to a
hypothetical from the Court.   I noted that the Relators had alleged that
Northern regularly provided Russian-language newspapers, but provided
newspapers in other languages on a more limited basis.   I then inquired:
assuming *arguendo* that this was the only discriminatory act the Relators
could prove, would that be *per-se* material under *Escobar*?   Relators' counsel
conceded that it would not be:

Relators also invoke *U.S. ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County*, 668 F. Supp. 2d 548 (S.D.N.Y. 2009) ("*Westchester County*"), ostensibly for the proposition that all civil rights violations give rise to False Claims Act liability.  Relators' Proposed Findings of Fact and Conclusions of Law at 24.  That case, however, is unavailing.  *Westchester County* involved a government program whose core purpose was to eradicate housing segregation. *Westchester County*, 668 F. Supp. 2d. at 569.  In order to receive development-related funding from the U.S. Department of Housing and Urban Development, Westchester County certified that it would meet a variety of anti-discrimination metrics.  *Id.* at 551.  The County promised, in particular, to comply with a regulation that required three tasks: "to conduct an analysis of impediments to fair housing choice within the area, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard."  *Id.* (citing 24 C.F.R. § 91.425(a)(1)(i)).  The County, it was

---

The Court: "I posed the hypo before trial of[,] imagine that the only discriminat[ion] that gets proved in this trial is that there [were] Russian language newspapers available for Russian-speaking registrants but not Mandarin or Cantonese or Spanish language newspapers . . . would that necessarily be material? And I think you said no."

Relators' Counsel: "I said no and I'll say no again."

Trial Tr. 410:13-21.

alleged, did not bother to conduct this analysis, but proceeded to seek payment anyway.  *Id.* at 559.  The Court denied defendants' motion for summary judgment.  *Id.* at 565.  Unlike here, however, there was evidence in *Westchester County* of regulatory requirements that were "express" conditions of payment.  *Id.* at 569.  And unlike here, those regulations went incontrovertibly to the absolute essence of the government's bargain, which was about eradicating housing discrimination.  Reliance on the *Westchester County* decision cannot, therefore, revive the Relators' case.

For these reasons, Relators failed to prove by a preponderance of the evidence — or anything close to it — that the discrimination evidence they adduced would have been material to the New York Department of Health's payment decisions in this case.  Simply put, we are left with no indication at all of how the DOH would likely have responded.

2. Medical Model Evidence — Application of the *Escobar* Factors

Relators have also failed to prove that any alleged non-compliance with "medical model" regulations was material. As set forth above, Relators adduced no evidence that the government designated certain statutory, regulatory, or contractual conditions as express preconditions to payment.  And they produced no evidence showing the government's response to

noncompliance with medical-model regulations, to the (limited)
extent proven here, in the "mine run of cases."  While the value
of the medical-model services provided is the essence of the
government's bargain, the violations proved are arguably minor,
making proof of the government's response to such violations in
the past even more essential.[17]  The critical question is not
whether Northern provided any degree of substandard care, but
whether there were "sufficiently widespread deficiencies that
they would likely affect the Government's payment decision."
*United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d

---

[17] If a party bills the government — expressly — for a particular good
or service, and does not provide that good or service, then materiality may
be "plain and obvious" as to that claim — but under the "factually false"
theory of FCA liability, not the implied false certification theory.  *Ruckh*,
963 F.3d at 1105 (materiality was "plain and obvious" where skilled nursing
facilities "indicated," through coding on a claim for payment, that "they had
provided more services — in quantity and quality — than they, in fact,
provided").  But that express claim was not alleged here, and the Relators
did not proceed on the "factually false" theory.

Relators argue that non-Russian registrants were not provided medical
services such as "special diets, physical therapy, occupational therapy, and
health education."  Relators' Opp. to Rule 52(c) Motion at 16 n.3, ECF No.
201.  Even assuming (*arguendo*) that Relators had proved each and every one of
these shortcomings — which they did not — the Relators do not suggest that
the Defendants billed Medicaid expressly for them.  Relators do not suggest,
for example, that Northern submitted claims for reimbursement for particular
physical therapy sessions as a line item.  If they had, that claim would have
proceeded under the factually false theory (which did not survive summary
judgment here).  *See Mikes*, 274 F.3d at 697 (under the "factually false
theory," a claim is made to the government seeking payment for services that
were never actually provided or for which the description of the services
provided is incorrect); *see also* Apr. 26, 2019 Tr. 11:4-6 (The Court: "[T]he
implied certification theory . . . is the only theory that survived the
motion to dismiss in this case.").  By contrast to the "factually false"
context, materiality is key (and cannot be presumed) in the posture of this
case, where Defendants are alleged to have submitted generic claims for "room
and board," Tr. 349:6-8, and Relators contend simply that those claims
"implied" compliance with various statutory and regulatory obligations.
Indeed, this is a primary lesson of *Escobar*.

533, 543 (10th Cir. 2020).  Following trial here, there is no
way of knowing the answer to that question.

For the foregoing reasons, I conclude that the
Relators have failed to carry their burden of proving, by a
preponderance of the evidence, that the evidence they adduced
concerning discrimination and medical-model failures would have
been material — separately or in the aggregate — to the
government's decision to pay any given claim or claims.  Based
on this failure of proof, the Relators' case must be dismissed.

**B. Scienter**

There is another, independent reason for the grant of
Defendants' Rule 52(c) motion.  Relators were obligated to prove
not only that Northern's implied misrepresentations were
material, but *that the Defendants knew they were material* when
making them.

*Escobar*'s scienter requirement for an implied false
certification theory claim explicitly demands knowledge of
materiality.  *Escobar*, 136 S. Ct. at 1996 ("What matters is not
the label the Government attaches to a requirement, but whether
the defendant knowingly violated a requirement that the
defendant knows is material to the Government's payment
decision."); *Id*. at 2001 ("A defendant can have 'actual
knowledge' that a condition is material without the Government
expressly calling it a condition of payment."); *Id*. at 2003

("[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement.").

Escobar goes on to suggest that such knowledge can be proved either by "actual knowledge" or, in the alternative, proof that materiality of the condition violated would be so obvious to a "reasonable person" that "a defendant's failure to appreciate the materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard'" thereof.  Id. at 2001-02.  The Relators here put a great deal of pressure on that sentence, arguing that it establishes a "reasonable person" standard, and that that standard obviates the need for proof that the Defendants knew that the violations at issue were material (or even obviates the need for proof of materiality at all — separate and apart from knowledge thereof).  This is, however, a far more expansive reading of the relevant sentence in Escobar than that single sentence can bear.

The cited sentence simply posits that certain violations go so obviously to the essence of the bargain that a person disclaiming knowledge thereof would necessarily demonstrate "deliberate ignorance."  Escobar posits the example of a military supplier's sale of guns to a government agency.

In that case, *Escobar* says, ignorance of the materiality of the condition that "guns [the government] orders must actually shoot" would require deliberate ignorance. *Id*. *Escobar* was providing guidance to the lower courts on remand, and I read this "reasonable person" sentence simply to say (not controversially) that the relevant knowledge can be proved by deliberate ignorance (what the Second Circuit calls conscious avoidance)[18] as an alternative to actual knowledge. Indeed, this reading emerges from the FCA itself, which defines "knowingly" to reach a person who "has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).

Relators offered no evidence of any kind regarding Defendants' knowledge of materiality to the government's payment decision. *See* Relators' Proposed Findings of Fact and Conclusions of Law 44-57. For this reason, too, the Relators' claims must be dismissed.

---

[18] Sand et al., Modern Federal Jury Instructions, Criminal Instruction 3A.01 (conscious avoidance means a person "deliberately closed his eyes to what would otherwise have been obvious to him" or "acted with . . . a conscious purpose to avoid learning the truth"); *see also United States v. Reyes*, 302 F.3d 48, 54 (2d Cir. 2002) ("The doctrine of conscious avoidance . . . [is] also known as deliberate ignorance or willful blindness[.]).

## C. Specific Representation

Finally, Relators also fell short of establishing that Northern "submit[ted] a claim for payment" to Medicaid that made "specific representations about the . . . services provided." *Escobar*, 136 S. Ct. at 1995; *see also id.* at 2001 ("Accordingly, we hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided . . . .").[19]

In this case, Relators introduced no actual Medicaid claims into evidence.  Instead they proffered a spreadsheet, that Defendants produced in response to a discovery request. Tr. 290:12-13.  Relators' counsel explained that Northern submitted thousands of electronic claims to Medicaid — over 16,000 pages — and this document was "the representation of the electronic claims that [were] submitted."  Tr. 355:24-356:17.  The meaning of only three of the spreadsheet's ten

---

[19] The phrase "at least" in the quoted language does seem to leave open the possibility that other bases for "implied false certification" liability may exist, even without the presence of a specific misrepresentation.  But even if other theories of "implied false certification" theory do exist, they have not been identified as yet by the Supreme Court or Second Circuit.  *Cf. United States ex rel. Schimelpfenig v. Dr. Reddy's Labs. Ltd.*, No. 11-cv-4607, 2017 WL 1133956, at *6 (E.D. Pa. Mar. 27, 2017) ("While it is true that the Supreme Court in *Escobar* left open the question of whether specific representations were always required for an implied false certification, the Third Circuit . . . albeit in a nonprecedential opinion, [has] suggested that an implied false representation "require[s] specific representations.") (cleaned up)).

columns are clear — the registrants' names, the dates of service, and the amounts billed for "room and board." *See* ECF No. 178-1; Tr. 348:16-349:11; 387:19-392:15. There was no testimony about who specifically created this document.

Relators' counsel claimed this chart satisfies the "specific representation" standard, arguing that "the [specific] representations are the compilation of claims made for room and board on certain dates for certain individuals." Tr. 356:14-23; 358:17-18 (Relators' Counsel: "I don't know more specifics than the date, the time of service, [and] the identity of an eligible beneficiary . . . .").

Assuming, *arguendo*, that this spreadsheet could constitute "a claim for payment," it provides little in the way of "specific" information about the services provided. The notation "R&B" (*i.e.*, room and board) is a general designation for ADHCs. Tr. 349:6-8. It includes, for example, "transportation to and from the facility," Tr. 358:8-16, as well as, presumably, the full swath of services an ADHC facility should provide to registrants — some of which Northern did provide, as noted above, and some of which it didn't. In *Escobar*, the reimbursement claims represented "the specific services provided," by including "payment codes that corresponded to specific counseling services" that were not provided, and listing the "specific types of professionals" who

purportedly provided those services (but did not).  *Escobar*, 136 S. Ct. at 1997-98, 2000.  The defendants in *Escobar* thus did "more than merely demand payment."  *Id.* at 2000.

"By contrast, a simple demand for payment," as Relators seem to rely on here, "does not constitute a 'specific representation about the goods and services provided.'"  *United States ex rel. Lisitza v. Par Pharm. Cos., Inc.*, 276 F. Supp. 3d 779, 796 (N.D. Ill. 2017) (quoting *United States v. Sanford Brown, Ltd.*, 840 F. 3d 445, 447 (7th Cir. 2016)).  It is unclear from the "room and board" code which services Northern implicated in their alleged omission(s) such that those services were "misleading half-truths."  *Escobar*, 136 S. Ct. at 2001.  This does not constitute a "specific representation" under *Escobar*.

## V.  Conclusion

Accordingly, for the reasons stated above, the Court concludes that Relators have failed to carry their burden of proof and finds in favor of Defendants.  The Clerk of Court is

respectfully directed to enter judgment for Defendants and to
close this case.


        SO ORDERED.


                              /s Eric Komitee
                              ERIC KOMITEE
                              United States District Judge

Dated:    August 25, 2021
          Brooklyn, New York